Laurence M. Rosen (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL STRADFORD, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CHIPOTLE MEXICAN GRILL, INC., BRIAN NICCOL, and JOHN R. HARTUNG,<br><br>Defendants. | No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>CLASS ACTION</u><br><br>JURY TRIAL DEMANDED |

Plaintiff Michael Stradford ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, public filings, wire and press releases published by and regarding Chipotle Mexican Grill, Inc. ("Chipotle" or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Chipotle common stock between February 8, 2024 and October 29, 2024, inclusive (the "Class Period") and those who purchased Chipotle call options or sold put options during the class period. Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

4.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

5.     In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants (defined below), directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.     Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased Chipotle securities during the Class Period and was economically damaged thereby.

7.     Chipotle "owns and operates Chipotle Mexican Grill restaurants, which feature a relevant menu of burritos, burrito bowls (a burrito without the tortilla), quesadillas, tacos, and salads."

8.     The Company is incorporated in Delaware and its principal place of business is located at 610 Newport Center Drive, Suite 1100, Newport Beach, California. Chipotle's common stock trades on the New York Stock Exchange (the "NYSE") under the ticker symbol "CMG."

9.     Defendant Brian Niccol ("Niccol") was the Company's Chief Executive Officer until August 31, 2024. He also served as the Chairman of the Company's Board of Directors.

10.    Defendant John R. Hartung ("Hartung") serves as the Company's Chief Financial and Administrative Officer.

11.    Defendants Niccol and Hartung are collectively referred to herein as the "Individual Defendants."

12. Each of the Individual Defendants:

(a) directly participated in the management of the Company;

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was privy to confidential proprietary information concerning the Company and its business and operations;

(d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g) approved or ratified these statements in violation of the federal securities laws.

13. The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

14. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Chipotle under *respondeat superior* and agency principles.

15. Defendant Chipotle and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

**Materially False and Misleading Statements Issued During the Class Period**

16. On February 8, 2024, the Company filed with the SEC its annual report on Form 10-K for the period ended December 31, 2023 (the "2023 Annual Report"). Attached to the 2023 Annual Report were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Niccol and Hartung attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

17. The 2023 Annual Report contained the following risk disclosure:

*The restaurant industry is highly competitive. If we are not able to compete successfully, our business, financial condition and results of operations would be adversely affected.*

The restaurant industry is highly competitive with respect to taste preferences, price, food quality and selection, ***customer service, brand reputation***, digital engagement, advertising and promotional initiatives, and the location, attractiveness and maintenance of restaurants. We also compete with non-traditional market participants, such as "convenience meals" in the form of entrées, side dishes or meal preparation kits from the deli or prepared foods sections of grocery stores, meal kit delivery services, and "ghost" or "dark" kitchens, where meals are prepared at separate takeaway premises rather than a restaurant. Increased competition could have an adverse effect on our sales, profitability and development plans. If guest or dietary preferences change, if our marketing efforts are unsuccessful, or if our restaurants are unable to compete successfully with other restaurant outlets, our business could be adversely affected.

We continue to believe that our commitment to higher-quality and responsibly sourced ingredients resonates with guests and gives us a competitive advantage; however, many of our competitors also make claims related to the quality of their ingredients and lack of artificial flavors, colors and preservatives. The increasing use of these claims by competitors, regardless of the accuracy of such claims, may lessen our differentiation and make it more difficult for us to compete. ***If we are unable to continue to maintain our distinctiveness and compete effectively, our business, financial condition and results of operations could be adversely affected***.

(Emphasis added).

18. The statement in ¶ 17 was materially false and misleading because the Company understated how difficult it would be to compete given that the Company provided customers with highly inconsistent (and in the view of some customers, lacking) portion sizes.

19. The 2023 Annual Report contained the following risk disclosure:
***If we do not continue to persuade guests of the benefits of paying higher prices for our higher-quality food, our sales and results of operations could be hurt***.

