# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

MICHAEL STRADFORD, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

v.

CHIPOTLE MEXICAN GRILL, INC., BRIAN NICCOL; JOHN R. HARTUNG; and LAURIE SCHALOW,

Defendants.

Case No. 8:24-cv-02459-SPG-JDE

**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS [ECF NO. 55]**

Before the Court is the Motion to Dismiss, (ECF No. 55 ("Motion")), filed by Defendants Chipotle Mexican Grill, Inc., Brian Niccol, John R. Hartung, and Laurie Schalow ("Defendants"). Lead Plaintiff Michael Stradford ("Plaintiff"), individually and on behalf of a proposed class, timely opposed Defendants' Motion, (ECF No. 62 ("Opp.")), and Defendants replied, (ECF No. 61 ("Reply")). The Court has read and considered the parties' submissions and concluded that the Motion is suitable for decision without oral argument. *See* Fed. R. Civ. P. 78(b); C.D. Cal. L.R. 7-15. Having considered the parties' submissions, the relevant law, and the record in this case, the Court GRANTS the Motion.

-1-

## I.    BACKGROUND

Chipotle Mexican Grill, Inc. ("Chipotle" or the "Company") is a "fast-casual" restaurant chain with more than 3,700 locations. (ECF No. 49 ("Compl.") ¶¶ 12, 25). Plaintiff alleges that, beginning in Spring 2022, management aimed to increase profits by shrinking portion sizes. *See* (*id.* ¶¶ 14, 31). The Complaint alleges that the Company, Chief Executive Officer ("CEO") Brian Niccol, Chief Financial Officer ("CFO") John R. Hartung, and Chief Corporate Affairs and Food Safety Officer Laurie Schalow defrauded investors through a series of statements between February 2024 and July 2024 denying that the Company had reduced the size of its portions. *See* (*id.* ¶¶ 7–9, 14–16). The Complaint seeks to recover for investor losses incurred between February 8, 2024, and October 29, 2024 (the "Class Period").

### A.    Niccol's Leadership

Steve Ells founded Chipotle in 1993. *See* (*id.* ¶¶ 12, 28). Under Ells's leadership, the Company "placed an emphasis on employee satisfaction and building a culture of family between restaurant workers and management." (*Id.* ¶ 28). The Company similarly taught employees "to focus on customer satisfaction." (*Id.* ¶ 29). One way that the Company sought to ensure customer satisfaction was "to be more generous with serving portions" if customers requested extra food. *See* (*id.*). In 2018, the Company hired Niccol to replace Ells. *See* (*id.* ¶ 30).

After the Company hired Niccol as CEO, Chipotle's "corporate culture changed significantly," and "there was more pressure . . . to generate profits by controlling costs." (*Id.* ¶¶ 30–31). During the 2020 coronavirus pandemic, the Company responded to "inflationary pressure" by raising prices. (*Id.* ¶ 31). The Company raised prices by approximately 10% in 2021 and by an additional 5% in 2022. *See* (*id.*). Between late 2021 and 2022, "management" also allegedly discussed how the Company's portion sizes impacted its profits and decided that employees were providing too much food to customers. *See* (*id.*).

## B.    The Critical Inventory Metric

The Complaint alleges that, through the Company's "Critical Inventory" metric, the Company shrunk customer portion sizes.  *See* (*id.* ¶¶ 34–35, 98–114).  Under Niccol's leadership, each store location was expected to "meet or exceed" an internal "Critical Inventory" metric.  (*Id.* ¶ 34).  This metric tracked food inventory levels "for high-cost items such as steak, chicken, sofritas, avocados, blocks of cheese, and queso blanco (melted white cheese)."  (*Id.*).  The Company required each store to enter their Critical Inventory levels into an internal system two times each day.  *See* (*id.*).  The system then generated reports to show the variance between "what employees were supposed to provide under Chipotle policy" and "the amount of inputs actually sold."  (*Id.*).  Management expected that, "in general," each store location would produce less than a 0.6% variance from Company policy.  *See* (*id.*).

## C.    Social Media Backlash

Beginning in 2023, "[t]housands of customers took to social media" to complain about the Company's portions.  (*Id.* ¶ 36).  In October 2023, "a video on TikTok complaining of the Company's shrinking portion sizes" received "millions of views, hundreds of thousands of likes, and thousands of comments."  (*Id.* ¶ 37).  In December 2023, the New York Post "published an article about the growing criticism of the Company on social media."  (*Id.* ¶ 38).  In March 2024, a YouTube video compared the size of burrito and burrito bowl orders across three different store locations over a 30-day period, finding that burritos ordered online "were skimpier [than burritos ordered in stores] 70% of the time."  (*Id.* ¶ 39).  "The public backlash peaked in May 2024," when a "TikTok influencer" previously associated with Chipotle posted a "viral" video "criticiz[ing] the Company's shrinking portions."  (*Id.* ¶ 40).  As discussed below, the Company publicly denied that it had shrunk portion sizes.  However, according to a former General Manager, the Company internally "responded by holding 'town hall' style meetings where Chipotle senior management told restaurant managers and employees to increase portion sizes."  (*Id.* ¶ 41).

### D.  The Confidential Sources

The Complaint relies on statements from four confidential sources (together, the "Confidential Sources") to show that the Company's use of the Critical Inventory metric led to smaller portions. *See* (*id.* ¶¶ 98–114).  According to Confidential Source 1, a former Regional Training Manager for employees and managers at more than 100 stores, "upper management began to apply constant and intense pressure down to the regional and restaurant levels to cut costs" after Niccol joined the Company.  (*Id.* ¶¶ 98, 100). Confidential Source 1 also reported that, from 2023 to early 2024, the Company increasingly pressured employees "to meet or beat the [Critical Inventory] variance figures." (*Id.* ¶ 101).  Confidential Source 1 claimed that the Critical Inventory variance target was "unrealistic" and, in response to pressure from management, employees "skimped" on customer portion sizes "all the time," with "skimping becoming more and more prevalent from 2022 to 2023 and again from 2023 to 2024." (*Id.*).

Confidential Source 2 previously worked as the Company's Manager of Customer Incidents.  *See* (*id.* ¶ 102).  Confidential Source 2 reported directly to Schalow, "regularly providing her and her team excel spreadsheets of customer complaints, updates on customer complaints at her request, and helping her respond to various PR and customer-relations situations."  (*Id.*).   According to Confidential Source 2, "the Company experienced an uptick in complaints about portion sizes in 2021 and 2022" but "the Company's executives did not seem to take them seriously until late 2023." (*Id.* ¶ 104). "In late 2023, Schalow and her team began focusing on the issues concerning portion size, acknowledging the growing number of complaints." (*Id.*).

Confidential Source 3, a former General Manager for the Company, "corroborated [Confidential Source 1's] description" of the Critical Inventory metric and "recalled General Managers . . . feeling significant pressure around maintaining compliance" with the Company's Critical Inventory standards.  (*Id.* ¶¶ 105–07).  According to Confidential Source 3, "General Managers . . . were reprimanded and screamed at if variance went above the allowed 0.6%." (*Id.* ¶ 108).  Confidential Source 3 claims that he/she and other General

-4-

Managers in his/her area were told by Field Leaders or Vice Presidents that "portion sizes were to blame" "if they had high [Critical Inventory] variance." (*Id.*). "[W]hen stores were not meeting [Critical Inventory] goals, General Managers were implicitly instructed to skimp on portions by Field Leaders and VPs." (*Id.*).

