ROBBINS GELLER RUDMAN
& DOWD LLP
TOR GRONBORG (179109)
TRIG R. SMITH (237399)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
torg@rgrdlaw.com
trigs@rgrdlaw.com

Lead Counsel for Lead Plaintiff

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| MICHAEL STRADFORD, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>CHIPOTLE MEXICAN GRILL, INC., et al.,<br><br>Defendants. | Case No. 8:24-cv-02459-SPG-JDE<br><br><u>CLASS ACTION</u><br><br>SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><u>DEMAND FOR JURY TRIAL</u> |

Lead Plaintiff Lisa Tai hereby brings this action on behalf of herself and all persons or entities who purchased or otherwise acquired Chipotle Mexican Grill, Inc. ("Chipotle" or the "Company") common stock, all persons or entities who purchased or otherwise acquired Chipotle call options, and all persons or entities who sold or otherwise disposed of Chipotle put options (collectively referred to herein as "Chipotle Securities"), between April 25, 2024 and October 29, 2024, inclusive (the "Class Period"), and were damaged thereby (the "Class"). Excluded from the Class are Defendants, as defined below, present or former executive officers and directors of Chipotle and their immediate family members (as defined in 17 C.F.R. §229.404(1)(a)(iii) and (1)(b)(ii)). Plaintiff seeks to recover damages caused by Defendants' violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5 promulgated thereunder.

Plaintiff alleges the following based upon personal knowledge as to herself and her own acts and upon information and belief as to all other matters. Plaintiff's information and belief is based on, *inter alia*, the independent investigation of her counsel, Robbins Geller Rudman & Dowd LLP. This investigation included, but was not limited to, a review and analysis of: (i) Chipotle's public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) transcripts of Chipotle's public conference calls; (iii) press releases; (iv) independent media reports regarding Chipotle; (v) economic analyses of the Company's stock price movement and pricing and volume data; (vi) consultations with relevant experts; (vii) other publicly available material and data identified herein; and (viii) information obtained from former employees of the Company. Plaintiff's investigation of the alleged fraud continues.

## JURISDICTION AND VENUE

1. The claims asserted herein arise pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)), and Rule 10b-5 promulgated by the SEC (17 C.F.R. §240.10b-5).

2. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, and §27 of the Exchange Act (15 U.S.C. §78aa).

3. Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and §27 of the Exchange Act (15 U.S.C. §78aa), as conduct constituting the alleged Exchange Act violations occurred in this District, including alleged misstatements made in this District, and damages took place in this District.

4. Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of the national securities exchange, to conduct the unlawful acts and wrongs alleged herein.

## PARTIES

5. Plaintiff made transactions in Chipotle Securities during the Class Period and suffered economic losses as a result of Defendants' alleged unlawful conduct. ECF 25-2 and 25-3.

6. Defendant Chipotle is the owner and operator of thousands of Chipotle Mexican Grill restaurants in the United States and other countries. The Company is incorporated in Delaware, and its principal place of business is located at 610 Newport Center Drive, Suite 1100, Newport Beach, California 92660. Throughout the Class Period, Chipotle's stock traded in an efficient market on the New York Stock Exchange ("NYSE") under the ticker "CMG."

7. Defendant Brian Niccol ("Niccol") was the Company's Chief Executive Officer and served on its Board of Directors from March 5, 2018 through August 31, 2024, including as Chairman of the Board beginning in March 2020. In August 2024, Niccol resigned and then took the position as CEO of Starbucks Corporation. While he was CEO of Chipotle, the Company's Code of Ethics applied to Niccol and stated:

> It is illegal to buy or sell securities while . . . aware of material, nonpublic [sic] (or "inside") information that you know about because of your job with Chipotle. . . . Information is considered material if it could

affect Chipotle's stock price or a person's decision to buy or sell Chipotle stock. . . .

Employees may not buy or sell Chipotle stock or any other security while they are aware of material, non-public information.

8. The Company's Code of Ethics required Niccol to provide "accurate and complete information to the public and to all government and regulatory agencies." During the Class Period, Niccol was a designated spokesperson for the Company, made speaking appearances on television, and spoke during the Company's second quarter fiscal 2024 earnings call (the "2Q24 Earnings Call"). In April 2024, Niccol sold 6,406 shares of his Chipotle stock for proceeds of $20.4 million. Niccol's April 2024 sales were conducted outside of a Rule 10b5-1 trading plan, and the proceeds were not used to satisfy tax obligations associated with the exercise of stock appreciation rights.

9. Niccol's April 2024 sales were also conducted while he was in possession of the following material non-public information: (a) the Company had initiated an internal investigation into social media allegations that Chipotle restaurants were skimping on customer orders; and (b) the Company concluded by no later than March 2024 that the public allegations of skimping on customer orders had already damaged the reputation of the Company.

10. Defendant John R. Hartung ("Hartung") served as the Company's Chief Financial Officer throughout the Class Period. On July 9, 2024, the Company announced that Hartung was retiring effective March 31, 2025. On August 14, 2024, due to Niccol's unexpected resignation, the Company announced that Hartung would remain as President and Chief Strategy Officer, a role in which he supported the Company's new CEO while maintaining oversight of the Company's new CFO. The Company's Code of Ethics also applied to Hartung and required him to comply with insider trading restrictions and to provide accurate and complete information to the public and governmental agencies. Throughout the Class Period, Hartung was a

designated spokesperson for the Company, and he also signed Company financial statements during the Class Period, including the 1Q 2024 Form 10-Q, and spoke during the Company's second quarter fiscal-2024 earnings call. In June 2024, Hartung sold 2,461 shares of his Chipotle stock for proceeds of $8.0 million. Hartung's sale of the 2,461 shares was conducted outside a Rule 10b5-1 trading plan, and the proceeds were not used to satisfy tax obligations associated with the exercise of stock appreciation rights.

11. Hartung's 2024 sales were also conducted while he was in possession of the following material non-public information: (a) the Company had initiated an internal investigation into social media allegations that Chipotle restaurants were skimping on customer orders; and (b) the Company concluded by no later than March 2024 that the public allegations of skimping on customer orders had already damaged the reputation of the Company.

12. Defendant Laurie Schalow ("Schalow") served as the Company's Chief Corporate Affairs and Food Safety Officer throughout the Class Period. The Company's Code of Ethics applied to Schalow and required her to provide accurate and complete information to the public and governmental agencies. Throughout the Class Period, Schalow was a designated spokesperson for the Company. Throughout the Class Period, Schalow was also in possession of the following material non-public information: (a) the Company had initiated an internal investigation into social media allegations that Chipotle restaurants were skimping on customer orders; and (b) the Company concluded by no later than March 2024 that the public allegations of skimping on customer orders had already damaged the reputation of the Company.

13. Defendants Niccol, Hartung and Schalow are collectively referred to herein as the "Individual Defendants." Chipotle, together with the Individual Defendants, are collectively referred to herein as the "Defendants."

14. The Individual Defendants possessed the power and authority to control the contents of Chipotle's SEC filings, press releases, and other market

communications. The Individual Defendants were provided with copies of Chipotle's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Chipotle and their access to material information available to them but not to the public, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations being made were then materially false or misleading. The Individual Defendants, along with Chipotle pursuant to the doctrine of *respondeat superior*, are liable for the Exchange Act violations pleaded herein.

## INTRODUCTION AND OVERVIEW

15. Chipotle owns and operates Chipotle Mexican Grill restaurants, which feature a menu of burritos, burrito bowls (a burrito without the tortilla), quesadillas, tacos and salads. The Company's first restaurant was opened in 1993 in Denver, Colorado. By December 31, 2024, the Company owned and operated over 3,700 restaurants in the United States and internationally. As acknowledged by Niccol on July 24, 2024: "Generous portions [are] a core brand equity of Chipotle. It always has been, and it always will be."