Our success depends in large part on our ability to persuade guests that food made with ingredients that were raised or grown according to our Food with Integrity principles are worth paying a higher price relative to prices of some of our competitors, particularly quick-service restaurants. Under our Food with Integrity principles, for example, animals must be responsibly raised, and the milk in our sour cream, cheese and queso must come from cows that have not been treated with rBGH, practices which typically are more costly than conventional farming. If we are not able to successfully persuade guests that consuming food made in accordance with our Food with Integrity principles is better for them and the environment, ***or if guests do not agree with the overall value proposition of our menu***, our sales could be adversely affected, which would negatively impact our results of operations.

(Emphasis added).

20. The statement in ¶ 19 was materially false and misleading because the Company understated how difficult it would be to convince customers of the "overall value proposition of its menu" given that the Company provided customers with highly inconsistent (and in the view of some customers, lacking) portion sizes.

21. On April 25, 2024, the Company filed with the SEC its annual report on Form 10-Q for the period ended March 31, 2024 (the "1Q24 Report"). Attached to the 2023 Annual Report were certifications pursuant to SOX signed by

5

Defendants Niccol and Hartung attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

22. The 1Q24 Report incorporated the risk disclosures from the 2023 Annual Report, certain of which were false for the reasons stated in ¶¶ 18 and 20.

23. Over the spring and summer of 2024, Chipotle customers began to air grievances on social media about portion sizes at Chipotle restaurants being inconsistent or lacking.

24. On May 29, 2024, The Washington Post published an article entitled "Chipotle portions haven't shrunk, company says after TikTok backlash." This article stated that there has been "***increasingly vocal online complaints in recent months from diners about the perceived stinginess of the burrito chain's portions***, once thought to be so generous that a crafty ordered could feed themselves for days from a single bowl." (Emphasis added). It then stated the following:

> ***But things took a turn when massively influential food reviewer Keith Lee echoed those laments*** – and added a few dings of his own – in a May 3 TikTok review.
>
> Lee, whose mild-mannered delivery and efforts to avoid getting special treatment have distinguished him from a sea of online food reviewers, wields considerable influence, even beyond his 16.3 million TikTok followers. (It's called the Keith Lee effect, and it's real.)
>
> "I used to love Chipotle," he said at the start of the segment, in which he ordered several menu items. "Lately, Chipotle has not hit the same, in my opinion." Things did not get better from there. ***He struggled to find bits of chicken in his bowl. "See, I don't see no chicken at all***," he said as dug around in disappointment, ultimately giving it a 2 out of 10 rating after locating a few lonely chunks. His formerly favorite steak quesadilla got a 2.5 ("tastes like Steak-umms").

> *What made the criticism sting — and no doubt ring true to viewers — was that Lee was previously known to his followers as an enthusiastic Chipotle* fan. He even collaborated with the brand last year, with Chipotle introducing a special menu item, the "Keithadilla," which was inspired by a custom order that Lee and fellow TikTok celebrity Alexis Frost had popularized in a viral video series.
>
> \*   \*   \*
>
> *Chipotle, the virtual pile-on intensified. Some people called for users to register their displeasure with the company by leaving one-star reviews on its app*. Others took their grievances to their local locations, posting videos of themselves starting an order, but walking out of the restaurant midway if they thought the workers behind the counter were not doling out sufficiently generous scoops.

(Emphasis added).

25. The Washington Post's article pointed out that this consumer frustration with Chipotle was "playing out against a backdrop of customer frustration with rising food costs across the board: at the grocery store, in fast-food drive-throughs and at white-tablecloth restaurants."

26. The Washington Post quoted the Company's chief corporate affairs and food safety officer said that "*[t]here have been no changes in our portion sizes, and we have reinforced proper portioning with our employees*. If we did not deliver on our value, we want our guests to reach out so we can make it right." (Emphasis added).

27. On May 30, 2024, Fortune published an article entitled "Chipotle CEO: our portion sizes aren't getting smaller—but you can get more food with a special look."

28. This Fortune article discussed certain social media posts about Chipotle. In one post, a person stated that "I used to eat Chipotle 2-3x a week. I haven't been in a year. *It's inconsistent, expensive, and the portions are terrible*." (Emphasis added).