Confidential Source 4, a former Assistant General Manager, echoes Confidential Source 3's account. *See* (*id.* ¶¶ 110–11). According to Confidential Source 4, from 2022 to 2023, the Company increased pressure to meet Critical Inventory targets. *See* (*id.* ¶ 112). In one instance, Confidential Source 4 "discussed the pressure these metrics imposed with a Field Leader," who "acknowledged that the goals were 'crazy'" but "said they were coming from above [Confidential Source 4's] level." (*Id.*). Confidential Source 4 claims that employees decreased customer portion sizes in response to this pressure. *See* (*id.* ¶ 113). According to Confidential Source 4, employees who did not "comply" with the Company's Critical Inventory metrics were fired. *See* (*id.* ¶ 111).

Confidential Sources 3 and 4 claim that, amidst social media backlash in May 2024, the Company changed its approach to portioning food. *See* (*id.* ¶¶ 109, 114). The Company allegedly "held town hall meetings to discuss correcting portion sizes." (*Id.* ¶ 109). According to Confidential Source 3, after the town hall meetings, the Critical Inventory variance in his/her geographic region "balloon[ed] to 1%-3%." (*Id.*). Confidential Source 4 "was told by employees at the Company's headquarters to re-train employees regarding portions." (*Id.* ¶ 114).

### E.    Challenged Statements

Plaintiff challenges a total of nine statements by Defendants as false or materially misleading. *See* (*id.* ¶¶ 48, 50, 52–58).[1] Two statements relate to potential reputational

---

[1] In connection with the Motion, Defendants filed a chart listing each challenged statement, the source of each statement, and why the Motion argues each statement is not false or materially misleading. *See* (ECF No. 55-1 ("Appendix A")). Plaintiff has filed a Motion to Strike, in which he argues this chart violates the page and length limitations for briefing set out in the Local Rules and this Court's Standing Order. *See* (ECF No. 59 ("Motion to

risk from social media.  *See* (Compl. ¶¶ 48, 50).  Seven other statements concern claims that the Company had reduced the size of its portions.  *See* (*id.* ¶¶ 52–58).

On February 8, 2024, in the Company's 2023 Form 10-K, the Company warned that its "inability or failure to recognize, respond to and effectively manage the immediacy of social media could have a material adverse impact on [its] business."  (*Id.* ¶ 48).  On April 25, 2024, in the Company's Form 10-Q for the first quarter of 2024, the Company "incorporated by reference the risk factors from the 2023 [Form] 10-K, including the risk factor concerning the Company's ability to recognize, respond, and effectively manage the immediacy of social media."  (*Id.* ¶ 50).  Plaintiff alleges that these two statements were false or materially misleading because these statements portrayed reputational risk from social media "as a mere possibility," even though "the Company was already facing significant negative publicity due to the social media campaigns launched in protest to the Company's shrinking portion sizes."  (*Id.* ¶ 49); *see also* (*id.* ¶ 51).

On May 16, 2024, Schalow told Restaurant Business Online, "[w]e have not changed our portion sizes, and our guests continue to appreciate the value we offer them."  (*Id.* ¶ 52).  On May 29, 2024, Niccol appeared on the CNBC program "Mad Money" with Jim Cramer and denied that the Company had reduced the size of its portions, saying that "social media accusations of Chipotle's shrinking portions were 'crazy to [him].'"  (*Id.* ¶ 53); *see also* (*id.* (Q. "[Y]ou haven't shrunk – you've not shrunk the portions?" A. "No. No.  We never have.")).  The same day, on May 29, 2024, Schalow told ABC News and the Washington Post that "[t]here have been no changes in our portion sizes."  (*Id.* ¶ 54).  The next day, on May 30, 2024, Niccol told Fortune Magazine, "portions have not gotten smaller."  (*Id.* ¶ 55).

On June 28, 2024, Schalow told CNN, "Chipotle's bowl size may vary depending upon the number of ingredients a customer selects or if they choose to make an ingredient extra or light."  (*Id.* ¶ 56).  Schalow also denied that the Company had changed its portion

---

Strike").  The Court finds Defendants' Appendix A unnecessary to resolve the Motion and, therefore, DENIES the Motion to Strike as moot.

sizes. *See* (*id.*). On July 4, 2024, Schalow told Fox Business, "there have been no changes in our portion sizes, and we aim to provide a great guest experience every time." (*Id.* ¶ 57). Finally, on July 24, 2024, during the Company's earnings call for the second quarter of 2024, Niccol told investors, "I want to take a minute to address the portion concerns that have been brought up in social media. First, there was never a directive to provide less to our customers. Generous portions [are] a core brand equity of Chipotle." (*Id.* ¶ 58).

Plaintiff alleges that Niccol and Schalow's statements denying a reduction in the size of the Company's portions were misleading because Company management pressured store locations to cut costs and enforce inventory targets and suggested that store managers could reduce portions sizes as one way to meet those targets. *See* (*id.* ¶ 59(a), (b)). Plaintiff alleges that these statements were also misleading because, by "[n]o later than May 29, 2024, Chipotle leadership . . . instructed restaurant managers and employees to increase portion sizes as a result of an internal investigation into the widely reported claims that its portion sizes were shrinking and inconsistent." (*Id.* ¶ 59(e)).

### F.    Investor Losses

Plaintiff alleges Defendants' fraud was gradually revealed to the market through a series of news articles and analyst reports published between June 27, 2024, and July 24, 2024. *See* (*id.* ¶¶ 60–68, 78–79); *see also* (Opp. at 10). In large part, Plaintiff relies on a June 27, 2024, analyst report published by Wells Fargo (the "Wells Fargo report") and a series of articles published in response to that report. *See* (Opp. at 30–31); *see also* (Compl. ¶¶ 60–63). The Wells Fargo report analyzed portion variation between 75 burrito bowls ordered at eight New York City store locations. *See* (Compl. ¶ 60). The report stated that, "[a]t the median in-store orders and digital orders were very similar" but "consistency varied widely" between locations. (*Id.*). Based on Wells Fargo's sample, "some locations serv[ed] bowls that weigh[ed] ~33% more than other locations (on equivalent orders)," with "the heaviest digital/in-store bowls weighing 87%/47% more vs the lightest." (*Id.*). The Company's stock price saw a 5.4% day-over-day decline from $65.86 per share on June 26, 2024, to $62.41 per share on June 27, 2024. *See* (*id.* ¶ 61). Over the next month,

the Company's stock price saw a further decline from $62.41 per share on June 27, 2024, to $52.55 per share on July 23, 2024.  *See* (*id.* ¶ 68).

Plaintiff alleges that the Company made two corrective disclosures, which revealed the fraud to the market.  *See* (Opp. at 31–32).  On July 24, 2024, during the Company's earnings call for the second quarter of 2024, Niccol told the market that "feedback [from customers] caused us to relook at our execution across our entire system with the intention to always serve our guests delicious, fresh, custom burritos, and bowls with generous portions." (*Id.* ¶ 58).  Niccol also told investors that the Company expected to see a 40 to 60 basis point increase in its cost of sales.  *See* (*id.* ¶ 69).  Over the next two days, the Company's stock price saw a 4.6% decline from $51.78 per share on July 24, 2024, to $49.38 per share on July 26, 2024.  *See* (*id.* ¶ 70).