16. From late 2023 and through the summer of 2024, however, Chipotle customers increasingly voiced their displeasure about the Company's inadequate and inconsistent portion sizes. These complaints were broadly covered in the press, prompted investigative reporting, and spawned a Company investigation into whether, in fact, it was complying with its long-held brand equity of providing customers with generous meal portions.

17. During the Class Period, Defendants engaged in a fraudulent course of conduct that artificially inflated the price of Chipotle stock, including by making and/or issuing false and/or materially misleading statements relating to Chipotle's portion sizes and the impact that correcting the Company's shrinking portions would

have on Chipotle's cost structure, including false denials of the fact that the Company's portion sizes were shrinking and inconsistent.

18. Defendants' false and/or misleading Class Period statements include:

- "Our inability or failure to recognize, respond to and effectively manage the immediacy of social media could have a material adverse impact on our business." April 25, 2024 Form 10-Q, at 20 (risk factor incorporated by reference from Chipotle's 2023 Form 10-K, filed with the SEC on February 8, 2024).
- May 16, 2024, Schalow stated: "'We have not changed our portion sizes, and our guests continue to appreciate the value we offer them.'"
- May 29, 2024, in response to CNBC's financial host Jim Cramer's question, "and you haven't shrunk – you've not shrunk the portions[?]" Niccol responded: "No. No. We never have."
- On June 28, 2024, a day after Wells Fargo published an analyst report criticizing Chipotle for inconsistent portioning in eight New York City restaurants, *CNN* reported that Schalow reiterated: "[T]he company has not changed its portion sizes."
- On July 4, 2024, in an article entitled "Wells Fargo analysts 'weigh in' on Chipotle sizing after restaurant chain faces backlash online," *Fox Business* reported that Schalow, on behalf of the Company, stated: "'There have been no changes in our portion sizes, and we aim to provide a great guest experience every time.'"

19. Chipotle's April 25, 2024 risk disclosure was materially false and misleading because prior to April 24, 2024, the Company had already concluded that the increasing number of social media allegations of skimping had negatively impacted the Company's business through increased negative customer sentiment. In short, the ***potential*** risk Defendants warned about had already materialized by April 25, 2024 – rendering the risk disclosure an actionable misstatement.

20. Defendants' unequivocal denials of the media allegations of skimping were materially false and misleading because at the time they were made, Chipotle had already commenced an investigation into the allegations, which was not yet complete, to determine whether they were accurate. Evidently, they were accurate. By no later than May 29, 2024, Chipotle senior leadership, through its regional managers, instructed restaurants to increase portion sizes as a result of the Company's ongoing investigation into the veracity of the social media allegations of skimping. Accordingly, Defendants had no basis to make the unequivocal denials that they did between May and early July 2024.

21. On June 27, 2024, prior to the market open, Wells Fargo securities analysts issued a report detailing the weight of 75 burrito bowls ordered from various Chipotle Mexican Grill restaurants in the New York City area. Wells Fargo found that portions varied significantly, with the lightest bowls weighing up to three standard deviations below the median weight of all bowls ordered.

22. On that news, the price of Chipotle's stock fell $3.45 a share, or 5.2%, to close at $62.41 per share.

23. Between the close of the market on June 27, 2024 and July 24, 2024, the Company's stock price continued to fall, dropping approximately 20%, as a result of persistent negative information and customer complaints about Chipotle's shrinking portions. Market participants reported that, despite the recent excitement about the late June 2024 50-for-1 stock split, the Company's stock price had entered into a

tailspin as media coverage of Chipotle's ever-shrinking portions intensified in light of Defendants' repeated denials of the allegations.

24. On July 24, 2024, after the close of the market, Chipotle conducted its 2Q24 Earnings Call, during which the Company made the following statements regarding the allegations concerning shrinking portions at its restaurants:

> I want to take a minute to address the portion concerns that have been brought up in social media. First, there never was a directive to provide less to our customers. Generous portions as [sic] a core brand equity of Chipotle. It always has been, and it always will be.
>
> With that said, getting that feedback [*i.e.*, social media complaints of skimping] caused us to relook at our execution across our entire system with the intention to always serve our guests . . . with generous portions. . . . ***We have also leaned in and reemphasized generous portions across all of our restaurants as it is a core brand equity of Chipotle.***
>
> ***Our guests expect this now more than ever, and we are committed to making this investment to reinforce that Chipotle stands for a generous amount of delicious, fresh food at fair prices for every customer visit***.
>
> * * *
>
> ***So look, your first question, part of the reason why we went and looked across the system was when we got the feedback on portion sizes [i.e., social media complaints of skimping] . . . we wanted to make sure we're executing consistently across the system***.

Chipotle also reported that its expected cost of sales would increase due, in part, to "an investment we are making as we focus on outlier restaurants ***to ensure correct and generous portions***."

25. On that news, the price of Chipotle's stock fell another $0.96 a share, or 1.85%, to close at $50.82 on July 25, 2024. The following day, the Company's stock continued to fall, closing at $49.83 a share.

26. Following Chipotle's disclosure that at least 10% of its 3,500+ restaurants were, in fact, skimping on customer portions, numerous news outlets characterized Niccol's July 24, 2024 statement as either an admission or an acknowledgment that the social media allegations of skimping were accurate. These news reports also expressed dismay with Chipotle, Niccol, and Schalow, as they had issued unequivocal denials of wide-spread public accusations of skimping just weeks prior to July 24, 2024.

27. On October 29, 2024, prior to the stock market close, Chipotle issued a press release, which it filed with the SEC on Form 8-K, announcing its 3Q24 financial results. The Company disclosed that its cost of sales had increased 90 basis points due in large part to its focus "on ensuring consistent and generous portions." Immediately after the close of the market, Chipotle conducted its 3Q24 Earnings Call, and affirmed the disclosure of increased cost of sales and decreased margins during Niccol's prepared remarks. The Company's new Chief Financial Officer also signaled a 2% to 3% price increase – to further remediate the skimping scandal – would likely be necessary.

28. On that news, the Company's stock price dropped by $4.76 per share, or 7.9%, to close at $55.73 on October 30, 2024.

29. As a consequence of the corrective disclosures made to the market between June and October 2024, Plaintiff and members of the Class collectively suffered economic losses, or damages.

## BACKGROUND AND OTHER RELEVANT FACTS

**The Company**

30. Chipotle, incorporated in Delaware in 1998, began publicly trading in 2006. Throughout the Class Period, the Company's main office was located at 610 Newport Center Drive, Newport Beach, California 92660. The Company has competed in the "fast-casual" restaurant segment since its founding and caters to customers who expect food quality that's more in line with full-service establishments. Since its inception, Chipotle has promoted itself as coupling a food quality offering in line with full-service restaurants, with the speed and convenience associated with the fast-food segment. Further, as stated by Niccol in late July 2024: "Generous portions [are] a core brand equity of Chipotle. It always has been, and it always will be."

31. Throughout the Class Period, Chipotle owned and operated Chipotle Mexican Grill restaurants, featuring a menu of burritos, burrito bowls, quesadillas, tacos, and salads. In various filings with the SEC, Defendants stated the Company is "passionate about providing a great guest experience and making [its] food more accessible to everyone while continuing to be a brand with demonstrated purpose."

32. Prior to Chipotle's 2006 initial public offering, McDonald's Corporation was the majority owner of the Company. McDonald's divested itself of its majority ownership position due to disagreements about Chipotle's business model. Chipotle owns and operates all of its restaurants, unlike most large fast-food companies that operate a franchise business model. As of December 31, 2024, the Company and its consolidated subsidiaries owned and operated over 3,700 Chipotle Mexican Grill restaurants in the United States and internationally.