29. Another said "[a]t least skimping on chicken/meat may make financial sense to them. ***They are skimping on rice and beans on veggie bowls***. That's crazy." (Emphasis added).

30. In the same Fortune article, Brian Niccol was quoted as saying that "portions have not gotten smaller." He further stated the following:

> ***We always want to give people big portions that get them excited about the food***. If you want to double the amount of meat, you gotta pay for it, but our goal is to get people really excited about what I believe is really delicious food.

(Emphasis added).

31. The statements in ¶¶ 26 and 30 were materially false and misleading when made because portions had in fact gotten smaller in many cases.

32. On July 4, 2024, Fox Business published an article entitled "Wells Fargo analysts 'weigh in' on Chipotle portion sizing after restaurant chain faces backlash online."

33. This article referenced how Chipotle had been facing consumer criticism for decreased portion sizes in items such as burrito bowls. It then discussed how a Wells Fargo analyst started recording data on Chipotle portion sizes to see if the Company did in fact have inconsistent portions.

34. The Wells Fargo analyst ordered "75 like-for-like" burrito bowls across eight locations in New York City, and found that the smallest burrito bowl was 13.8 ounces, and the largest was 26.8 ounces.

35. In response to these findings, Chipotle's chief corporate affairs officer made the following statement to Fox Business:

> Similar to others in the fast casual industry, our completely customizable meals may have variability in their size or weight depending upon the number of ingredients a guest selects or if they choose to make an ingredient extra or light when ordering from our list of real ingredients in-person or

digitally[.] ***There have been no changes in our portion sizes, and we aim to provide a great guest experience every time***.

(Emphasis added).

36. The statement in ¶ 35 was materially false and misleading at the time it was made because portions had in fact gotten smaller in many cases.

37. The statements contained in ¶¶ 17, 19, 26, 30, and 35 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Chipotle's portion sizes were inconsistent and left many customers dissatisfied with the Company's offerings; (2) in order to address the issue and retain customer loyalty, the Company would have to ensure more generous portion sizes, which would increase cost of sales; and (3) as a result, Defendants' statements about its business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## **THE TRUTH BEGINS TO EMERGE**

38. On July 24, 2024, after market hours, Chipotle conducted its Q2 2024 earnings call (the "Q2 Call"). On the Q2 call, Brian Niccol made the following statement, acknowledging that portion inconsistency was an issue at Chipotle, and that it had caused customers to feel justifiably unhappy with the Company:

> ***Before I give an update on our five key strategies, I want to take a minute to address the portion concerns that have been brought up in social media***. First, there was never a directive to provide less to our customers. Generous portion is a core brand equity of Chipotle. It always has been, and it always will be.

> *With that said, getting the feedback caused us to relook at our execution across our entire system with the intention to always serve our guests delicious, fresh, custom burritos, and [bowls] with generous portions*.
>
> To be more consistent across all 3,500 restaurants, we have focused in on those with outlier portion scores based on consumer surveys, and we are reemphasizing training and coaching around ensuring we are consistently making bowls and burritos correctly.
>
> We have also leaned in and reemphasized generous portions across all of our restaurants as it is a core brand equity of Chipotle. Our guests expect this now more than ever, and we are committed to making this investment to reinforce that Chipotle stands for a generous amount of delicious, fresh food at fair prices for every customer, every visit.
>
> The good news is that we are already beginning to see our actions positively reflected in our consumer scores and our value proposition remains very strong. We believe our focus on operations, including throughput as well as terrific marketing and menu innovation, have strengthened the brand and our value proposition. And we will continue to listen to and treasure our guests to earn every transaction.

(Emphasis added).