On October 29, 2024, the Company issued a press release announcing its financial results for the third quarter of 2024.  *See* (*id.* ¶ 71).  In the press release, the Company announced that its cost of sales had increased by 90 basis points and partially attributed that increase to its focus on "ensuring consistent and generous portions." (*Id.*).  After the market closed on October 29, 2024, the Company held its earnings call for the third quarter of 2024.  *See* (*id.* ¶ 72).  During the call, the Company's new CFO, Adam Rymer, attributed part of the increase in the Company's cost of sales and decrease in profit margins to "the investment that we made in portion." (*Id.*).  Rymer also told investors that the Company may need to increase prices by 2% to 3% to offset the Company's increased cost of sales. See (*id.*).[2]

---

[2] Plaintiff's briefing treats Defendants' statements on July 24, 2024, and October 29, 2024, as each constituting a single corrective disclosure. *See* (Opp. at 23–24 (arguing "Defendants made two corrective disclosures" and referring to Defendants' statements on July 24, 2024, and October 29, 2024)).  Thus, Plaintiff does not characterize statements in the press release that the Company issued on October 29, 2024, and the statements that the Company made during the earnings call on the same day as separate corrective disclosures.

## II.    LEGAL STANDARD

To state a claim for securities fraud, plaintiffs must satisfy three requirements.  *Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681, 690–91 (9th Cir. 2011).  First, consistent with Rule 8(a)(2), a plaintiff must provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), alleging "enough facts to state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In ruling on such a motion, the Court must "accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007).  However, the Court is "not required to accept as true allegations that contradict exhibits attached to the Complaint," allegations that contradict "matters properly subject to judicial notice, or allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *Seven Arts Filmed Ent., Ltd. v. Content Media Corp. PLC*, 733 F.3d 1251, 1254 (9th Cir. 2013) (internal quotation marks and citation omitted).

Second, a plaintiff must satisfy the heightened pleading standard of Federal Rule of Civil Procedure 9(b), requiring that fraud claims "state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  To meet this standard, a plaintiff must identify "the time, place, and content of [the] alleged misrepresentation[s]," as well as the "circumstances indicating falseness" or "the manner in which the representations at issue were false and misleading."  *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1547–48 (9th Cir. 1994) (internal quotation marks, citation, and alterations omitted); *see also Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010) ("Rule 9(b) requires a party to state with particularity the circumstances constituting fraud or mistake, including the who, what, when, where, and how of the misconduct charged." (internal quotation marks and citation omitted)).  Those allegations "must be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud

charged so that they can defend against the charge and not just deny that they have done anything wrong." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (citation omitted). Although the circumstances of the alleged fraud must be alleged with specificity, knowledge "may be alleged generally." Fed. R. Civ. P. 9(b).

Finally, a plaintiff must satisfy the additional requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), which "require that a complaint plead with particularity both falsity and scienter." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009) (citation omitted). Under the PSLRA, a complaint must (1) "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," and (2) "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(1)–(2) (emphasis added).

## III. REQUEST FOR JUDICIAL NOTICE

Generally, at the motion to dismiss stage, courts may not consider any material beyond the pleadings when assessing the sufficiency of a complaint under Federal Rule of Civil Procedure 12(b)(6). *See Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) ("[R]eview is limited to the complaint." (citation omitted)). If a court considers such extrinsic evidence, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). However, under the doctrines of incorporation-by-reference and judicial notice, courts may consider the contents of certain extrinsic documents "without converting the motion to dismiss into a motion for summary judgment." *Lee*, 250 F.3d at 688.

### A. Incorporation by Reference

First, pursuant to the "judicially created" incorporation-by-reference doctrine, courts may consider an external document to be "part of the complaint itself" if "the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018). The doctrine

-10-

seeks to prevent "plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims." *Id.* A court may also "assume an incorporated document's contents are true for purposes of a motion to dismiss under Rule 12(b)(6)." *Id.* at 1003 (citation and alterations omitted). However, "it is improper to assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well-pleaded complaint." *Id.*

Defendants request that the Court consider 18 documents incorporated by reference into the Complaint. *See* (ECF No. 56 ("RJN")).[3] Plaintiff does not dispute that 16 of these documents are incorporated by reference. *See* (ECF No. 58 ("RJN Opp.") at 1, 4–5). However, Plaintiff argues that the Court should not consider two documents, Exhibits 5 and 12, because they are not referred to in the Complaint. *See* (*id.* at 4). Exhibit 5 is a May 29, 2024, article from the Washington Post, titled "Chipotle portions haven't shrunk, company says after TikTok backlash." Exhibit 12 is an August 5, 2024, article from the Wall Street Journal, titled "Chipotle Fans Take Burrito 'Skimp' Into Their Own Hands."

The Complaint challenges a statement that Schalow made in the Washington Post article as false or materially misleading. *See* (Compl. ¶ 54 ("[O]n May 29, 2024, Schalow issued statements to various news outlets, including ABC News and The Washington Post" in which she said "[t]here have been no changes in our portion sizes[.]")). The Complaint also relies on the Wall Street Journal article to show the Company's April 25, 2024, risk disclosure concerning the Company's ability to recognize, respond, and effectively manage feedback from social media was false or materially misleading. *See* (*id.* ¶ 51 (noting that, "by April 2024, complaints about Chipotle's skimping customers and inconsistent portioning were gaining increased traction," and citing the reporting in the Wall Street Journal article as an example)). Therefore, Plaintiff's claims rely on the contents of both documents, and they are incorporated by reference into the Complaint. *See Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005); *see also Garcia v. J2 Glob., Inc.*, No. 2:20-

---

[3] All references to "Exhibits" refer to exhibits attached to the Declaration of Matthew J. Peters. *See* (ECF No. 55-2).

-11-

CV-06096-FLA (MAAX), 2021 WL 1558331, at *5 (C.D. Cal. Mar. 5, 2021) (incorporating documents that contain alleged misrepresentations and corrective disclosures identified in the complaint).

The Court likewise considers Exhibits 1 through 4, 6 through 11, 15, and 17 incorporated by reference into the Complaint. Exhibits 1 through 4 and 9 reflects news articles and investor disclosures that contain statements Plaintiff challenges as false or misleading. *See* (Compl. ¶¶ 7–8, 15, 38, 48–52, 54, 58). The Complaint relies on news articles, investor disclosures, and analyst reports submitted as Exhibits 6 through 11, 13, and 17 through 20 to prove loss causation. *See* (*id.* ¶¶ 45–46, 56–57, 60, 62–67, 70, 78).[4] The Complaint also relies on trades that Hartung made through 2024, as reflected in the SEC Form 4 submitted as Exhibit 15, to show Hartung acted with scienter. *See* (*id.* ¶ 97). Therefore, these documents all form the basis of Plaintiff's claims. *See Baron v. Hyrecar Inc.*, 2022 WL 17413562, at *5 (C.D. Cal. Dec. 5, 2022) (incorporating disclosures of stock sales that plaintiff relied upon to establish scienter); *see also Garcia*, 2021 WL 1558331, at *5.