**Change in Chipotle's Culture**

33. Under the leadership of Chipotle's Denver, Colorado-based founder, Steve Ells, Chipotle placed an emphasis on employee satisfaction and building a

culture of family between restaurant workers and management. For example, in its 2010 10-K, the Company stated:

> *Culture of High Performers*. We value the individuality of our company, our employees and our customers, which we believe results in a management, operations and training philosophy distinct from that of our competitors. We are committed to creating a performance based culture that leads to the best restaurant experience possible for our customers. The foundation of that culture starts with hiring the best teams in our restaurants. We make an effort to hire employees who share a passion for food, and who will operate our restaurants in a way that is consistent with our high standards but that allows each of their unique personalities and strengths to contribute to our success. We provide attractive career opportunities to crew and managers who are committed to work hard, provide great customer service and have the ability to lead and empower others. We provide hands on, shoulder to shoulder training to develop the full potential of our restaurant employees. . . . This program helps encourage our staff members to develop skills that will enhance their work experience and enrich their personal lives.

34. Under Ells's leadership, Chipotle employees were taught to focus on customer satisfaction, and to be more generous with serving portions, should customers request them, even if it meant less profitability.

35. In 2018, however, Chipotle's corporate culture changed significantly. In February 2018, Chipotle announced that it had hired Niccol to replace Ells. As reported on February 13, 2018, the Company's largest shareholder – Pershing Square Capital Management, L.P. ("Pershing Square") – lauded Niccol's hire as its first choice and stated, "'[Niccol] is the right leader to reinvigorate the company and help it achieve its enormous potential.'"

36. After Niccol's hire, there was more pressure at Chipotle to generate profits by controlling costs. During the 2020 Covid-19 pandemic, however, Chipotle was able to weather some inflationary pressure through several price increases. For example, Chipotle raised its menu prices by around 10% during 2021 and by an additional 5% during 2022. During late 2021 and through 2022, as the pandemic continued to wane in severity, Chipotle management discussed the impact portion sizes had on the Company's costs and profits, deciding that store employees were providing too much food to customers and that they needed to be much leaner with regard to portions. When corporate employees returned to their offices in Spring 2022, there was an intense push to increase profits.

37. According to Chipotle's former Manager of Customer Incidents, when employees returned to the Company's corporate offices in 2022, Chipotle executives called a town hall meeting to discuss the Company's performance. During that meeting, with Schalow in attendance, Niccol told corporate employees that they were lazy and not working hard to increase profits.

38. According to the same Manager of Customer Incidents, Chipotle started to receive increased complaints about shrinking portions in 2021 through 2022. However, the Company did not take them seriously until late 2023, when customer complaints about shrinking portions increased drastically.

39. Under Niccol's leadership, each Chipotle restaurant was expected to meet or exceed a Company metric known as Critical Inventory (or "CI"). CI tracked food inventory levels for high-cost items such as steak, chicken, sofritas, avocados, blocks of cheese, and queso blanco (melted white cheese). Twice each day, Chipotle restaurant employees were required to count their CI and enter it into system known as the E-Restaurant System (or "ERS"). The ERS system would provide restaurant employees and Chipotle management a variance of the amount of inputs actually sold versus what employees were supposed to provide under Chipotle policy. Chipotle

management expected all restaurants, in general, to produce less than a 0.6% variance in terms of food on hand compared to what Company policy dictated.

40. According to a former Chipotle Field Leader and Regional Training Manager, the easiest way to achieve an acceptable CI was by skimping on portions, which Chipotle employees did all the time because they were afraid of losing their jobs. The former Field Leader had numerous conversations with store-level employees, throughout 2023 and during the Class Period, who saw no way of hitting the CI metric other than skimping on portions. The former Field Leader spoke to numerous General Managers in the former Field Leader's "patch" (a geographical location, often crossing state lines, representing eight to ten restaurants) about the issue of skimping and spoke with other General Managers in other patches who openly admitted to skimping. Further, when the former Field Leader was involved in Chipotle's regional training between October 2021 and May 2022, the former Field Leader worked with over 100 General Managers and observed that skimping was already an internal issue at Chipotle. And, the former Field Leader stated, the problem only grew worse up to the point the former Field Leader resigned in 2024.

**Public Accusations of Skimping on Orders and Defendants' Repeated Unequivocal Denials**

41. Complaints concerning Chipotle's "'shrinkflation'" increased in 2023, surging toward the latter half of the year. Thousands of customers took to social media, including TikTok, Reddit, and X (formerly Twitter) to complain.

42. For example, on October 30, 2023, content creator Ryan Lynch posted a video on TikTok complaining of the Company's shrinking portion sizes. His video received millions of views, hundreds of thousands of likes, and thousands of comments from customers that echoed his observations.

43. On December 19, 2023, the *New York Post* published an article about the growing criticism of the Company on social media, headlined "Chipotle called out by fans over 'shrinking' portion sizes," including the following denial from Schalow:

"'We have not changed our portion sizes, and we continue to receive praise for the incredible value our entrees offer.'" The *New York Post* article quoted a Northwestern University professor as stating "'[w]hen something touches a nerve like this, brands really do need to respond'" and "'I don't think anyone is expecting Chipotle to change overnight, but if I were Chipotle, I would acknowledge [the matter] . . . and look into it. There may be procedural reasons they cannot do it, but authenticity would go a long way here.'"

44. By April 2024, complaints about skimping orders and inconsistent portioning were gaining increased traction. For example, a website known as "stoptheskimp.com" began accumulating ratings of Chipotle Mexican Grill restaurants across the country (and in Europe) by the amount customers reported the restaurants to have skimped on the ingredients in their orders. As reported by *The Wall Street Journal*, Zackary Smigel released a YouTube video in March 2024 disclosing his findings with respect to burrito and burrito bowl orders he had placed over 30 days at three different Chipotle Mexican Grill locations in Pennsylvania and Ohio. Smigel's primary finding was that the burritos he ordered online were skimpier 70% of the time.

45. The public backlash peaked in May 2024. On May 3, 2024, TikTok influencer Keith Lee, who was previously affiliated with Chipotle through a brand partnership, posted a video that criticized the Company's shrinking portions. The video went viral, receiving tens of millions of views, millions of likes, and sparking multiple follow-on articles by news outlets.

46. Privately, according to a former Chipotle General Manager, the Company responded by holding "town hall" style meetings where Chipotle senior management told restaurant managers and employees to increase portion sizes.

47. Publicly, the Company responded by issuing a flurry of denials. On May 16, 2024, Schalow issued a statement denying that Chipotle's portion sizes had

changed, as well as denying that customers' view of Chipotle and the value it provided them had been negatively impacted.

48. On May 29, 2024, Schalow and Niccol made multiple public statements, to news outlets and during a television appearance, each denying that Chipotle's portion sizes had changed.

49. Defendants' denials temporarily had the intended effect. Analysts from Wedbush Securities LLC published a report following the first denial, on May 20, 2024, reporting on the "slew" of content creators critiquing Chipotle's portion sizes, but maintaining their 2024 projected earnings estimates.

50. On June 27, 2024, analysts from Wells Fargo published a report with their findings after ordering 75 similar burrito bowls across eight New York City locations. The analysts found that portion sizes were inconsistent and varied significantly, with the largest bowl being roughly double the size of the smallest.

51. On July 17, 2024, the same analysts from Wells Fargo Securities published a follow-up report, attributing the Company's recent share price decline to rising concerns regarding portion size.

52. On July 24, 2024, during the Company's 2Q24 Earnings Call, the Company finally began to reveal the truth. During that call, Niccol informed investors and the public that an internal review revealed that Chipotle's portion sizes needed to be corrected, and that doing so would increase the Company's cost of sales and decrease its profit margins.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND SCHEME TO MISLEAD CUSTOMERS AND INVESTORS

53. On April 25, 2024, Chipotle filed its 1Q24 Form 10-Q with the SEC. The 1Q24 Form 10-Q was signed by Hartung (and approved for filing by Niccol), and contained the following risk disclosure: "***Our inability or failure to recognize, respond to and effectively manage the immediacy of social media could have a material adverse impact on our business. . . . Use of social media by our . . . guests***

***. . . could lead to litigation or result in negative publicity that could damage our reputation***." Niccol is also alleged to be primarily liable for this risk disclosure because it was originally stated in the Company's 2023 Form 10-K (which Niccol signed), and the Company incorporated that risk disclosure by reference into Chipotle's April 25, 2024 Form 10-Q.