39.     Brian Niccol further revealed that that the company would have higher cost of sales in the third quarter of 2024, partially as a result of giving customers more generous portions. He stated the following:

> For Q3, we expect our cost of sales to be just below 31%. About one-third of the step-up is due to the higher protein costs as we roll out Chicken al Pastor and then launched Smoke Brisket later in the quarter.
>
> About one-third is due to an uptick in dairy and avocado prices and the final one-third are about **40 to 60 basis points [SIC] is an investment we are making as we focus on outlier restaurants to ensure correct and generous portion**. We expect this investment will ease from these levels somewhat. We also believe that we can offset the remaining investment with efficiencies and innovation over time.

10

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

> While avocado prices are higher than the very favorable levels we have seen over the past several quarters, this is in line with our expectations from earlier this year. Additionally, we are less impacted by the recent volatility in the Mexican avocado market, as our supply chain team has done a fantastic job of diversifying our exposure, and in the third quarter, the majority of our avocados come from Peru.
>
> Outside of avocados and the protein mix shift, we anticipate underlying cost of sales inflation will be in the low single-digits range for the remainder of the year.

(Emphasis added).

40.　On this news, the price of Chipotle stock fell $0.96 per share, or 1.85%, to close at $50.82 on July 25, 2024. It fell a further $0.99 per share, or 1.9%, to close at $49.83 on July 26, 2024.

41.　On October 29, 2024, after market hours, the Company held its Q3 2024 earnings call. In this earnings call, interim Chief Executive Offer Scott Boatwright stated that the following:

> Cost of sales in the quarter were 30.6%, an increase of about 90 basis points from last year. The benefit of last year's menu price increase was more than offset by inflation across several items, most notably avocados and dairy, as well as higher usage as we focused on ensuring consistent and generous portions, and the mixed impact from our premium Smoked Brisket LTO.

42.　On October 30, 2024, during market hours, *Business Insider* published an article entitled "Chipotle says ensuring 'consistent and generous portions' has taken a toll on its profitability." It stated the following:

> It has been a big year for the humble scoop – at Chipotle, at least.
>
> ***Profit margins for the chain suffered last quarter because of a concerted effort to provide "consistent and generous portions" in every order, the company said Tuesday***.
>
> The issue was first highlighted when dissatisfied customers – protesting against what they saw as skimpy or inconsistent serving sizes at the

11

restaurant chain – used social media this summer to complain about their scoops of protein and to try to maximize their meals.

Investors noticed, with one analyst going so far as to order 75 chicken and rice bowls from eight New York City Chipotle locations and finding that the total weight of each varied considerably.

***All the scrutiny has prompted the burrito and bowl chain to embark on an initiative to ensure everyone gets a consistent meal every visit***.

(Emphasis added).

43. The article further stated that while ensuring the right portion might be "good news for Chipotle diners, ***the chain said it was partly the reason for a hit to profitability in the last fiscal quarter***." (Emphasis added).

44. On this news, the price of Chipotle stock fell $4.76 per share, or 7.86%, to close at $55.73 on October 30, 2024.

45. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

46. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who purchased Chipotle's common stock or purchased Chipotle call options or sold put options during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

47. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

48. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

49. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

50. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of the Company;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused the Company to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;
- whether the prices of the Company securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

51. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

52. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- the Company's shares met the requirements for listing, and were listed and actively traded on NYSE, an efficient market;
- as a public issuer, the Company filed periodic public reports;
- the Company regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;
- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period; and

- the Company was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

53. Based on the foregoing, the market for the Company's securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the shares, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

54. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## COUNT I

## For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder Against All Defendants

55. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

56. This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

57. During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

58. Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;
- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

59. Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

60. Individual Defendants, who are the senior officers of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or any other of the Company's personnel to members of the investing public, including Plaintiff and the Class.

61. As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

62. Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

63. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

64. By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of the Company's securities during the Class Period.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

65. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

66. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because

of their senior positions, they knew the adverse non-public information about the Company's business practices.

67. As officers of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's' financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

68. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

69. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a) declaring this action to be a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiff's counsel as Lead Counsel;

(b) awarding damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, together with interest thereon;

(c) awarding Plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) awarding Plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: November 11, 2024     **THE ROSEN LAW FIRM, P.A.**
/s/ Laurence M. Rosen
Laurence M. Rosen (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*