In incorporating these documents, the Court is cognizant of the Ninth Circuit's warning in *Khoja* against "[t]he overuse and improper application of judicial notice and the incorporation-by-reference doctrine" that essentially amounts to "unscrupulous use of extrinsic documents to resolve competing theories against the complaint." 899 F.3d at 998. Therefore, the Court will only consider these documents as necessary to contextualize Plaintiff's allegations in the Complaint. *See Alghazwi v. Beauty Health Co.*, No. 2:23-CV-09733-SPG-MAA, 2025 WL 2751076, at *9 (C.D. Cal. Sept. 23, 2025); *see also In re CV*

---

[4] The Court understands Plaintiff to only argue that the Company's disclosures in connection with its second and third quarter earnings results, as reflected in the earnings transcripts submitted as Exhibits 11 and 13, constitute corrective disclosures. *See* (*id.* ¶¶ 69, 71–73); *see also* (Opp. at 31 ("Defendants made two corrective disclosures")). However, Plaintiff relies on the articles and analyst reports in Exhibits 6 through 10 and 17 through 20 as "interim manifestations of later-disclosed fraud" to establish loss causation through a "leakage theory." *In re Lendingclub Sec. Litig.*, 282 F. Supp. 3d 1171, 1181 (N.D. Cal. 2017); *see* (Opp. at 30–31 (relying on "leakage theory" of loss causation)).

*Scis., Inc. Sec. Litig.*, No. 218CV01602JADBNW, 2019 WL 6718086, at *2 (D. Nev. Dec. 10, 2019) (refusing to incorporate a document where "it would not serve the doctrine's purpose of ensuring appropriate context for documents alleged in the complaint").

**B.   Judicial Notice**

Judicial notice under Federal Rule of Evidence 201 authorizes courts to notice an adjudicative fact if it is "not subject to reasonable dispute." Fed. R. Evid. 201(b). A fact is "not subject to reasonable dispute" if it is "generally known," or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(1), (2). Accordingly, "[a] court may take judicial notice of matters of public record without converting a motion to dismiss into a motion for summary judgment." *Lee*, 250 F.3d at 689 (internal quotation marks and citation omitted). A court, however, may not "take judicial notice of disputed facts contained in such public records." *Khoja*, 899 F.3d at 999.

Defendants request that the Court take judicial notice of Exhibit 14—an excerpt of a chart from Yahoo! Finance showing data related to the Company's common stock—and Exhibit 16—which shows four Forms 4 that Niccol filed with the SEC in 2022 through 2024. Plaintiff does not dispute that the Court may take judicial notice of Exhibit 14 but argues that judicial notice of Exhibit 16 is improper, to the extent Exhibit 16 "reflect[s] trading conducted well prior to the eight months preceding the eight-month Class Period in this action." (RJN Opp. at 5). Plaintiff does not contest that the Court may properly consider Exhibit 16 insofar as it reflects Niccol's disclosure of stock sales in April 2024, (*id.*), which Plaintiff relies upon in the Complaint to argue that Niccol acted with scienter, *see* (Compl. ¶ 95).

As an initial matter, it is clear that both exhibits "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Documents publicly filed with the SEC are subject to judicial notice. *See, e.g.*, *In re Aqua Metals, Inc. Sec. Litig.*, No. 17-cv-07142-HSG, 2019 WL 3817849, at *5 (N.D. Cal. Aug. 14, 2019); *Waterford Twp. Police v. Mattel, Inc.*, 321 F. Supp. 3d 1133, 1143

(C.D. Cal. 2018).  The same is true for documents showing historical stock prices.  *See, e.g.*, *Sentinelone, Inc. Sec. Litig.*, 2024 WL 3297150, at *3 (N.D. Cal. July 2, 2024); *Kampe v. Volta Inc.*, No. 4:22-cv-2055-JST, 2024 WL 308262, at *7 (N.D. Cal. Jan. 26, 2024).

However, "accuracy is only part of the inquiry under Rule 201(b)" and courts "must also consider—and identify—which fact or facts" are being noticed.  *Khoja*, 899 F.3d at 999.  SEC filings "should be considered only for the purpose of determining what statements the documents contain, not to prove the truth of the documents' contents." *Troy Grp., Inc. v. Tilson*, 364 F. Supp. 2d 1149, 1152 (C.D. Cal. 2005) (citation omitted).  Thus, while it "is appropriate for the court to take judicial notice of the content of the SEC Forms 4 and the fact that they were filed with the agency," it is not appropriate to take judicial notice of "[t]he truth of the content."  *Patel v. Parnes*, 253 F.R.D. 531, 546 (C.D. Cal. 2008); *see also Maiman v. Talbott*, No. SACV 09-0012 AG (ANx), 2010 WL 11421950, at *7 (C.D. Cal. Aug. 9, 2010) ("[W]hile it may be appropriate to judicially notice the existence of SEC filings and their contents, judicial notice should not be taken of the *truth* of their contents.").  Therefore, the Court will consider "the existence" of Niccol's Form 4s from 2021 through 2023 and "their contents" but will not "notice the truth of the stock sales disclosed in the SEC Forms 4 for purposes of negating scienter." *Alghazwi*, 2025 WL 2751076, at *10.[5]

The Court will also take judicial notice of Exhibit 14.  *See Okla. Firefighters Pension & Ret. Sys. v. Ixia*, 50 F. Supp. 3d 1328, 1349 (C.D. Cal. 2014) ("Because [publicly] traded companies historical stock prices can be readily ascertained and those prices are not subject to reasonable dispute, courts routinely take judicial notice of them.").

---

[5] Since the Complaint relies on Niccol's sale of stock in April 2024 to show that Niccol acted with scienter, the Court will also consider that portion of Exhibit 16 that reflects the SEC Form 4 reporting Niccol's April 2024 stock sales to be incorporated into the Complaint.  *See Baron*, 2022 WL 17413562, at *5.

-14-

## IV.    DISCUSSION

To state a claim for a violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), a plaintiff must allege "(1) a material misrepresentation or omission ('falsity'), (2) made with scienter, (3) in connection with the purchase or sale of a security, (4) reliance on the misrepresentation or omission, (5) economic loss, and (6) loss causation." *In re Genius Brands Int'l, Inc. Sec. Litig.*, 97 F.4th 1171, 1180 (9th Cir. 2024). Section 20(a) of the Exchange Act extends liability to those who wield control over the primary violator. *See* 15 U.S.C. § 78t(a). To establish a cause of action under Section 20(a), a plaintiff must first prove a primary violation of Section 10(b) and then show that the defendant exercised actual power over the primary violator. *See In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1052 (9th Cir. 2014). In the Motion, Defendants argue that Plaintiff's Section 10(b) and 20(a) claims fail, because the Complaint does not plead facts to show falsity, scienter, or loss causation. *See* (Motion at 16–33). Because the Court agrees that Plaintiff has not alleged facts to establish falsity or scienter, the Court declines to address whether the facts alleged are enough to show loss causation.

### A.    Falsity

The Complaint identifies two categories of statements as false: (a) statements denying that the Company changed the size of its portions; and (b) statements concerning the risks that the Company faced from social media. *See, e.g.*, (Compl. ¶ 15). Defendants argue that the first theory fails because, at most, Plaintiff alleges facts to show that the Company's portion sizes were inconsistent across locations. *See* (Motion at 17–21; Reply at 7–10). Defendants further argue that Plaintiff's second theory of falsity fails because the Complaint has not alleged facts to suggest any reasonable investor would have been misled by the Company's social media risk disclosure. *See* (Motion at 21–22; Reply at 11–12).