54. The statement in ¶53, was false and/or materially misleading because:

(a) By no later than April 25, 2024, public complaints about Chipotle's skimping customers and inconsistent portioning were gaining increased traction. As subsequently reported by *The Wall Street Journal*, in March 2024, Zackary Smigel released a YouTube video disclosing his findings concerning burrito and burrito bowl orders he had placed over 30 days at three different locations in Pennsylvania and Ohio. Smigel's primary finding was that the burritos he ordered online were skimpier 70% of the time;

(b) By April 2024, Smigel's "stoptheskimp.com" website had begun to publicly report ratings of the Company's restaurants in the United States and Europe according to the amount those restaurants were skimping on customers' orders; and

(c) The Company's risk disclosure portrayed the risk of social media being used by its customers, causing negative publicity and damage to the Company's reputation, as a mere possibility. By no later than March 31, 2024, Chipotle had already internally acknowledged that the rising level of customer complaints, and the Company's lack of an affirmative response thereto, had already negatively impacted customer sentiment and needed to be addressed. ¶¶112, 114.

55. On May 16, 2024, Schalow was quoted by, among others, *Restaurant Business Online*, issuing the following statement, denying both that any change in portion sizes had occurred as well as the extent of the harm caused to the Company: "'***We have not changed our portion sizes, and our guests continue to appreciate the value we offer them***.'"

56. On May 29, 2024, Niccol appeared on CNBC's program "Mad Money" with Jim Cramer to discuss the issues. During Niccol's appearance, Cramer asked Niccol, "***[Y]ou haven't shrunk – you've not shrunk the portions***[?]" Niccol responded: "***No. No. We never have***." During Niccol's "Mad Money" appearance, he asserted that the social media accusations of Chipotle skimping on customer orders were "***crazy to me***" and reminded viewers the Company's burritos were as "big as your head."

57. Also on May 29, 2024, Schalow issued statements to various news outlets, including *ABC News* and *The Washington Post*, which attributed the following quote to Schalow: "'***There have been no changes in our portion sizes*** . . . .'"

58. On May 30, 2024, *Fortune Magazine*, in an article entitled "Chipotle CEO: Our portion sizes aren't getting smaller – but you can get more food with a special look," quoted Niccol again denying any change to Chipotle's portion sizes, saying that "'***portions have not gotten smaller***.'"

59. On June 28, 2024, *CNN* published an article entitled "An analyst ordered 75 Chipotle burrito bowls to test portion sizes." As part of the story, *CNN* reported that Schalow had informed the news outlet

> Chipotle's bowl size may vary depending upon the number of ingredients a customer selects or if they choose to make an ingredient extra or light. ***She said the company has not changed its portion sizes***.

60. On July 4, 2024, in an article entitled "Wells Fargo analysts 'weigh in' on Chipotle sizing after restaurant chain faces backlash online," *Fox Business* reported that Schalow had shared a Company statement saying "'***[t]here have been no changes in our portion sizes, and we aim to provide a great guest experience every time***.'"

61. The statements in ¶¶55-60 were false and/or materially misleading for the following reasons:

(a) Niccol and Schalow, while issuing their denials of restaurants skimping on customer portions, failed to disclose that the Company had, in fact,

already commenced an investigation to determine whether the social media accusations of customer skimping were accurate. ¶¶112, 114. On July 25, 2024, moreover, Defendants acknowledged that the previously undisclosed investigation commenced immediately after the social media allegations of skimping blew up in the media (¶¶72, 77);

(b) Defendants had no reasonable factual basis to make unequivocal denials of social media allegations of skimping on customers given the Company was conducting, at the time those denials were made, a non-public investigation of the allegations of skimping;

(c) No later than May 29, 2024, Chipotle leadership, through its regional managers, privately instructed restaurant managers and employees to increase portion sizes as a result of its ongoing internal investigation into the increasing allegations that the Company was skimping on customers' orders (¶¶119, 124);

(d) On July 24, 2024, Niccol acknowledged that at least 10% of Chipotle's 3,500+ restaurants had been, in fact, skimping on customers' orders based on the previously undisclosed internal investigation into the social media allegations (¶¶72, 77);

(e) Between 2022 and the beginning of the Class Period, Chipotle's executives and upper management placed constant and intense pressure on its restaurant managers to cut costs, closely monitoring and enforcing inventory targets, which led to employees regularly skimping on portions, particularly for online orders, with increasing frequency from 2023 to 2024 (¶¶111, 116-119, 121-123); and

(f) Between 2022 and the beginning of the Class Period, Chipotle leadership suggested to store managers that they could reduce portion sizes if they struggled to meet inventory targets (¶118).

**THE TRUTH IS REVEALED**

62. On June 27, 2024, prior to the market open, Wells Fargo analysts published a report entitled "Chipotle Mexican Grill, Inc. (CMG), Chart(s) of the Day

Part 15: Weighing in on the Burrito Bowl 'Weight Debate.'" In that equity research report, Wells Fargo stated:

> In response to rising social media attention, we ordered & weighed 75 like-for-like burrito bowls across 8 NYC locations. At the median in-store orders and digital orders were very similar (within ~0.2 oz). That said, consistency varied widely, w/ some locations serving bowls that weigh ~33% more than other locations (on equivalent orders); and the heaviest digital/in-store bowls weighing 87%/47% more vs the lightest. While throughput is improving, order consistency remains an opportunity.
>
> * * *
>
> Bowl weight varied widely with the lightest bowl ~3 standard deviations below the median.

The Wells Fargo report noted that U.S. consumers utilizing Google for the search "'Chipotle portion'" had reached an all-time high in late-May and early-June 2024.

63. On June 27, 2024, Chipotle's stock price closed at $62.41 per share, representing a 5.4% drop from the prior day's close of $65.86.

64. On June 27, 2024, *BroBible* published an online article entitled, "Finance Bro Discovers Chipotle is Completely Lying About Consistent Portion Sizes":

> Chipotle has been under fire over portions sizes lately, as social media is abound with people complaining about the lack of food they're getting in a standard order compared to what they got in the past from the fast-casual Mexican chain. Customers have even resorted to filming themselves going through the lines to ensure they get what they should.
>
> A Wells Fargo analyst took it upon himself to test whether portion sizes truly were as inconsistent as people have been claiming. He tested 75 identical Chipotle bowls at eight restaurants in New York City, and found that portion sizes wildly vary.

* * *

> Look at the variation there! One bowl was nearly twice as big as the smallest bowl. I understand that something like a Chipotle-style restaurant is never going to be exact science. But, to be off by that much is actually inexcusable.
>
> In [M]ay, Chipotle CEO Brian Nicol [sic] claimed that portion sizes were perfectly fine at Chipotle. He clearly hadn't seen this chart yet, because this is pretty much a catastrophe for the brand in terms of quality control.

65. On June 28, 2024, *CNN* published an article entitled "An analyst ordered 75 Chipotle burrito bowls to test portion sizes." In the article, *CNN* reported about the June 27, 2024 Wells Fargo analyst report and noted "[c]ustomers go to restaurant chains for consistency, and if portion sizes are not standardized it could hurt a chain's reputation, analysts say. Many brands have been criticized for shrinking their product sizes and charging the same or more, known as 'shrinkflation.'"

66. On July 12, 2024, *Bloomberg* published an article reporting:

> A hubbub on social media over Chipotle Mexican Grill Inc.'s portion sizes has sent the burrito chain's shares into their worst tailspin in nearly a year.
>
> * * *
>
> The stock plunged 8.1% in the past five days and is now down 16% from a record set last month. Chipotle's 50-for-1 stock split in late June added to [upward price] volatility in recent weeks.
>
> * * *
>
> Chipotle's criticism online comes from diners who say its serving sizes have shrunk, though Chief Executive Brian Niccol has denied the claims.
>
> * * *

> Chris O'Cull [a Stifel analyst] said he wouldn't be surprised if there was some "short-term disruption" from customers' claims about small portions, but he views any pullbacks related to this concern as a chance to buy Chipotle shares.