#### 1.    Portion Size Statements

Plaintiff seeks to show that Niccol and Schalow falsely denied any change to the Company's portion sizes based on allegations: (1) the Company required restaurants to

maintain an unrealistic Critical Inventory variance target; (2) certain employees reduced meal portion sizes to meet this target; (3) the Company faced increasing customer complaints about its portions between 2022 and 2024; and (4) the Company ultimately responded by privately instructing stores to increase their portion sizes. *See, e.g.*, (Compl. ¶¶ 33–41, 98–114).

Defendants argue that Plaintiff has not pleaded that the Company "actually directed a change to portion sizes" and the facts alleged are insufficient to show "an implicit directive to reduce portion sizes." (Motion at 16–17) (emphasis omitted). In support, Defendants argue that "Plaintiff does not allege that the Critical Inventory target changed when Niccol became Chipotle's CEO in 2018, when cost-cutting pressure supposedly increased in 2022, when the Class Period started in February 2024, or at any time in between." (*Id.* at 17). Defendants argue that Plaintiff's theory that employees systematically reduced portion sizes to meet the Critical Inventory target relies on statements by "low-level confidential sources" not "positioned to know" about "a company-wide change in portions." (*Id.* at 17–18). Finally, Defendants argue that customer complaints about the Company's portions and the Company's response do not show that the Company ever changed portion sizes. *See* (*id.* at 18–19).

In response, Plaintiff largely reiterates the allegations in the Complaint. Plaintiff relies on statements from the Confidential Sources to argue that, after Niccol joined the Company in 2018, "senior management applied constant and intense pressure to lower costs," including through "strict enforcement of the [Critical Inventory] metric." (Opp. at 18–19). Plaintiff references statements by Confidential Sources 1 and 4 that "skimping became a norm at Chipotle restaurants prior to and during the Class Period due to aggressive enforcement of the [Critical Inventory] metric." (*Id.* at 19). Plaintiff argues that, in March 2024, the Company "internally acknowledged increasing customer complaints . . . had impacted customer satisfaction" and, in May 2024, "senior management privately instructed [Chipotle] restaurants to increase portion sizes." (*Id.* at 17). Plaintiff

also argues that, in the Company's July 24, 2024, earnings call, Niccol "admitted" to "skimping" customers. *See* (*id.* at 17–18).

The Court agrees that the facts alleged do not show Niccol and Schalow made a false or misleading statement by denying that the Company had reduced the size of its portions. First, the Complaint's allegations as to the Critical Inventory variance target fail to satisfy Rule 9(b). To plead fraud, a Plaintiff must "includ[e] the who, what, when, where, and how of the misconduct charged." *Ebeid*, 616 F.3d at 998. Plaintiff claims that, "[b]etween 2022 and the beginning of the Class Period," the Company pressured restaurants to reduce portion sizes. *See, e.g.*, (Compl. ¶ 16(a), (b)). However, Plaintiff does not allege when the Company adopted the Critical Inventory metric.

The statements from the Confidential Sources also do not show that the Company systematically reduced portion sizes. For one thing, Confidential Sources 1, 3, and 4 were low-level employees. *See* (*id.* ¶¶ 98, 105, 110 (Confidential Source 1 was responsible for training managers and employees at more than 100 stores, Confidential Source 3 was the General Manager of a single location, and Confidential Source 4 was the Assistant General Manager at a single location)). Many of their statements rely on "vague hearsay" that is not sufficiently reliable to establish falsity. *Zucco*, 552 F.3d at 997; *see also* (Compl. ¶ 108 (General Managers were "implicitly instructed to skimp on portions by Field Leaders and VPs")). Other allegations are too general to show falsity. *See, e.g.*, (Compl. ¶ 101 (Confidential Source 1 "observed the pressure to meet or beat the [Critical Inventory] variance figures increase from 2023 to early 2024")).

The allegations concerning customer complaints do not show that Niccol and Schalow made false or misleading statements denying a change in the size of the Company's portions. "[E]very large company can expect to have some customer complaints." *Curry v. Yelp Inc.*, No. 14-CV-03547-JST, 2015 WL 1849037, at *8 (N.D. Cal. Apr. 21, 2015). Plaintiff's reference to "viral criticism" of the Company's portions, (Opp. at 17), is insufficient to establish falsity, *cf. Mahapatra v. Truecar, Inc.*, No. CV 15-3979-R, 2015 WL 12552062, at *1 (C.D. Cal. Dec. 9, 2015) ("[T]he mere existence of

-17-

consumer complaints does not establish that TrueCar misrepresented that it guaranteed prices to customers.").

Further, the Complaint fails to sufficiently allege that the Company directed employees to increase portion sizes. The Complaint alleges that, "[n]o later than May 29, 2024," (Compl. ¶ 15(e)), "senior management" told employees to increase portion sizes, (*id.* ¶ 41). This directive allegedly followed "an internal investigation" into claims that the Company's "portion sizes were shrinking and inconsistent." *See* (*id.* ¶ 59(e)). Confidential Source 2 claims that, "[i]n late 2023, Schalow and her team began focusing on the issues concerning portion size" and, sometime thereafter, "Schalow's team privately worked to address portion size concerns." (*Id.* ¶ 104). Confidential Source 4 claims that, at some point after May 3, 2024, he/she "was told by employees at the Company's headquarters to re-train employees regarding portions." (*Id.* ¶ 114). However, the Complaint fails to identify when the Company carried out the "internal investigation" into its portion sizes, who was involved, and what the results were; who in "senior management" told employees to increase portion sizes and what they said; when "Schalow's team" "worked to address portion size concerns" and what this entailed; or what "headquarters" said "regarding portions." *See* (*id.* ¶¶ 41, 59(e), 104, 114).

Finally, Plaintiff's allegations do not show that Niccol "admitted that Chipotle had a skimping problem." *See* (Opp. at 31); *see also* (*id.* at 17–18). During the Company's July 24, 2024, earnings call, Niccol told investors that customer feedback had "caused [the Company] to relook at our execution across our entire system with the intention to always serve our guests delicious, fresh, custom burritos, and bowls with generous portions." (Compl. ¶ 58). However, this statement does not plausibly suggest that the Company had systematically reduced the size of its portions. Plaintiff's theory of falsity depends on a temporal change in the size of the Company's portions between 2022 and 2024. *See* (*id.* ¶ 59(a), (b)). This statement and the subsequent increase in the Company's cost of sales, however, do not show any change in the size of the Company's portions before the July 24, 2024, earnings call.

-18-

###### 2.   Social Media Risk Disclosure

Plaintiff also alleges that Niccol and Hartung committed securities fraud through the social media risk disclosure included in the Company's 2023 Form 10-K and incorporated by reference in the Company's Form 10-Q for the first quarter of 2024. *See* (*id.* ¶¶ 48, 50). In these disclosures, the Company warned investors that its "inability or failure to recognize, respond to and effectively manage the immediacy of social media could have a material adverse impact on [its] business" and social media use could "result in negative publicity that could damage [the Company's] reputation." (*Id.* ¶ 48); *see also* (*id.* ¶ 50). According to Plaintiff, these statements were false or materially misleading because, at the time the Company made these disclosures, it was "already facing significant negative publicity due to the social media campaigns launched in protest to the Company's shrinking portion sizes." (*Id.* ¶ 49); *see also* (*id.* ¶ 51).