67. On July 15, 2024, TD Securities issued a report stating that its investor survey data regarding Chipotle slowed in June, "coinciding with a social media focus on portion variability (aka Stop the Skimp) that we believe is weighing on shares."

68. On July 17, 2024, analysts from Wells Fargo published a follow-up report to their June 27, 2024 report regarding the wide variances in servings sizes observed in New York City. The analysts identified a "rising concern" about the "portion size debate" as a factor explaining the 16% drop in the Company's stock price since its recent high in mid-June 2024.

69. On July 19, 2024, *YouGov.com* published an article titled "Is Chipotle feeling the heat amid portion size concerns? Buzz and Value scores are certainly dipping." After noting Chipotle had been facing criticism since December 2023 regarding portion sizes, *YouGov* reported that customer sentiment about the Chipotle brand and whether customers believed they were getting good value for their money – both nationally and with TikTok users only – had significantly slipped between March and mid-July 2024.

70. Between June 27 and July 23, 2024, as the truth regarding Chipotle's shrinking portions leaked into the market, the Company's stock price dropped from $65.86 to $52.55 per share, or by 20.2%.

71. After the market closed on July 24, 2024, during the Company's 2Q24 Earnings Call, the Company belatedly acknowledged that at least 10% of its 3,500+ restaurants had been, in fact, skimping on customer portions, and that the Company had previously begun an internal investigation of allegations of skimping after the topic blew up on social media. And, Niccol made that clear in his opening comments

to investors and securities analysts that he was now going to be ensuring that restaurants served "***generous portions***" at "***all of [its] restaurants***."

> ***We have also leaned in and reemphasized generous portions across all of our restaurants as it is a core brand equity of Chipotle.***
>
> ***Our guests expect this now more than ever, and we are committed to making this investment to reinforce that Chipotle stands for generous amounts of delicious, fresh food at fair prices for every customer every visit.***

72. During the July 24, 2024 Earnings Call, Niccol also suggested to a Citigroup financial analyst that the Company initiated its investigation of portion skimping months earlier, when the social media accusations sprang up: "***So look, your first question, part of the reason why we went and looked across the system was when we got the feedback on the portion sizes . . . we wanted to make sure we're executing consistently across the system***."

73. On July 24, 2024, Niccol also warned investors that the Company's efforts to correct the problem would result in a 40 to 60 basis point increase in Chipotle's cost of sales. In an attempt to blunt that news, the Company announced in a press release, filed with the SEC on Form 8-K the same day, that it authorized an additional $400 million in stock buybacks.

74. Following Niccol's disclosure, Chipotle's stock price dropped from its July 24, 2024 close of $51.78 per share, to close at $49.83 per share on July 26, 2024, representing a two-day drop of 3.8%. Moreover, analysts from Deutsche Bank, Morgan Stanley, Oppenheimer, Guggenheim Securities, Stephens Inc., Evercore ISI, and Wedbush Securities, each issued reports lowering their price target for Chipotle stock, most by 5%, each citing the Company's added costs to address the portion size concerns.

75. On the heels of the July 24, 2024 disclosure, several news sources stated that Defendants had either confirmed, admitted, or conceded that at least 10% of

Chipotle's 3,500+ restaurants were skimping on customer orders, despite Defendants' repeated and unequivocal denials of social media allegations to the contrary.

76. On July 25, 2024, *CBS News* reported an article entitled "Chipotle customers were right – some restaurants were skimping, CEO says." The article stated:

> In its initial response to complaints, Chipotle earlier this month told CBS MoneyWatch that it hadn't changed its portion sizes, but that some meals "may have variability in their size or weight."
>
> ***On Wednesday, however, Niccol disclosed that skimpy portions have been a problem at about 10% of its roughly 3,500 locations***.

77. On July 25, 2024, *Breaking Innovation* issued an article entitled "Some Chipotles Actually Were Skimping on Portion Sizes – But 'Generous' Servings Are Priority, Chipotle CEO Says." In the "[t]opline" of the article, the author stated "***Chipotle's CEO confirmed at least 10% of its locations were skimping on portion sizes after the company previously denied the claim*** . . . ." The article also confirmed that Niccol said Chipotle began investigating alleged shrinking portions "***after the topic blew up on social media***."

78. On July 29, 2024, *Fox 26 Houston* issued a report entitled "Chipotle CEO admits some restaurants were skimping on portion sizes." The article noted Niccol's belated admission of skimping on customers at least 10% of its 3,500+ restaurants: "***After weeks of denying social media accusations . . . company leadership says in some cases, they were [skimping], and it's time to get better***." The article also noted that "***[i]n June Chipotle CEO told Fortune magazine that there was no order to skimp on orders . . . . Now [Niccol] tells investors that some restaurants were doing just that***. [Niccol] says there will be retraining to ensure consistent . . . products in every location."

79. On July 29, 2024, *Today.com* issued an article containing the sub-title: "Chipotle customers were right: Some restaurants were indeed skimping on the

portions the company's CEO says." In the same article, the author stated: "***Chipotle has conceded to customer complaints on social media***, ***admitting that its portion sizes at some location have been lacking***." In the same article, *Today.com* reiterated Niccol's July 24, 2024 statement that the Company had been investigating skimping accusations (*i.e.*, "***[the prior] negative feedback . . . caused the company to reexamine its portion execution across its entire system***").

80. On October 29, 2024, just before markets closed, Chipotle issued a press release, which it filed with the SEC on Form 8-K, announcing its third quarter financial results. In that press release, the Company disclosed that its cost of sales had increased 90 basis points due in part to its focus "on ensuring consistent and generous portions." In an attempt to blunt that news, the Company announced in the same press release that it had authorized a total of $900 million in stock buybacks.

81. After the market closed on October 29, 2024, Chipotle conducted its 3Q24 Earnings Call. During the call, the Company disclosed that its cost of sales increased by 90 basis points due, in part, to "***ensuring consistent and generous portions***." During that same call, Chipotle's new CFO, Adam Rymer, also attributed the Company's increased cost of sales to "the investment that we made in portion," and decreased profit margins to "the portion investment," when responding to questions from analysts. Rymer also told investors that a menu price increase of 2% to 3% was likely necessary to offset increased cost of sales due to inflation and to continue remediating the skimping scandal.

82. Following Chipotle's October 29, 2024 disclosures, Chipotle's stock price dropped from its October 29, 2024 close of $60.49 per share, to close at $55.73 per share on October 30, 2024, representing a one-day drop of 7.9%.

83. On October 30, 2024, during the trading day, *Business Insider* published an article entitled "Chipotle Says Ensuring 'Consistent' Portions Has Hit Profitability." The article noted "[p]rofit margins for the chain suffered last quarter

because of a concerted effort to provide 'consistent and generous portions' in every order, the Company said on Tuesday."

## LOSS CAUSATION/ECONOMIC LOSS

84. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and its customers – a course of conduct that artificially inflated the price of Chipotle's stock. Their conduct operated as a fraud or deceit on members of the Class, including through statements which failed to disclose and misrepresented the adverse facts relating Company's portion sizes, cost structure, and profitability.

85. Defendants' Exchange Act violations, including the false and misleading statements and omissions identified herein at ¶¶53 and 55-60, had the intended effect and caused Chipotle stock to trade at artificially inflated levels during the Class Period.

86. The price of Chipotle stock dropped significantly, as the artificial inflation dissipated each time the Defendants' prior false statements, misrepresentations, and omissions were at least partially disclosed or became apparent to the market, and/or the risks concealed by their misconduct at least partially materialized.

87. Prior to the market open on June 27, 2024, Wells Fargo published an analyst report addressing the allegations of Chipotle's shrinking portion sizes. The Wells Fargo analyst tested 75 burrito bowls ordered from 8 New York City Chipotle Mexican Grill restaurants, and found that the lightest bowls weighed three standard deviations lower than median weight of all bowls tested.