Defendants argue that the Company's social media risk disclosure was not false or materially misleading for three reasons. First, elsewhere in the risk disclosure, the Company warned investors that "it is impossible for [the Company] to fully predict or control social media backlash." (Motion at 21 (quoting Exhibit 2 at 10)). Second, Defendants argue that the media reported on the social media criticism identified in the Complaint and, therefore, any "reputation-damaging criticism" was already "well-known and understood" by the market. (*Id.* (internal quotation marks and citation omitted)). Third, Defendants argue that "no reasonable investor could have been misled by the generalized observations about social media in this risk disclosure." (*Id.* (internal quotation marks, citation, and alterations omitted)).

In response, Plaintiff argues that the social media risk disclosure is actionable because, at the time of these statements, the Company's "inability to 'effectively manage' public allegations of skimping had already materialized." (Opp. at 21) (emphasis omitted). According to Plaintiff, the social media risk disclosure was misleading because the Company "began investigating the public allegations [that the Company had reduced the size of its portions] in late 2023" but "never told investors." (*Id.*). According to Plaintiff,

-19-

Defendants should "have informed the public that they took the public allegations seriously, were investigating them, and would later report their findings." (*Id.*).  Plaintiff further argues that, to "clearly disclose[]" that the Company had already faced backlash on social media, it "should have modified the risk disclosure in the February 2024 Form 10-K to reflect that it had, in fact, 'failed' to 'respond and effectively manage' the social media outcry of skimping." (*Id.* at 22).

The Court agrees that Plaintiff has not alleged facts to plausibly suggest that the Company's risk disclosure was false.  To plausibly state a claim, a plaintiff must allege facts that show a statement or omission changed the "total mix" of information available to investors.  *See Sneed v. Talphera, Inc.*, 147 F.4th 1123, 1131 (9th Cir. 2025); *see also In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 390 (9th Cir. 2010) ("Plaintiffs must demonstrate that a particular statement, when read in light of all the information then available to the market, or a failure to disclose particular information, conveyed a false or misleading impression." (internal quotation marks and citation omitted)).  The Complaint alleges that, in 2023, "[t]housands of customers took to social media" to complain about the Company's portion sizes; a "TikTok [video] complaining of the Company's shrinking portion sizes" "received millions of views" on social media; and the New York Post "published an article about the growing criticism of the Company on social media." (Compl. ¶¶ 36–38).  Based on these allegations, Plaintiff has failed to allege facts to show that, when "[c]onsidered in context," the Company's social media risk disclosure would "mislead a reasonable investor." *Sneed*, 147 F.4th at 1131.

## B.    Scienter

The Complaint independently fails to state a claim because it does not show any Defendant acted with scienter.  To establish scienter under the PSLRA, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A).  To meet this standard, "a complaint must allege that the defendant made false or misleading statements with an intent to deceive, manipulate, or defraud, or with deliberate recklessness." *Prodanova v. H.C.*

-20-

*Wainwright & Co., LLC*, 993 F.3d 1097, 1106 (9th Cir. 2021) (internal quotation marks and citation omitted).  Deliberate recklessness is "an *extreme* departure from the standards of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so *obvious* that the actor must have been aware of it."  *Id.* (citation omitted).  As a corporation, the Company "can only act through its employees and agents and can likewise only have scienter through them."  *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 701 (9th Cir. 2021) (internal quotation marks and citation omitted).  The scienter of Niccol, Hartung, and Schalow, as the Company "senior controlling officers," may be imputed to the Company "to establish liability as a primary violator of § 10(b) and Rule 10b-5."  *Id.*

To determine whether Plaintiffs have pled scienter, the Court must determine "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  *Tellabs*, 551 U.S. at 322–23.  To do so, courts within the Ninth Circuit conduct a two-part inquiry.  *See Zucco*, 552 F.3d at 992.  First, the Court must "determine whether any of the plaintiff's allegations, standing alone, are sufficient to create a strong inference of scienter."  *Id.*  Then, "if no individual allegations are sufficient," the Court "will conduct a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness."  *Id.* In making this inquiry, "courts must 'take into account plausible opposing inferences' and determine that 'a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *Alphabet*, 1 F.4th at 701 (quoting *Tellabs*, 551 U.S. at 323, 324).

Plaintiff seeks to establish scienter five ways: (1) through the "core operations" doctrine; (2) based upon Defendants' repeated denial that the Company had reduced the size of its portions; (3) through statements from the Confidential Sources; (4) through allegations concerning Niccol and Hartung's stock sales; and (5) based upon a holistic

-21-

analysis of the Complaint as a whole.  *See* (Opp. 23–28).  As explained below, none of these theories give rise to a strong inference of scienter.

### 1.    Core Operations Doctrine

Plaintiff argues that scienter may be imputed to Niccol, Schalow, and Hartung (the "Individual Defendants") "based on the inference that they have knowledge of the core operations of the company." (*Id.* at 24 (internal quotation marks, citations, and alterations omitted)).  Plaintiff claims that the Complaint alleges each Defendant knew or had access to information that contradicted their public statements.  *See* (*id.* at 24–25).  In support, Plaintiff relies on allegations that the Company's management was focused on cutting costs and increasing profits, *see* (Compl. ¶¶ 100–03, 105–14), and that Confidential Source 2 informed Schalow of customer complaints concerning the size of the Company's portions, *see* (*id.* ¶¶ 102–04).  Plaintiff further claims that it would be "absurd" to suggest management was not aware of reductions in the size of the Company's portions because the Company's "sole operation" was "selling food." (Opp. at 24).

The "core operations" theory "is not easy" to plead.  *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014).  A plaintiff must either allege "specific admissions by one or more corporate executives of detailed involvement in the minutia of a company's operations," *id.*, or information about a company's corporate structure "in conjunction with detailed and specific allegations about management's exposure to factual information within the company," *S. Ferry, LP. No. 2 v. Killinger*, 542 F.3d 776, 785 (9th Cir. 2008).  In "rare circumstances," a plaintiff may also show that "the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." *Id.* at 786.

Here, the Complaint does not allege a specific admission by any of the Defendants concerning their involvement with the Company's Critical Inventory data.  *Cf. Intuitive Surgical*, 759 F.3d at 1062 (rejecting the core operations theory in the absence of alleged admissions by individual defendants concerning their involvement with the company's software-generated reports).  The Complaint likewise does not allege any Defendant was

-22-

exposed to factual information to suggest the Company had reduced the size of its portions. The allegation that Confidential Source 2 provided Schalow and her "team" with "excel spreadsheets of customer complaints" does not show Schalow had access to information that cast doubt on her statements. *See* (Compl. ¶¶ 102–04). Additionally, while the Complaint alleges "pressure" to cut costs, *see* (*id.* ¶¶ 100–103, 105–14), Plaintiff has not alleged that any Defendant was aware employees were reducing the size of the Company's portions in response, *see Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 772 (9th Cir. 2023) (defendants acted with scienter in making false statements about the company's sales pipeline where "[d]efendants themselves engaged in [a] widespread pressure campaign" to encourage sales representatives to misclassify deals).

The Complaint also lacks allegations to suggest that it would be "absurd" to conclude Defendants were unaware of reductions in the size of the Company's portions. Although the Complaint alleges that the Company tracked Critical Inventory levels, *see* (Compl. ¶ 34), Plaintiff does not allege how this information was presented to executives or how executives would be able to infer changes in meal portions from the Critical Inventory data, *see Sneed*, 147 F.4th at 1134 (core operations theory does not apply where "no fact existed that would have led [executives] to know the [company's] slogan conveyed patently false" information (internal quotation marks and citation omitted)); *see also In re Acadia Pharms. Inc. Securities Litig.*, No. 18-CV-01647-AJB-BGS, 2020 WL 2838686, at *8 (S.D. Cal. June 1, 2020) (applying the core operations doctrine where executives tracked data concerning the company's "only product" and that data "clearly showed red flags"). Plaintiff has thus failed to demonstrate scienter based on the core operations doctrine.