88. Between June 27 and July 23, 2024, as a direct result of Wells Fargo's June 27, 2024 analyst report concerning portion consistency, and additional leakage of persistent and increasing public complaints – for example, negative information regarding Chipotle customer value and satisfaction scores – the price of Chipotle's stock dropped from $65.86 to $52.55 per share, or 20.2%.

89. Between June 27 and July 23, 2024, the Dow Jones Industrial Average ("DJIA") was up 3.1%, and Chipotle Industry Proxy was down 4.2%.[1] Each day between June 27 and July 23, 2024, the average daily trading volume for Chipotle's stock exceeded its 2024 average daily volume of 11.4 million shares.

90. On July 24, 2024, Niccol admitted publicly that Chipotle had investigated the allegations of shrinking portions and the Company was forced to "relook at our execution across our entire system with the intention to always serve our guests . . . with generous portions."

91. As a result of Defendants' July 24, 2024 disclosure that at least 10% of its 3,500+ restaurants were, in fact, skimping on customer orders, the Company's stock price suffered another decline. Between July 24 and July 26, 2024, the price of Chipotle's stock dropped by 3.6%.

92. Between July 25 and July 26, 2024, the DJIA increased by 1.8%, and the Chipotle Industry Proxy dropped by 1.0%. On July 25, 2024, the Company's trading volume was 40.8 million shares, or 360% of its 2024 average trading volume of 11.4 million shares. On July 26, 2024, the Company's trading volume on the NYSE was 24.6 million shares, or 220% of its 2024 average daily volume of 11.4 million shares.

93. On October 29, 2024, the Company disclosed that its cost of sales increased by 90 basis points in large part due to "ensuring consistent and generous portions" and a related 2% to 3% price increase was likely.

---

[1] According to Chipotle's 2024 Proxy (filed with the SEC in April 2024), the Company "believes the investment community generally assesses our performance by reference to a peer group composed primarily of other companies in the restaurant industry and other high-growth hospitality and digitally enabled, customer-oriented companies." Chipotle then identified those companies associated with its claimed "peer group." Plaintiff calculated Chipotle Industry Proxy returns by utilizing daily stock price changes associated with the companies listed as Chipotle's claimed "peer group" in the 2024 Proxy, but excluded Chipotle's stock price returns for the purpose of eliminating bias.

94. As a result of Defendants' October 29, 2024 disclosure that cost of sales had increased by a larger amount than expected due to Chipotle's past conduct of serving shrinking portion sizes to customers, including the likely necessity of raising the Company's menu items by 2% to 3%, on October 30, 2024, the Company's stock price suffered yet another price decline. On October 30, 2024, the price of Chipotle's stock dropped by 7.9%.

95. On October 30, 2024, the DJIA remained relatively unchanged, and the Chipotle Industry Proxy dropped by 0.8%. On October 30, 2024, the Company's trading volume on the NYSE was 28.6 million shares, or 250% of its 2024 average daily volume of 11.4 million shares.

## ADDITIONAL ALLEGATIONS OF SCIENTER

**Repeated Denials of Public Accusations**

96. Between late 2023 and July 2024, there was a steady stream of allegations by Chipotle customers over social media asserting that while the Company was steadily increasing the prices of its menu options, it was at the same time cutting back on portions.

97. For example, on December 19, 2023, the *New York Post* reported that Schalow had denied rumors that Chipotle's portion sizes were shrinking. The article quoted Schalow as saying: "'We have not changed our portion sizes, and we continue to receive praise for the incredible value our entrees offer.'" The *New York Post* article quoted a Northwestern University professor as stating "'[w]hen something touches a nerve like this, brands really do need to respond'" and "'I don't think anyone is expecting Chipotle to change overnight, but if I were Chipotle, I would acknowledge [the matter] . . . and look into it. There may be procedural reasons they cannot do it, but authenticity would go a long way here.'"

98. On May 16, 2024, Schalow denied the growing allegations again, stating: "'We have not changed our portion sizes, and our guests continue to appreciate the value we offer them.'"

99. On May 29, 2024, Niccol denied the allegations while appearing on *CNBC*'s program "Mad Money," stating: "No. No. We never have [shrunk the portions]."

100. Also on May 29, 2024, Schalow issued statements to various news outlets, including *ABC News* and *The Washington Post*, which attributed the following quote to Schalow: "'There have been no changes in our portion sizes . . . .'"

101. On May 30, 2024, *Fortune Magazine*, in an article entitled "Chipotle CEO: Our portion sizes aren't getting smaller – but you can get more food with a special look," quoted Niccol again denying any change to Chipotle's portion sizes, saying that "'portions have not gotten smaller.'"

102. Then, on July 24, 2024, Niccol finally admitted that Chipotle, in fact, had a shrinking portion problem.

103. Defendants' denials, when contrasted with the Company's disclosure that, in fact, at least 10% of its 3,500+ restaurants had been skimping on customers' orders, supports a strong inference that Niccol and Schalow were severely reckless (at minimum) in denying the public allegations of skimping because, unknown to investors, at the time the denials were made, the Company had already initiated a non-public, internal investigation into whether the allegations were accurate. ¶¶72, 77, 112, 114.

**Suspicious Insider Trading**

104. During April 2024, it was reported that Niccol sold 6,406 shares of Chipotle stock, for proceeds of approximately $20.4 million. The sales of these shares were not reported as being conducted pursuant to Niccol's Rule 10b5-1 trading plan, or to satisfy any accrued tax obligations associated with the vesting of performance share units awarded to him. Between January 2, 2024 and January 29, 2024, Niccol sold another 3,971 shares of Chipotle stock, reportedly to satisfy either accrued tax obligations associated with vesting of performance share units, and/or pursuant to his

Rule 10b5-1 trading plan, as amended.[2] In the 12-month time period preceding Niccol's April 2024 insider sales, he did not sell a single share of Chipotle stock outside of his 10b5-1 trading plan. Niccol's $20.4 million in proceeds were pure profits as he acquired those shares at no cost-basis to him. Niccol's profits from his April 2024 insider sales were 1,570% higher than his 2023 salary of $1.3 million, and 1,820% higher than his 2024 salary of $1.12 million. After April 2024, Niccol did not report any other insider sales of Chipotle pursuant to §16 of the Exchange Act.

105. In addition, Niccol's April 2024 insider sales of Chipotle stock were highly suspicious, if not flat-out illegal, in light of the following material non-public information to which Niccol had direct knowledge of or had direct access to: That there was an ongoing and undisclosed internal investigation into whether the cavalcade of social media allegations of skimping were accurate, and the Company had already privately concluded that the allegations – whether true or not – had impacted the Company's reputation among investors and customers. ¶¶72, 77, 112, 114.

106. During June 2024, it was reported that Hartung reported to the SEC that he had sold 2,461 shares of Chipotle stock for proceeds of $8.0 million. This stock sale was not reported as being made to satisfy tax obligations as a result of vesting of performance stock units. During 2024, Hartung sold another 2,286 shares, reportedly to satisfy tax obligations as a result of vesting of performance stock units.

107. Hartung's June 2024 insider sale of Chipotle stock was highly suspicious, if not flat-out illegal, in light of the following material non-public information to

---

[2] At the same time Niccol was making his insider trades, Pershing Square (which championed Niccol's selection as Chipotle's CEO in 2018) sold over 348,000 shares of Chipotle stock, while the Company's stock was trading in a range between approximately $2,000 and $3,400 per share (assuming all shares were sold prior to Chipotle's June 26, 2024 50-for-1 stock split). Even if Pershing Square sold all of those shares at $2,500, it would have received proceeds exceeding $870 million. Bill Ackman is the principal and founder of Pershing Square. As admitted during an early 2024 "How Leaders Lead" podcast, Niccol stated "[a]nd to this day, Bill and I still chat."

which Hartung had direct knowledge of or had direct access to: That there was an ongoing and undisclosed internal investigation into whether the cavalcade of social media allegations of skimping were accurate, and the Company had already privately concluded that the allegations – whether true or not – had impacted the Company's reputation among investors and customers. ¶¶72, 77, 112, 114. In addition, Hartung's illegal insider sale was only made after Niccol and Schalow repeatedly denied persistent social media allegations of skimping.