### 2.    Repeated Denials of Portion Shrinkage

Plaintiff argues that, "[t]hroughout the Class Period, Defendants repeatedly made statements concerning the Company's portion sizes and the public response thereto." (Opp. at 23). According to Plaintiff, these repeated denials are at least "actionably reckless." (*Id.*). In support, Plaintiff relies on cases in which defendants made "detailed factual statements, contradicting important data to which [those defendants] had access."

-23-

*Roberti v. OSI Sys., Inc.*, No. CV 13-9174-MWF VBKX, 2015 WL 1985562, at *12–13 (C.D. Cal. Feb. 27, 2015) (internal alterations omitted) (finding scienter where defendants had access to data that contradicted their public statements); *see also In re QuantumScape Sec. Class Action Litig.*, 580 F. Supp. 3d 714, 741 (N.D. Cal. 2022) (executives repeatedly insisted that the company "used uncompromised testing conditions" but presented data showing the company "used compromised testing conditions"); *S. Ferry LP No. 2 v. Killinger*, 687 F. Supp. 2d 1248, 1260 (W.D. Wash. 2009) (statements addressing company's "technology and integrations with a high degree of specificity" sufficient to show CEO "had actual knowledge of the integration of the [company's] technological systems"). Plaintiff fails to adequately allege that Niccol or Schalow had access to data showing that the Company had reduced the size of its portions. *Cf. Joyce v. Amazon.com, Inc.*, No. 2:22-CV-00617, 2025 WL 835054, at *13 (W.D. Wash. Mar. 17, 2025) (no scienter where executive repeatedly addressed topic but complaint failed to show he was aware of conflicting facts). Plaintiff has therefore failed to demonstrate scienter based on this theory.

### 3.   Statements by Confidential Sources

Plaintiff also seeks to show scienter based on statements from the Confidential Sources. *See* (Opp. at 25–26). Defendants argue that the statements from the Confidential Sources are not indicative of scienter because only Confidential Source 2 worked with one of the Individual Defendants. *See* (Motion at 25). Defendants further argue that none of the statements from Confidential Source 2 establish scienter because these allegations do not show Schalow was aware the Company had reduced the size of its portions. *See* (*id.*). In response, Plaintiff argues Confidential Source 1 also regularly interacted with the Company's leadership, and the lack of allegations that Confidential Sources 3 and 4 interacted with the Individual Defendants is not dispositive. *See* (Opp. at 25–26).

None of the statements by the Confidential Sources are sufficient to show scienter. Courts within the Ninth Circuit apply a two-part test to determine whether statements from a confidential witness are sufficient to establish scienter. *See Zucco*, 552 F.3d at 995. First,

-24-

courts must determine whether the complaint has described the confidential witness "with sufficient particularity to establish their reliability and personal knowledge." *Id.* Second, the confidential witness statements must be indicative of scienter. *See id.*

Confidential Sources 1 and 2 claim that, after Niccol joined the Company, Chipotle's corporate culture changed, and the Company increasingly focused on cutting costs and increasing profits. *See* (Compl. ¶¶ 100, 103). However, "allegations of routine corporate objectives," such as a desire to cut costs and increase profits, are not themselves "sufficient to allege scienter." *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 884 (9th Cir. 2012); *see also Wyche v. Advanced Drainage Sys., Inc.*, No. 15 CIV. 5955 (KPF), 2017 WL 971805, at *10 (S.D.N.Y. Mar. 10, 2017) ("It is not enough for a plaintiff to show motives that are common to most corporate officers, such as the desire for the corporation to appear profitable." (internal quotation marks, citation, and alterations omitted)).

Confidential Sources 1, 3, and 4 also claim that "Company leadership" focused on the Critical Inventory metric, and pressure to meet the Company's Critical Inventory targets led some employees to reduce portion sizes. *See* (Compl. ¶¶ 101, 108, 112). However, the Complaint does not allege that anyone in "Company leadership," let alone the Individual Defendants, knew that employees had reduced the size of the Company's portions or had directed the employees to do so. *Cf. Yaron v. Intersect ENT, Inc.*, No. 19-CV-02647-JSW, 2020 WL 6750568, at *9 (N.D. Cal. June 19, 2020) ("At most, the confidential witness allegations show that bulk pricing took place—not that the individual defendants knew about the practice or about its effect on inventory."). Moreover, the Complaint lacks allegations to show that these employees had "the required personal knowledge of [defendants'] decision-making to show scienter." *Sneed*, 147 F.4th at 1134; *see also Intuitive Surgical*, 759 F.3d at 1063 (confidential witness statements lacked foundation where witnesses did not have "first hand knowledge regarding what the individual defendants knew").

Confidential Source 2 is alleged to have "worked closely with Schalow," (Compl. ¶ 102), but does not provide any statements that show Schalow acted with scienter.

According to the Complaint, Confidential Source 2 "regularly provid[ed] [Schalow] and her team excel spreadsheets of customer complaints" and "help[ed] her respond to various PR and customer-relations situations." (*Id.* ¶ 102).  In late 2023, Schalow allegedly "began focusing on the issues concerning portion size," "reached out to [Confidential Source 2's] team for help in addressing the portion size debacle," and "privately worked to address portion size concerns." (*Id.* ¶ 104).  However, the most compelling inference from these allegations is that Schalow was focused on responding to the reputational impact of customer complaints. *See Alphabet*, 1 F.4th at 701.  These allegations do not show Schalow had reason to believe the Company had reduced the size of its portions.  Plaintiff has thus not sufficiently alleged scienter based on this theory.

### 4. Insider Stock Sales

Plaintiff also attempts to show scienter based on Niccol and Hartung's sale of Chipotle stock during the Class Period.  *See* (Opp. at 26–28).  According to the Complaint, in April 2024, Niccol sold 6,406 shares of stock for a total of $20.4 million and, in June 2024, Hartung sold 2,461 shares of stock for a total of $8 million.  *See* (Compl. ¶¶ 95, 97).  Plaintiff argues that the timing of these sales shows scienter, as the sales followed customer criticism of the Company's portion sizes and an internal investigation that "validated" this criticism.  *See* (Opp. at 26–27).[6]  In response, Defendants argue that Niccol's sales were not suspicious because he sold stock early in the Class Period, before Defendants made all but two of the challenged statements, *see* (Motion at 24), and the timing of Hartung's sale was not suspicious because, on the day he sold, he exercised the right to purchase an equivalent quantity of stock, *see* (*id.* at 25).