**Information from Confidential Sources**

108. CS-1 was a Chipotle employee from the summer of 2017 through June 2024. CS-1 occupied various managerial positions during CS-1's time at the Company, including as a General Manager, Field Leader, and Regional Training Manager. As Field Leader, CS-1 supervised the managers of roughly ten restaurants. As a Regional Training Manager, CS-1 trained and oversaw the training of Chipotle employees and managers for over 100 restaurants.

109. CS-1 regularly interacted with Company leadership during the Class Period, including interactions with Chipotle's then-Chief Operating Officer, Scott Boatwright ("Boatwright"), who reported directly to Niccol at the time and later became the Company's CEO upon Niccol's departure.

110. CS-1 observed the culture shift described above (¶¶33-40) that occurred when Niccol was named CEO. After Niccol joined the Company, CS-1 noticed that upper management began to apply constant and intense pressure down to the regional and restaurant levels to cut costs. This pressure was reflected in CS-1's interactions with Boatwright. The emails CS-1 received from Boatwright and his team were usually about financial results, particularly costs of sales, which leadership presented as "non-negotiable." When those metrics deviated from the Company standard during the Class Period, CS-1 witnessed field leaders and restaurant managers being told that they needed to fix the problems immediately.

111. CS-1 reported that Company leadership focused closely on "CI" (or, "Critical Inventory"). CI included higher-cost menu items, like meats, avocados, and dairy products. CS-1 reported that store managers were expected to maintain CI variance – as compared to the expected CI inventory levels based on the items served that day – of 0.6% of sales or lower. This 0.6% variance figure included any food waste, narrowing the already unrealistic margin for error. CS-1 observed the pressure to meet or beat the CI variance figures increase from 2023 to early 2024. CS-1 reported talking to restaurant managers that felt as if they could easily lose their jobs if their CI metrics weren't satisfactory to the Company's leaders. In response to that pressure, Chipotle employees skimped "all the time," particularly with online orders where a customer was not present to observe employees distribute the portions, with skimping becoming more and more prevalent from 2022 to 2023 and again from 2023 to 2024.

112. CS-2 was a Chipotle employee from 2018 through March 2024. CS-2 worked at the Company's Columbus, Ohio corporate office as Chipotle's Manager of Customer Incidents. In that role, CS-2 led a team of ten specialists that focused on customer complaints, monitoring them in an internal Company database that compiled the complaints by issue. CS-2 reported directly to the Senior Director of Restaurant Food Safety and indirectly to the Vice President of Food Safety and the Company's Chief Corporate Affairs Officer, Schalow. CS-2 worked closely with Schalow, regularly providing her and her team excel spreadsheets of customer complaints, updates on customer complaints at her request, and helping her respond to various PR and customer-relations situations.

113. Like CS-1, CS-2 observed the shift in culture following Niccol being named CEO. CS-2 recalled that under the Company's founder, Steve Ells, the culture was much more lax about portions. Emblematic of this culture shift, CS-2 reported that upon returning to the office following the COVID-19 pandemic in the spring of 2022, Chipotle executives, including Niccol and Schalow, called a town hall meeting

to discuss the Company's performance. During that meeting, CS-2 recalled Niccol's remarks, summing them up as basically telling employees that they were lazy and not working hard enough. This meeting was followed by more discussions of and pressure surrounding food costs and an immense push regarding profits, led by Niccol.

114. While the Company experienced an uptick in complaints about portion sizes in 2021 and 2022, CS-2 reported that the Company's executives did not seem to care about them until late 2023. In late 2023, Schalow and her team began focusing on the issues concerning portion size, acknowledging the growing number of complaints. Prior to CS-2's departure in March 2024, Schalow's team reached out to CS-2's team for help in addressing the portion size debacle. At the same time, Defendants were maintaining their public denials that there was any issue with portion size. Thus, while Defendants publicly denied awareness of any issues with portion size or customers' perceptions of Chipotle as a result, Schalow's team privately worked to investigate portion size concerns. CS-2 recalled that those efforts, and specifically the communications to restaurants attempting to address portion size issues, were overseen by Schalow.

115. CS-3 was a Chipotle employee from 2019 through October 2024. CS-3 was promoted several times prior to the Class Period and was a General Manager from the beginning of the Class Period through CS-3's departure.

116. As a General Manager, CS-3 was tasked with validating inventory levels and food cost metrics. Despite working in a different geographic region than CS-1, CS-3 corroborated CS-1's description of CI, CS-1's report that CI metrics were counted and entered into a Company database twice daily, CS-1's report that CI variance was required to be at or below 0.6%, and CS-1's report that CI variance included any food waste.

117. CS-3 also recalled General Managers, including CS-3, reported feeling significant pressure around maintaining compliance with the Company's CI metric standards. CS-3 attended weekly and bi-weekly meetings with CS-3's regional

manager, along with other General Managers in CS-3's patch, where CS-3's regional manager would review each store's CI metrics, calling out stores that failed to comply. CS-3 recalled Field Leaders and VPs performing audits of restaurants, providing feedback when they visited CS-3's restaurant.

118. CS-3 recounted discussions with other General Managers in CS-3's patch about the pressure they faced to maintain compliance with CI metric goals. According to CS-3, General Managers, including CS-3, were reprimanded and screamed at if variance went above the allowed 0.6%. CS-3 reported that CS-3, and other General Managers in CS-3's patch, discussed feeling like they would be fired if they did not skimp. CS-3 reported that CS-3, like other General Managers in CS-3's patch, had been told by Field Leaders or VPs that if they had high CI variance, portion sizes were to blame. CS-3 also reported that, along with other General Managers in CS-3's patch, when stores were not meeting CI goals, General Managers were implicitly instructed to skimp on portions by Field Leaders and VPs that suggested skimping was one way they could bring their stores back into compliance. CS-3 reported that, as a result of the pressure described above, CS-3 observed employees at CS-3's store skimp on customer portions.

119. CS-3 also recalled the Company's internal reaction following Keith Lee's May 3, 2024 TikTok described above (¶¶45-47). CS-3 reported that the Company held town hall meetings to discuss correcting portion sizes. CS-3 was able to review the CI metrics reported by all restaurants in CS-3's patch when CS-3 entered CS-3's restaurant metrics into the Company database. After those meetings, CS-3 recalled seeing drastic increases in the CI metrics reported by restaurants in CS-3's patch – ballooning to 1%-3%, and in some cases up to five times the permitted variance.

120. CS-4 was a Chipotle employee from January 2022 through August 2024. CS-4 was an Assistant General Manager from the beginning of the Class Period through CS-4's departure.

121. CS-4, despite working in restaurants in different geographic regions from CS-1 and CS-3, corroborated CS-1's and CS-3's accounts concerning CI, including the Company's requirement that restaurants measure and enter their CI levels into a database twice daily. CS-4 also recalled employees at CS-4's restaurant, and other restaurants in CS-4's patch, discussing their fear that they would be fired if they did not improve their inventory numbers. CS-4 reported that these fears were justified; Chipotle employees at restaurants who did not comply were fired.

122. CS-4 reported that the pressure on Chipotle employees to comply with CI goals trickled down from upper-level leadership, to CS-4 through Vice Presidents and Field Leaders. CS-4 recalled that this pressure from corporate intensified from 2022 to 2023. At one point during the Class Period, CS-4 discussed the pressure these metrics imposed with a Field Leader. The Field Leader acknowledged that the goals were "crazy," but said they were coming from above CS-4's level.

123. CS-4 reported that Chipotle employees did skimp and did so due to the unrealistic expectations imposed by Company leadership and "out of fear of losing their jobs." CS-4 reported that Company employees received bonuses associated with achieving certain metrics, including good CI. But, as CS-4 put it, "the fear of keeping your job was a stronger motivator than the bonuses."