Based on the facts alleged, Plaintiff has not shown scienter through Niccol and Hartung's sale of Chipotle stock.  A plaintiff may show "circumstantial" evidence of

---

[6] Plaintiff also alleges that the timing of Niccol's stock sales were suspicious because these sales occurred "mere days" days before a viral TikTok video criticizing the Company's portions.  *See* (*id.* at 26).  However, Plaintiff fails to explain why Niccol's sales were suspicious in light of this video.  The Complaint does not allege Niccol had advance notice of the video.

scienter, *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1066 (9th Cir. 2008), through "unusual" or "suspicious" stock sales, *Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001), *abrogated on other grounds by Matrixx Initiatives v. Siracusano*, 563 U.S. 27, 37–49 (2011).  However, "[i]nsider stock sales are not inherently suspicious." *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1092 (9th Cir. 2002), *abrogated on other grounds by Matrixx*, 563 U.S. at 37–49.  Instead, "such sales only give rise to an inference of scienter when they are dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Metzler*, 540 F.3d at 1067 (internal quotation marks and citation omitted).  Courts consider three factors to determine whether insider stock sales support a finding of scienter: (1) "the amount and percentage of the shares sold"; (2) "the timing of the sales"; and (3) "whether the sales were consistent with the insider's trading history." *Id.*

Plaintiff does not present argument as to why the amount and percentage of shares that Niccol and Hartung sold support a finding of scienter.  *See* (Opp. at 26–27).  Based on the Form 4s that Niccol and Hartung filed with the SEC for the relevant sales, in April 2024, Niccol sold 22.1% of his holdings, *see* (Exhibit 16 at 6), and, in June 2024, Hartung sold 3.6% of his holdings, *see* (Exhibit 15 at 2).[7]  Neither quantity is necessarily suspicious. *See, e.g.*, *Metzler*, 540 F.3d at 1067 (no inference of scienter with sale of 37% of holdings, noting "[we] typically require larger sales amounts . . . to allow insider trading to support scienter"); *City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, No. 18-CV-04844-BLF, 2019 WL 6877195, at *21 (N.D. Cal. Dec. 17, 2019) (sale of one-third of holdings not inherently suspicious).

The timing of Niccol and Hartung's sales also does not support an inference of scienter.  Niccol sold stock on April 26, 2024, when the Company's stock sold at $62.41

---

[7] Defendants argue that Plaintiff cannot show scienter based on Niccol and Hartung's stock sales, as Plaintiff did not plead the percentage of shares that Niccol and Hartung sold.  *See* (Opp. at 24).  However, as discussed above, the Form 4s that Defendants rely upon to calculate Niccol and Hartung's sales as a percentage of their holdings are incorporated by reference into the Complaint.

at market open and $63.74 at market close. *See* (Exhibit 14 at 6; Exhibit 16 at 6). Hartung sold stock on June 13, 2024, when the Company's stock sold at $63.77 at market open and $65.31 at market close. *See* (Exhibit 14 at 5; Exhibit 15 at 2). These sales approach the Class Period high point on June 20, 2024, when the Company's stock traded at $68.91 at market open. *See* (Exhibit 14 at 5). These sales also exceed the Class Period low on July 26, 2024, when the Company's stock closed at $49.83 per share. *See* (*id.* at 4). However, "[t]his fact alone is not enough to provide a strong inference of scienter." *Limantour v. Cray Inc.*, 432 F. Supp. 2d 1129, 1151 (W.D. Wash. 2006).

The Complaint fails to allege facts to suggest Niccol and Hartung's trades were "calculated to maximize the personal benefit from undisclosed inside information." *Metzler*, 540 F.3d at 1066–67 (citation omitted). Niccol sold stock about three weeks before Plaintiff alleges anyone from the Company denied Chipotle had reduced the size of its portions. *See* (Compl. ¶ 52; Exhibit 16 at 6). Additionally, customer criticism on social media does not show Niccol had undisclosed inside information, as this criticism was public. *See* (Compl. ¶¶ 36–39). Plaintiff also fails to adequately allege that an "internal investigation" "validated" this criticism, much less that Niccol was aware of the results of such an investigation. *See* (Opp. at 26); *see also* (Compl. ¶¶ 102, 104). As such, the Complaint fails to establish a "temporal connection" between Niccol's stock sales and the allegedly false and misleading statements. *See Limantour*, 432 F. Supp. at 1151; *see also No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 939 (9th Cir. 2003) (analyzing sales in proximity to false statements).[8]

Similarly, the timing of Hartung's sale of stock is not inherently suspicious. On the same day that Hartung sold 2,461 shares of stock, he also exercised the right to purchase

---

[8] Plaintiff further argues that Niccol's sales were suspicious because Niccol sold stock "outside of his Rule 10b5-1 insider trading plan." (Opp. at 14); *see also* (*id.* at 27). However, this is not enough to find Niccol's sales suspicious. *See In re Zillow Group, Inc. Sec. Litig.*, No. C17-1387-JCC, 2018 WL 4735711, at *15 (W.D. Wash. Oct. 2, 2018) (finding that a $1.2 billion stock sale not conducted under a 10b5-1 trading plan was not suspicious where plaintiffs failed to show how the timing of the sale demonstrates scienter).

-28-

an additional 3,000 shares. *See* (Exhibit 15 at 2). As such, Hartung maintained roughly the same economic exposure to the Company's stock price before and after his sale. *See Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*, 895 F.3d 933, 940 (7th Cir. 2018) (courts consider whether insiders "bought more shares to offset their sales"); *see also Oklahoma Firefighters Pension & Ret. Sys. v. Ixia*, No. CV 13-08440 MMM SHX, 2015 WL 1775221, at *41 (C.D. Cal. Apr. 14, 2015) (sale not suspicious where "the most plausible inference" from sale is that insider sold shares to "maintain his overall holdings at a similar level").

Finally, Plaintiff has not shown that Niccol and Hartung's sales were suspicious as compared to their prior trading history. Months before the alleged fraud, Niccol sold roughly 4,000 shares. *See* (Compl. ¶ 95). Therefore, his sale of close to 6,500 shares during the Class Period is not "dramatically out of line" with his prior sales. *See Metzler*, 540 F.3d at 1066. The Complaint does not include any allegations as to Hartung's trading history. *See* (Compl. ¶ 97); *see also Ronconi*, 253 F.3d at 436 (declining to find scienter absent trading history, where defendant sold 98% of her holdings during the class period).

### 5. Holistic Analysis

Under the Court's holistic analysis, Plaintiff has failed to show that any Defendant acted with scienter. The Complaint lacks factual allegations to suggest that the Individual Defendants were aware that the Company had decreased the size of its portions or had access to information that showed as much. Instead, the most plausible inference from the allegations set forth in the Complaint is that Defendants honestly believed the Company had not changed the size of its portions. *See Alphabet*, 1 F.4th at 701.

Because Plaintiff has failed to allege facts to establish falsity or scienter, the Court GRANTS the Motion as to Plaintiff's claims under Section 10(b) and Section 20(a).

### C.   Leave to Amend

Plaintiffs have requested leave to amend. Generally, "in dismissals for failure to state a claim, a district court should grant leave to amend." *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 247 (9th Cir. 1990). Nevertheless, a district

court may, in its discretion, deny leave to amend when amendment would be futile. *Zucco,* 552 F.3d at 1007. Amendment is considered futile where "allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Telesaurus VPC, LLC v. Power*, 623 F.3d 998, 1003 (9th Cir. 2010) (citation omitted). The Court does not find at this time that amendment would be futile and will grant Plaintiff one additional opportunity to amend to cure the deficiencies identified in this Order only.

## V.   CONCLUSION

For the foregoing reasons, Court GRANTS the Motion. Within twenty-one (21) days of the issuance of this Order, Plaintiff may file a Second Amended Complaint curing the deficiencies identified herein. If Plaintiff fail to file a Second Amended Complaint within twenty-one days, the case shall be closed.

**IT IS SO ORDERED.**

DATED: December 18, 2025

HON. SHERILYN PEACE GARNETT
UNITED STATES DISTRICT JUDGE