124. CS-4 also recalled the Company's response to Keith Lee's May 3, 2024 TikTok and other social media complaints. ¶¶45-47. Following Keith Lee's viral social media critique, CS-4 was told by employees at the Company's headquarters to re-train employees regarding portions.

## CLASS ACTION ALLEGATIONS

125. Plaintiff brings this action on behalf of herself and all persons or entities who purchased or otherwise acquired Chipotle common stock, all persons or entities who purchased or otherwise acquired Chipotle call options, and all persons or entities who sold or otherwise disposed of Chipotle put options between April 25, 2024 and October 29, 2024, inclusive, and were damaged thereby. Excluded from the Class are

Defendants, as defined above (¶¶7, 10, 12), present or former executive officers and directors of Chipotle and their immediate family members (as defined in 17 C.F.R. §229.404(1)(a)(iii) and (1)(b)(ii)).

126. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Throughout the Class Period, Chipotle's Securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class. During the Class Period, there were more than 27.4 million shares of Chipotle common stock outstanding and the average daily trading volume was over 11.3 million shares.[3] Record owners and other members of the Class may be identified from records maintained by Chipotle or its transfer agent(s) and may be notified of the pendency of this action using the form of notice similar to that customarily used in securities class actions.

127. There is a well-defined community of interest in the questions of law and fact involved in this case. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) Whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

(b) Whether statements made by Defendants to the investing public during the Class Period misrepresented and omitted material facts about the shrinking

---

[3] According to the Company's 2023 SEC Form 10-K (annual report), as of February 2, 2024, there were approximately 27.4 million Chipotle common stock shares outstanding. On June 26, 2024, however, Chipotle exercised a 50-for-1 common stock split. Prior to the June 26, 2024 stock split, Chipotle's common stock traded on the NYSE at above $3,000 per share.

and/or inconsistent food portions served to customers, and its impact on the cost structure of the Company; and

(c) To what extent the members of the Class have sustained damages and the proper measure of damages.

128. Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages as a result of Defendants' wrongful conduct.

129. Plaintiff will adequately protect the interests of the Class and has retained counsel who is experienced in securities and class action litigation. Plaintiff has no interests which conflict with those of the Class.

130. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for all members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**APPLICABILITY OF THE PRESUMPTION OF RELIANCE**

131. Plaintiff and the Class are entitled to a presumption of reliance pursuant to *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and the fraud-on-the-market doctrine because, during the Class Period, Chipotle common stock traded in an efficient market on the NYSE, the material misstatements and omissions alleged herein would induce a reasonable investor to misjudge the value of Chipotle Securities, and without knowledge of the misrepresented or omitted material facts, Plaintiff and other members of the Class transacted in Chipotle Securities between the time Defendants' Exchange Act violations began, including Defendants' misrepresentations and failures to disclose material facts about the size and/or consistency of food portions served to consumers and the time the true facts were disclosed. Accordingly, Plaintiff and other members of the Class relied, and are entitled to have relied, upon the integrity of the market for Chipotle Securities and are entitled to a presumption of reliance on

Defendants' materially false and misleading statements and omissions during the Class Period.

## CLAIMS FOR RELIEF

## COUNT I

### For Violations of §10(b) of the Exchange Act and Rule 10b-5 Against All Defendants

132. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein. Count I is brought pursuant to §10(b) of the Exchange Act (15 U.S.C. §78j(b)) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

133. During the Class Period, Defendants violated the Exchange Act and Rules 10b-5(a) and (c) promulgated thereunder. As alleged herein, Defendants' scheme and wrongful course of business was designed to and did: (i) enable Chipotle to artificially deflate its cost of sales and artificially inflate its profit margins; (ii) conceal adverse material information about the size and/or consistency of food portions served to consumers, and the attendant material risks posed to the investing public; and (iii) conceal adverse material information contradicting, and/or inconsistent with, Defendants' false and/or materially misleading statements complained of herein.

134. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they transacted in Chipotle Securities at prices that were manipulated by Defendants' fraudulent scheme and wrongful course of business complained of herein.

135. During the Class Period, Defendants also violated §10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder. As alleged herein, Defendants made or were responsible for the statements specified in ¶¶53 and 55-60, which they knew or recklessly disregarded were false and/or misleading in that they failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

136. Defendants and the Company's officers, management, and agents did not have a reasonable basis for their alleged false statements and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the Class during the Class Period.

137. Chipotle is liable for all false and/or misleading statements and omissions made during the Class Period, as alleged above, including the false and misleading statements made by the Company's officers and agents, as alleged above, as the maker of such statements and under the principle of *respondent superior*.

138. Defendants and the Company's officers, management, and agents directly and indirectly, by the use of means and instrumentalities of interstate commerce, the mails, and/or the facilities of a national securities exchange: (a) employed devices, schemes, and artifices to defraud; (b) made misleading statements and omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Chipotle Securities during the Class Period. All Defendants are sued as primary participants in the wrongful and illegal conduct alleged herein and as controlling persons as alleged below.

139. The allegations above establish a strong inference that Chipotle, as an entity, acted with corporate scienter throughout the Class Period, as its officers and agents had actual knowledge of the false and/or misleading nature of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth because they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were made knowingly or with recklessness, and without a reasonable basis, for the purpose and effect of concealing the truth about the size and/or consistency of food portions served to consumers and to Chipotle's future

operational results and strategic direction and artificially inflating the prices of the Company's securities. By concealing these material facts from investors, Chipotle's stock price was artificially inflated during the Class Period.

140. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they transacted in Chipotle Securities at the time Chipotle's stock was artificially inflated. Plaintiff and the Class would not have transacted in Chipotle Securities at the prices they paid, or at all, if they had been aware that the market prices of Chipotle stock had been artificially and falsely inflated by Defendants' misleading statements, omissions, and/or fraudulent scheme and course of conduct complained of herein.

141. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their transactions in Chipotle Securities during the Class Period.

**COUNT II**

**For Violation of §20(a) of the Exchange Act**
**Against the Individual Defendants**

142. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein. Count II is brought pursuant to §20(a) of the Exchange Act (15 U.S.C. §78t(a)).

143. The Individual Defendants acted as controlling persons of Chipotle within the meaning of §20(a) of the Exchange Act. By virtue of their high-level positions, their ownership and contractual rights, their participation in and awareness of the Company's shrinking and/or inconsistent portions served to customers, as well as their intimate knowledge of the false statements and omissions made by the Company and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the Company's decision making, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Defendants made public

statements regarding the allegations of Chipotle's shrinking portions, and otherwise lack of consistency in portion sizes, during television interviews and/or to the press, identified and described herein at ¶¶55-60, and issued risk disclosures through SEC filings, identified and described herein at ¶53 alleged by Plaintiff to be materially misleading.

144. In particular, Niccol, Hartung, and Schalow had direct and supervisory involvement in the Company's day-to-day operations and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein and to have exercised the same. By reason of such power to control or influence conduct, Niccol, Hartung, and Schalow are liable pursuant to §20(a).

145. As set forth above, Niccol, Hartung, and Schalow each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this complaint. By virtue of their positions as controlling persons, Defendants are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of Chipotle stock during the Class Period.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays for relief and judgment, as follows:

A. Determining that this action is a proper class action and certifying Plaintiff as Class representative under Federal Rule of Civil Procedure 23 and Plaintiff's counsel as Class counsel;

B. Awarding compensatory damages in favor of Plaintiff and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' violations of the federal securities laws, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Such equitable, injunctive, or other and further relief as the Court may deem just and proper, including, but not limited to, rescission.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury.

DATED: January 20, 2026

ROBBINS GELLER RUDMAN
& DOWD LLP
TOR GRONBORG
TRIG R. SMITH

s/ Trig R. Smith

TRIG R. SMITH

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
torg@rgrdlaw.com
trigs@rgrdlaw.com

Lead Counsel for Lead Plaintiff