LATHAM & WATKINS LLP
Michele D. Johnson (CA Bar No. 198298)
 michele.johnson@lw.com
Ryan A. Walsh (CA Bar No. 294506)
 ryan.walsh@lw.com
650 Town Center Drive, 20th Floor
Costa Mesa, California 92626-1925
Telephone: +1.714.540.1235
Facsimile: +1.714.755.8290

Andrew B. Clubok (*pro hac vice*)
 andrew.clubok@lw.com
Susan E. Engel (*pro hac vice*)
 susan.engel@lw.com
Matthew J. Peters (*pro hac vice*)
 matthew.peters@lw.com
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004-1304
Telephone: +1.202.637.2200
Facsimile: +1.202.637.2201

*Attorneys for Defendants Chipotle
Mexican Grill, Inc., Brian Niccol,
John R. Hartung, and Laurie Schalow*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| MICHAEL STRADFORD, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>CHIPOTLE MEXICAN GRILL, INC., BRIAN NICCOL, JOHN R. HARTUNG, and LAURIE SCHALOW,<br><br>Defendants. | Case No. 8:24-cv-02459-SPG-JDE<br><br>CLASS ACTION<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS THE SECOND AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Judge: Hon. Sherilyn Peace Garnett<br>Date: May 20, 2026<br>Time: 1:30 p.m.<br>Place: Courtroom 5C<br><br>*[Request for Judicial Notice; Peters Declaration in Support; Proposed Orders concurrently filed herewith]* |

## NOTICE OF MOTION AND MOTION TO DISMISS

PLEASE TAKE NOTICE that on May 20, 2026, at 1:30 p.m., or as soon thereafter as the parties may be heard, before the Honorable Sherilyn Peace Garnett, District Judge, United States District Court for the Central District of California, in the First Street Courthouse, Courtroom 5C, 350 W. 1st Street, Los Angeles, CA 90012, Defendants Chipotle Mexican Grill, Inc. ("Chipotle" or "Company"), Brian Niccol, John R. Hartung, and Laurie Schalow (collectively "Defendants") will, and hereby do, move to dismiss the Second Amended Complaint for Violations of the Federal Securities Laws ("SAC") (ECF 70) brought by Lead Plaintiff Lisa Tai ("Plaintiff") pursuant to Federal Rules of Civil Procedure ("FRCP") 9(b) and 12(b)(6).

Pursuant to Local Rule 7-3, the Parties thoroughly discussed the substance and potential resolution of the filed motion by telephone on February 27, 2026. This motion is based on this Notice of Motion and Motion to Dismiss, the following Memorandum of Points and Authorities, Defendants' Request for Judicial Notice, the Declaration of Matthew J. Peters and the exhibits thereto, all pleadings and papers in this action, and any oral argument of counsel.

Dated: March 3, 2026

Respectfully submitted,

LATHAM & WATKINS LLP

By  /s/ Michele D. Johnson
Michele D. Johnson (CA Bar No. 198298)
 michele.johnson@lw.com
Ryan A. Walsh (CA Bar No. 294506)
 ryan.walsh@lw.com
650 Town Center Drive, 20th Floor
Costa Mesa, California 92626-1925
Telephone: +1.714.540.1235
Facsimile: +1.714.755.8290

Andrew B. Clubok (*pro hac vice*)
 andrew.clubok@lw.com
Susan E. Engel (*pro hac vice*)
 susan.engel@lw.com
Matthew J. Peters (*pro hac vice*)
 matthew.peters@lw.com
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004-1304
Telephone: +1.202.637.3309
Facsimile: +1.202.637.2201

*Attorneys for Defendants Chipotle
Mexican Grill, Inc., Brian Niccol,
John R. Hartung, and Laurie Schalow*

# **TABLE OF CONTENTS**

Page

I.  INTRODUCTION ..................................................................................... 1

II.  BACKGROUND ...................................................................................... 3

    A.  Chipotle And Individual Defendants ............................................. 3

    B.  Chipotle Faces Viral Social Media Criticism Over Portions ......................................................................................... 3

    C.  Chipotle And Individual Defendants Respond To Criticism ...................................................................................... 5

    D.  This Court Dismisses The Complaint, And Plaintiff Amends ....................................................................................... 7

III.  LEGAL STANDARDS ............................................................................ 8

IV.  ARGUMENT .......................................................................................... 8

    A.  Plaintiff Still Fails To Plead Falsity .............................................. 8

        1.  The Portion-Size Statements Were Not Misleading ................. 9

        2.  The Social Media Risk Disclosure Was Not Misleading. .......................................................................... 14

        3.  Niccol Is Not The Speaker For The 1Q24 10-Q ................... 16

        4.  The Safe Harbor Shields Forward-Looking Statements. ...................................................................... 16

    B.  There Is Still No Strong Inference Of Scienter .............................. 17

    C.  Plaintiff Still Fails To Plead Loss Causation With Particularity ................................................................................. 22

    D.  Any Scheme Liability Claim Fails ................................................ 25

    E.  Plaintiff's Section 20(a) Claim Fails ............................................. 25

V.  CONCLUSION ...................................................................................... 25

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Espy v. J2 Glob., Inc.*,
99 F.4th 527 (9th Cir. 2024).....................................................................................22

*Glickenhaus & Co. v. Household Int'l, Inc.*,
787 F.3d 408 (7th Cir. 2015).....................................................................................16

*Hampton v. Aqua Metals, Inc.*,
2020 WL 6710096 (N.D. Cal. Nov. 16, 2020)..........................................................16

*Handal v. Innovative Indus. Props., Inc.*,
157 F.4th 279 (3d Cir. 2025)......................................................................................16

*HRSA-ILA Funds v. adidas AG*,
2025 WL 3471703 (9th Cir. Dec. 3, 2025) ...............................................................15

*In re BofI Holding, Inc. Sec. Litig.*,
977 F.3d 781 (9th Cir. 2020)......................................................................................24

*In re Cloudera, Inc.*,
121 F.4th 1180 (9th Cir. 2024)...................................................................................10

*In re Genius Brands Int'l, Inc. Sec. Litig.*,
97 F.4th 1171 (9th Cir. 2024).....................................................................................23

*In re Lululemon Sec. Litig.*,
14 F. Supp. 3d 553 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d
Cir. 2015)....................................................................................................................12

*In re Nektar Therapeutics Sec. Litig.*,
34 F.4th 828 (9th Cir. 2022).......................................................................................23

*In re NVIDIA Corp. Sec. Litig.*,
768 F.3d 1046 (9th Cir. 2014)...............................................................................8, 17

*In re Oracle Corp. Sec. Litig.*,
627 F.3d 376 (9th Cir. 2010)......................................................................................23

*In re Rigel Pharms., Inc. Sec. Litig.*,
697 F.3d 869 (9th Cir. 2012)........................................................................................8

*In re Silver Lake Grp., LLC Sec. Litig.*,
     108 F.4th 1178 (9th Cir. 2024)....................................................................................19

*In re Solarcity Corp. Sec. Litig.*, 274 F. Supp. 3d 972
     (N.D. Cal. 2017) ........................................................................................................18

*In re Target Corp. Sec. Litig.*,
     955 F.3d 738 (8th Cir. 2020).....................................................................................18

*In re Viatris Sec. Litig.*,
     2025 WL 324941 (3d Cir. Nov. 6, 2025) ..................................................................10

*Joyce v. Amazon.com, Inc.*,
     2025 WL 835054 (W.D. Wash. Mar. 17, 2025)........................................................21

*Kang v. PayPal Holdings, Inc.*,
     620 F. Supp. 3d 884 (N.D. Cal. 2022).......................................................................25

*Lipton v. Pathogenesis Corp.*,
     284 F.3d 1027 (9th Cir. 2002)....................................................................................16

*Lloyd v. CVB Fin. Corp.*,
     811 F.3d 1200 (9th Cir. 2016)....................................................................................23

*Metzler Inv. GMBH v. Corinthian Colls.*,
     540 F.3d 1049 (9th Cir. 2008)......................................................................18, 23, 24

*Murphy v. Precision Castparts Corp.*,
     2020 WL 4040827 (D. Or. July 17, 2020) .................................................................25

*Nguyen v. Endologix, Inc.*,
     962 F.3d 405 (9th Cir. 2020)......................................................................................20

*Oakland Cnty. Voluntary Emps.' Beneficiary Ass'n v. Tesla Inc.*,
     2025 WL 3459471 (9th Cir. Dec. 2, 2025) ...........................................................11, 13

*Oaktree Principal Fund V, LP v. Warburg Pincus, LLC*,
     2016 WL 6782768 (C.D. Cal. Aug. 9, 2016).............................................................25

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
     774 F.3d 598 (9th Cir. 2014)....................................................................................8, 22

*Plumbers & Steamfitters Loc. 60 Pension Tr. v. Meta Platforms, Inc.*,
  2024 WL 4251896 (N.D. Cal. Sept. 17, 2024), *aff'd sub nom.*,
  *Menora Mivtachim Ins. Ltd. v. Meta Platforms, Inc.*, 2026 WL
  508834 (9th Cir. Feb. 24, 2026) ........................................................................... 15

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
  759 F.3d 1051 (9th Cir. 2014) ............................................................................... 14

*Prodanova v. H.C. Wainwright & Co. LLC*,
  993 F.3d 1097 (9th Cir. 2021) ............................................................................... 21

*Ramos v. Comerica Inc.*,
  2024 WL 2104398 (C.D. Cal. Apr. 12, 2024) ....................................................... 23

*Rok v. Identiv, Inc.*,
  2017 WL 35496 (N.D. Cal. Jan. 4, 2017), *aff'd sub nom.*
  *Cunningham v. Identiv, Inc.*, 716 F. App'x 663 (9th Cir. 2018) .................... 23, 24

*Sneed v. Talphera, Inc.*,
  147 F.4th 1123 (9th Cir. 2025) ................................................................. 11, 15, 21

*Strezsak v. Ardelyx Inc.*,
  2024 WL 1160900 (N.D. Cal. Mar. 18, 2024) ...................................................... 17

*Sundaram v. Freshworks Inc.*,
  2023 WL 6390622 (N.D. Cal. Sept. 28, 2023) ...................................................... 15

*Sundaram v. Freshworks Inc.*,
  2025 WL 1083168 (N.D. Cal. Apr. 10, 2025) ....................................................... 19

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ......................................................................................... 8, 17

*Waterford Twp. Police v. Mattel, Inc.*,
  321 F. Supp. 3d 1133 (C.D. Cal. 2018) ................................................................... 8

*Weston Fam. P'ship v. Twitter, Inc.*,
  29 F.4th 611 (9th Cir. 2022) ................................................................................. 10

*Wochos v. Tesla*,
  985 F.3d 1180 (9th Cir. 2021) ........................................................................ passim

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009) ........................................................................... 22, 25

# STATUTES

15 U.S.C. § 78u-5(c) ................................................................................................. 16

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

The Second Amended Complaint, Dkt. 70 ("SAC"), confirms that all Plaintiff can plead is viral social media controversy about Chipotle's portion sizes. But alleging a social media frenzy is not enough to plead securities fraud. Instead of addressing the falsity and scienter deficiencies that the Court identified, Dkt. 67 ("Order"), Plaintiff changed next to nothing: she relies on the same low-level confidential sources, none of whom help her show falsity based on an investigation or pressure to comply with Company metrics, much less that any Defendant was deliberately reckless in speaking to investors. Plaintiff's barely altered allegations do not get anywhere near overcoming the heightened requirements of the Private Securities Litigation Reform Act ("PSLRA") and Federal Rule of Civil Procedure 9(b). The Court correctly dismissed Plaintiff's claims before, and should do so again.

*First*, Plaintiff offers a new spin on her falsity theory but fails to back it up with particularized facts. She doubles down on her allegation that an "internal investigation" led to an increase in portion sizes. Her story is that Niccol's July 24, 2024 statement that 10% of restaurants were not living up to Chipotle's portion-size standards and needed retraining must have meant that, weeks or months earlier, each Defendant supposedly knew the same information and falsely denied that Chipotle directed restaurants to reduce portions. But that is woefully inadequate for pleading securities fraud (and makes no sense in light of what Niccol publicly said). Plaintiff certainly does not (and could not, in good faith) plead a Company-wide instruction to reduce portions that contravened any challenged statement. And no reasonable investor would have been misled about portion-size consistency across thousands of restaurants, because, when considered in context, the statements addressed *Chipotle's* standards and *acknowledged* inconsistency. Despite the Court cataloguing the prior complaint's deficiencies, however, Plaintiff adds no facts that predate the challenged statements or demonstrate knowing falsity by any speaker:

she does not say who was involved in any internal review of portion sizes, when such review began, when it identified outlier restaurants that were not consistently meeting Chipotle's portion-size standards, or when any results from an internal review were presented to any Defendant. Evaluating restaurant performance in the wake of social media complaints is not a sign that Chipotle changed portion sizes; it is responsible management in response to customer feedback. Plaintiff also claims that Defendants shrank portions by enforcing the Critical Inventory ("CI") metric, which aims to ensure that restaurants serve *proper* portions, *i.e.*, neither too much nor too little food. But she does not add to the "'vague hearsay'" from "low-level" confidential sources that this Court rejected. Order at 17. Nor does she plead any facts suggesting that a reasonable investor would have been misled by Chipotle's social media risk disclosure when such public criticism was obviously already well known. And several challenged statements are puffery, opinion, or forward-looking.

*Second*, Plaintiff again falls far short of pleading a strong inference of scienter. She still cannot plead a motive to defraud investors where Schalow sold *no* stock, Niccol sold stock *before* he spoke, and Hartung sold a small percentage of his holdings after *warning* investors of a risk. Plaintiff's unchanged confidential-source allegations do not suggest that Niccol or Schalow knew of "skimping" due to CI requirements or revealed by an "investigation" when they spoke. Defendants displayed a desire to improve operations in response to customer feedback, not to conceal a change in Chipotle's portion sizes. This Court's prior conclusion still holds true: the "most plausible inference" is that Defendants "honestly believed the Company had not changed the size of its portions." Order at 29.

*Third*, Plaintiff fails to plead loss causation. None of the alleged corrective disclosures revealed any new information about portion sizes to the market, because portion complaints had been actively discussed in the media for months. Nor are any of the alleged disclosures "corrective"; none indicated that Chipotle had, in fact, reduced portion sizes, contrary to Niccol's and Schalow's statements. And the cited

stock drops are too small and short-lived to show that any corrective disclosure revealed information that was previously unknown to investors.

Defendants' Motion to Dismiss should be granted in full and with prejudice.

## II.    BACKGROUND

### A.    Chipotle And Individual Defendants

Defendant Chipotle Mexican Grill is a "fast casual" restaurant chain that owned and operated over 3,500 Chipotle restaurants in the United States and abroad during the Class Period. ¶¶ 15, 30. Defendant Brian Niccol served as Chipotle's CEO and on its Board of Directors from March 5, 2018, through August 31, 2024, when he resigned to serve as CEO of Starbucks Corporation. ¶ 7. During the Class Period, Defendant John R. Hartung served as Chipotle's CFO, and Defendant Laurie Schalow served as Chief Corporate Affairs and Food Safety Officer. ¶¶ 10, 12.

### B.    Chipotle Faces Viral Social Media Criticism Over Portions

In late 2023 and early 2024, Chipotle was swept up in a broader trend of consumer complaints about "shrinkflation," *i.e.*, companies charging "the same amount for a subtly smaller product." Ex. 6 at 2; *see* ¶¶ 41, 65. For example, on October 30, 2023, TikToker Ryan Lynch complained about "portion control," imploring Chipotle to use measuring cups to "consistently ... fill" bowls "up to the same amount." Ex. 1 at 1-2; ¶ 42. Weeks later, the *New York Post* reported that "[TikTokers] are calling out Chipotle's portion sizes." Ex. 1 at 1. The article featured Lynch's video and other criticism saying that Chipotle had "varying" and "shrinking" portions. *Id.* at 2; ¶ 43. Schalow responded that Chipotle customers "can completely customize their meal … by vocalizing their desired portions," and affirmed that "[w]e have not changed our portion sizes, and we continue to receive praise for the incredible value our entrees offer." Ex. 1 at 3; ¶ 43.

Chipotle's 2023 10-K, filed on February 8, 2024, warned that its "inability or failure to recognize, respond to and effectively manage the immediacy of social media could have a material adverse impact on [its] business." ¶ 53. Chipotle stated

that social media "platforms have dramatically increased the speed and scale of dissemination and accessibility of information, including negative comments about our food quality or safety, negative guest or employee experiences and videos depicting inappropriate behavior of employees and guests" and that "[a]ccurate and inaccurate or misleading information can be widely disseminated before there is any meaningful opportunity to respond or address an issue." Ex. 2 at 10.

Portion-related social media criticism continued in early 2024. In March, YouTuber Zackary Smigel claimed that his online burritos were "skimpier" than in-restaurant ones "70% of the time," but that "[b]owls weren't as bad." Ex. 24 at 1; ¶ 44. By April, "stoptheskimp.com" started rating Chipotle restaurants based on portion complaints. ¶ 44. Soon after, Chipotle's 1Q24 10-Q, filed on April 25, 2024, and signed by Hartung, stated that "[t]here have been no material changes from the risk factors previously disclosed in [the 2023 10-K]." Ex. 3 at 20 (quoting risk factor in 2023 10-K incorporated by reference into 1Q24 10-Q).

"The public backlash peaked in May 2024." ¶ 45; Ex. 5 at 1; Ex. 4 at 1. On May 3, Keith Lee—a TikTok food critic who has "risen to social media stardom," Ex. 5 at 2—complained to his 16.3 million followers that his Chipotle burrito bowl was "cold" and light on chicken.[1] The video "went viral," triggering "a perfect storm of rough social media waves," which one article attributed to "simmering discontent ... about food prices" and "viral videos." Ex. 6 at 1. Echoing previous criticism, online influencers began encouraging Chipotle customers to film the employees preparing their meals to guard against supposed "skimping." Ex. 8 at 2.

Despite this social media maelstrom, Chipotle's stock climbed roughly 69% between October 30, 2023 (the date of Lynch's TikTok) and May 10, 2024. Ex. 27 at 5, 8.[2] On May 3, 2024 (the date of Lee's TikTok), the price went up 1.3%, and

---

[1] keith_lee125, *Chipotle Taste Test Video Review: Would You Try It?*, TikTok https://www.tiktok.com/@keith_lee125/video/7364650719380770094?lang=en.

[2] All stock prices prior to June 26, 2024, are adjusted to account for Chipotle's 50:1 stock split. *See* ¶ 126 n.3.

rose another 1.2% by May 10. *Id.*

## C.    Chipotle And Individual Defendants Respond To Criticism

In statements between May 16 and 30, 2024, Chipotle executives addressed the widespread viral criticism that Chipotle had reduced its portion sizes. Schalow told news outlets that "[t]here have been no changes in [Chipotle's] portion sizes," ¶ 57; *see* ¶ 55, while acknowledging that the Company had "reinforced proper portioning with [its] employees." Ex. 5 at 1; Ex. 6 at 1. She further urged customers to "reach out" if Chipotle "did not deliver on [its] value," so that the Company "can make it right." Ex. 6 at 1; Ex. 5 at 3. News reports about social media criticism and the Company's response noted that the Company faced challenges in ensuring perfectly consistent portions: Chipotle's made-to-order process relies on "subjective" judgments, and "diners say [portions] can vary by restaurant, or even by server." Ex. 4 at 3. Indeed, this "human element has long made [Chipotle] a target" for portion-size "hack[s]," where customers attempt to get "the maximum amount of food for the least amount of money." Ex. 6 at 2.

On May 29 and 30, Niccol told *CNBC*'s Jim Cramer and *Fortune* that Chipotle "never" "shrunk the portions" and that "portions have not gotten smaller." ¶¶ 56, 58. Niccol emphasized that "we want to give people great portions" and that Chipotle's teams "are focused on giving people what they want." Ex. 7 at 4:20-21. When Cramer asked whether online orders might be lighter because "you're not looking in the eye of the worker," Niccol noted that "in person" customers can ask team members for "a little more rice." Ex. 7 at 5:21.

During May and June, Chipotle's stock price largely held between $61 and $65 per share. Ex. 27 at 4-5. The stock jumped to $68.55 on June 18, Ex. 27 at 4, around the time of a 50:1 stock split that "added to volatility." Ex. 13 at 1.

On June 27, 2024, Wells Fargo published an analyst report, Ex. 9 at 1 ("Wells Fargo Report"); ¶ 62, in which analysts concluded based on 75 Chipotle orders that "[a]t the median, in-store orders and digital orders were very similar" but

"consistency varied widely." Ex. 9 at 1. On the same day, Chipotle's stock dropped 5.2%. ¶ 22; Ex. 27 at 4. In a *Fox Business* article on July 4, 2024, Schalow reiterated that there had been "no changes in [Chipotle's] portion sizes," ¶ 60, and that Chipotle's "completely customizable meals may have variability in their size or weight depending on the number of ingredients a guest selects." Ex. 12 at 2.

A July 17, 2024 Wells Fargo report concluded that investors read its prior report "as positive, [with] bowl weights in line with a reasonable distribution curve [and] departures largely isolated to 1 (out of 8) locations." Ex. 15 at 1; ¶ 68. Still, Plaintiff asserts that the Wells Fargo Report and several follow-on articles caused Chipotle's stock to drop 20.2% between June 27 and July 23, 2024. ¶¶ 64-69.

On July 24, 2024, Chipotle held its second quarter earnings call. Niccol addressed the media attention regarding portion sizes, stating, "there was never a directive to provide less to our customers." Ex. 17 at 4. Niccol also explained that in light of customer "feedback," the Company "relook[ed] at [its] execution across [its] entire system with the intention to always serve [its] guests ... with generous portions." *Id*. at 4, 16. The Company had "focused in on those [restaurants] with outlier portion scores based on consumer surveys" and was "reemphasizing training and coaching around ensuring we are consistently making bowls and burritos correctly." *Id*. Addressing an analyst question, Niccol indicated that "about 10% or more of restaurants" were "outliers that needed to be retrained." *Id*. at 16. Hartung said that, as an "investment" to ensure "correct" portions, the Company expected Q3 costs to increase "about 40 to 60 basis points." *Id.* at 8; ¶ 73. The stock dipped by 3.8% in the two days following the call but quickly recovered. ¶ 74; Ex. 27 at 3-4. By July 31, the stock closed at $54.32, nearly 5% above its July 24 close. *Id*.

On October 29, 2024, Chipotle announced that, as predicted, costs of sales increased 0.9% compared to Q3 2023, due in part to "investment … in portion[s]." Ex. 26 at 11; ¶ 81. Plaintiff claims this led to a 7.9% drop in stock price the next day. ¶ 82. Within two weeks, however, Chipotle's stock returned to its October 29 close

of $60.49, and traded as high as $66 by mid-December. Ex. 27 at 1-2.

### D.  This Court Dismisses The Complaint, And Plaintiff Amends

On December 18, 2025, this Court dismissed Plaintiff's complaint. As to falsity, the Court held that Plaintiff failed to provide factual support for her theories that Defendants pressured restaurants to reduce portions by emphasizing cost cutting and CI compliance and that Defendants responded to social media complaints by investigating portion sizes and ordering an increase. Order at 15-18. The Court also concluded that no reasonable investor would have been misled by the social media risk disclosures in light of contemporaneous public criticism. *Id.* at 18-20. As to scienter, the Court held that the "most plausible inference" was that "Defendants honestly believed" their statements about the Company's portion sizes. *Id.* at 20-29. Because Plaintiff failed to plead falsity or scienter, the Court "decline[d] to address … loss causation." *Id.* at 15. The Court granted Plaintiff "one additional opportunity to amend to cure the deficiencies" identified in the Order. *Id.* at 30.

The SAC abandons two previously challenged statements—the social media risk disclosure in the 2023 10-K filed on February 8, 2024, and Niccol's statement that there was never a "directive" to change portion sizes during the earnings call on July 24, 2024. *See* ¶¶ 24, 53. This leaves seven challenged statements between April 25 and July 4, 2024: Six denied changes to or reductions of Chipotle's portion sizes, ¶¶ 55-61; the remaining statement is the 2023 10-K's social media risk disclosure, to the extent it was incorporated into the 1Q24 10-Q. ¶¶ 53-54. Instead of arguing there was a "directive" to reduce portions—a claim this Court rejected—Plaintiff now emphasizes her previously pleaded allegations that the Company conducted an internal "investigation" that—on some unpleaded date—revealed "at least 10% of Chipotle's 3,500+ restaurants had been, in fact, skimping on customers' orders." ¶ 61. This theory relies on unchanged confidential-source allegations and the July 24, 2024 earnings call—even though Niccol repeated during that supposedly corrective call that there "never was a directive to provide less to our customers."

¶ 24. She also contends that Chipotle's portion-size statements were false based on "pressure" to cut costs and meet inventory targets. ¶ 61(e), (f). And she claims that the 1Q24 10-Q incorporated the prior risk disclosure without accounting for public social media criticism and customer complaints during March and April 2024. ¶ 54.

### III.   LEGAL STANDARDS

A claim for securities fraud under Section 10(b) and Rule 10b-5 of the Securities Exchange Act is subject to the "[e]xacting pleading requirements" of both Rule 9(b) and the PSLRA. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). To plead falsity, Plaintiff must identify statements that are "capable of objective verification," *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014), and demonstrably "false or misleading at the time they were made," *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012). Under the safe harbor, Defendants "will not be liable for a false or misleading statement if it is forward-looking and *either* is accompanied by cautionary language *or* is made without actual knowledge that it is false or misleading." *Wochos v. Tesla*, 985 F.3d 1180, 1190 (9th Cir. 2021) (citation omitted). To plead a strong inference of scienter, Plaintiff must allege that each Defendant "made false or misleading statements either intentionally or with deliberate recklessness," *Waterford Twp. Police v. Mattel, Inc.*, 321 F. Supp. 3d 1133, 1151 (C.D. Cal. 2018) (citation omitted)—with the latter standard "much closer to one of intent," *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1053 (9th Cir. 2014). Plaintiff must also show a "causal connection between the deceptive acts that form the basis for the claim … and the injury suffered." *Apollo*, 774 F.3d at 608 (citation omitted).

### IV.   ARGUMENT

#### A.   Plaintiff Still Fails To Plead Falsity

Plaintiff again "identifies two categories of statements as false: (a) statements denying that the Company changed the size of its portions; and (b) statements concerning the risks that the Company faced from social media." Order at 15. Instead

of pleading any new material facts to support these theories, Plaintiff recycles old allegations with a different emphasis. But shifting focus is not a substitute for adding particularized facts. Despite Plaintiff's attempt to reframe her case, the SAC is substantively identical to the complaint this Court correctly rejected for failing to plead falsity with particularity.

### 1.    The Portion-Size Statements Were Not Misleading

The Court rejected the prior complaint's theory as to why Defendants' statements were misleading. *Id.* at 15-18. Plaintiff asserted that Chipotle pressured employees to meet CI requirements; some employees reduced portions in response; social media complaints about portions increased from 2022 to 2024; and Chipotle investigated the complaints and instructed restaurants to increase portions. *Id.* at 15-16. But she did not plead particularized facts regarding pressure to comply with the CI metric, any instruction to change portions, or any investigation into portion-size complaints. *Id.* at 17-18. Facts about "who," "what," and "when" were missing from the complaint, and neither confidential sources' "vague hearsay" nor "viral criticism" filled that void. *Id.* at 17-18 (citation omitted).

Little has changed. Plaintiff again challenges Niccol's and Schalow's statements from May through June 2024 that "portions have not gotten smaller" and "[t]here have been no changes in our portion sizes" as misleading. ¶¶ 58, 60; *see id.* ¶¶ 55-57, 59. Though her factual allegations have not changed, her emphasis has: she contends these statements were false due to Defendants' investigation of portion-size criticism, ¶ 61(a)-(d), and, as a fallback, alleged enforcement of CI requirements, ¶ 61(e)-(f). But Plaintiff still does not provide particularized factual support for either falsity theory: she pleads no new facts about the investigation, any purported instructions to "increase" portion sizes, or any change to CI.

***Investigation.*** Plaintiff says Defendants' statements denying changes to Chipotle's portion sizes were misleading because (1) the Company had "commenced an investigation" into "social media allegations," ¶ 61(a); (2) Defendants

"unequivocal[ly] den[ied]" changing portion sizes during that investigation, ¶ 61(b); (3) "Chipotle leadership" had "instructed" restaurants "to increase portion sizes" by May 29, 2024, due to the investigation, ¶ 61(c); and (4) Niccol "acknowledged" on July 24, 2024, that "at least 10% of Chipotle's 3,500+ restaurants" were "skimping," ¶ 61(d). But this new emphasis on an "investigation" is window dressing that does not render any statement about Chipotle's portion sizes false.

*First*, Plaintiff alleges the existence of an "investigation" but offers no particularized details, let alone any details that suggest any challenged statement was false when made. Niccol said the Company "relook[ed]" at "execution across our entire system" and learned that about 10% of restaurants "needed to be retrained" on "the right standards." Ex. 17 at 4, 16. But Niccol did not say who was involved in that review, when it began, when it yielded results, or when he or any other Defendant learned those results. Under the PSLRA and Rule 9(b), those omitted facts are essential to evaluating whether the status of an investigation made any challenged statement about Chipotle's portion sizes false "*at the time*" it was made. *In re Cloudera, Inc.*, 121 F.4th 1180, 1190 (9th Cir. 2024). Pleading that the investigation began some time "after" social media criticism "blew up" does not suggest that each Defendant knew about "outlier" restaurants at the time of any challenged statement. ¶ 61(a); *In re Viatris Sec. Litig.*, 2025 WL 324941, at *3 (3d Cir. Nov. 6, 2025) (comments about status of biosimilars "at *some* point in the preceding year" did not show statements were false when made). As with the original complaint, Plaintiff does not connect the dots between this "internal investigation['s]" existence and the alleged falsity of any challenged statement. Order at 18. Without such facts, Niccol's statement is merely a "later … development[]" that cannot render his or Schalow's prior statements false. *Weston Fam. P'ship v. Twitter, Inc.*, 29 F.4th 611, 621 (9th Cir. 2022).

None of Plaintiff's confidential sources helps her plead an "investigation" that supports her theory of the case with particularity. CS-1, CS-3, and CS-4 do not

mention an investigation. *See* ¶¶ 108-112, 115-124. CS-2 states that before he left Chipotle in March 2024, "Schalow's team reached out to CS-2's team for help in addressing the portion size debacle" and that "communications to restaurants attempting to address portion size issues" were "overseen by Schalow." ¶ 114. But Plaintiff does not plead what this March 2024 (or earlier) review of customer complaints "entailed." Order at 18. She also does not tie these complaints to Niccol's statements about "outlier" restaurants in July 2024. And she does not explain whether these customer complaints relate to any investigation that commenced after social media complaints "blew up." ¶ 61(a). Once again, the "vague hearsay" of confidential sources is insufficient to plead falsity. Order at 17 (citation omitted).

*Second*, beyond failing to allege any detail regarding the "investigation," Plaintiff's argument that Niccol and Schalow issued "unequivocal denials of social media allegations of skimping" ignores the content and context of their statements. ¶ 61(b). Plaintiff asserts that Niccol and Schalow's statements denying a decrease in the Company's portion sizes were misleading because an investigation into portion-size consistency was ongoing. *Id.* But Defendants never guaranteed that every customer was receiving identical portions or that every restaurant always complied with the Company's standards. Rather, Defendants denied that the Company instructed restaurants to reduce portions. For example, Niccol and Schalow said the Company had not "shrunk," ¶ 56, or "changed," ¶¶ 55, 59, its portion sizes, and reaffirmed that "there have been no changes in portion sizes," ¶ 57, and "portions have not gotten smaller," ¶ 58. Plaintiff still pleads no facts suggesting any contrary directive. And "fairly consider[ing] th[o]se statements," no reasonable investor would have understood Defendants to be vouching for consistency across thousands of restaurants. *Oakland Cnty. Voluntary Emps.' Beneficiary Ass'n v. Tesla Inc.*, 2025 WL 3459471, at *1 (9th Cir. Dec. 2, 2025).

To the contrary, the "context surrounding" the challenged statements *acknowledges* the possibility of portion inconsistency and reflects the Company's

efforts to address inconsistency. *Sneed v. Talphera, Inc.*, 147 F.4th 1123, 1131-32 (9th Cir. 2025) (citation omitted). On May 29, 2024, Schalow told *ABC News* that "there have been no changes in [Chipotle's] portion sizes," but noted that the Company had "reinforced proper portioning with [its] employees." Ex. 5 at 1. That same day, Schalow likewise told the *Washington Post* that "[t]here have been no changes in our portion sizes," ¶ 57, and added that customers should "reach out" if Chipotle "did not deliver on [its] value," so that the Company "can make it right." Ex. 6 at 1. In "den[ying] claims that … [Chipotle]'s portion sizes have been shrinking," Niccol also noted that customers can "usually" get "a little more scoop" of some ingredients with a "look." Ex. 8 at 2; ¶ 58. And on July 4, 2024, Schalow told *Fox Business* that "[t]here have been no changes in [Chipotle's] portion sizes," but Chipotle's "completely customizable meals" may result in "variability in their size or weight." Ex. 12 at 2. These challenged statements *contemplate* inconsistency, describe efforts to address it, and are not rendered false by an investigation into portion-size complaints. *See In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 578 (S.D.N.Y. 2014) (statements about quality that "explicit[ly] recogni[zed]" "possibility of product defects" and "need for continued investment" were not false), *aff'd*, 604 F. App'x 62 (2d Cir. 2015).

*Third*, Plaintiff still fails to plead that any investigation led to an "instruct[ion]" to "increase portion sizes" by May 29, 2024. ¶ 61(c). This Court previously rejected the same claim based on the same facts: Plaintiff still has not pleaded "who in 'senior management' told employees to increase portion sizes and what they said" or "what 'headquarters' said 'regarding portions.'" Order at 18. Plaintiff's unchanged confidential-source allegations undercut her claim of a May 2024 instruction to *increase* portion sizes. CS-3 and CS-4 stated that unidentified individuals in the Company told them to "*correct[]*" portion sizes and "*re-train* employees regarding portions," respectively. ¶¶ 119, 124 (emphasis added). Chipotle thus told its employees and the market the same thing: it was "reinforc[ing]

proper portioning with [its] employees" to provide correct portions. Ex. 6 at 1.

*Fourth*, Plaintiff's reliance on Niccol's July 24, 2024 statements fails because those statements are entirely consistent with—and in fact reinforce—Defendants' statements that portion-size standards had not changed. Niccol stated that "when we got the feedback on the portion sizes … we wanted to make sure we're executing consistently across the system" and "found about 10% or more of restaurants that we really view as outliers that needed to be retrained, recoached to be executing against what we believe are the right standards." Ex. 17 at 16. As this Court made clear, this statement did not "admit[] that Chipotle had a skimping problem." Order at 18. Nor does it "acknowledge[]," ¶ 61(d), that Niccol's or Schalow's prior statements were false when made due to an investigation. Read in context, those statements acknowledged potential portion inconsistencies but denied that the Company instructed restaurants to serve smaller portions. There is no conflict between the prior statements denying skimping allegations and the July 24, 2024 earnings call denying a directive to change portions. Plaintiff's contrary argument cites headlines suggesting Niccol "admitted" that Chipotle restaurants had reduced portions. ¶¶ 75-79. But those headlines do not change what Niccol actually said. *Oakland*, 2025 WL 3459471, at *1 (court must "fairly consider[]" statement). Ultimately, Niccol's earnings call statements underscore that Chipotle was acting responsibly: "there was never a directive to provide less to [Chipotle's] customers," but Chipotle responded to negative "feedback" by examining its operations. ¶ 24.

**Critical Inventory.** Plaintiff again asserts her rejected theory that CI targets rendered statements denying a change in the Company's portion sizes false. ¶ 61(e), (f). But as before, Plaintiff's generalized allegations regarding the CI metric are insufficient. Order at 17. Plaintiff still does not "allege when the Company adopted the Critical Inventory metric," *id.* at 16-17, or that Defendants ever changed the metric, ¶¶ 111, 116-124. As this Court held, Plaintiff's allegations that Company "leadership" "implicitly instructed [restaurant managers] to skimp" to comply with

CI metrics, ¶¶ 118, 122-123, amount to nothing more than "vague hearsay" from low-level employees, Order at 17 (citation omitted).

More fundamentally, Plaintiff does not explain how "pressure" to comply with CI requirements, ¶ 122, "systematically reduced the size of [Chipotle's] portions," Order at 18. CI compliance did not require portion-size reductions—as the 90% of Chipotle restaurants that did not need any re-training on portion sizes clearly show. *See* Ex. 17 at 16. That's because CI is a measure of variance designed to ensure *correct* portions that are not too large or too small. As the Court already held, Plaintiff's lack of particularized allegations about any "temporal change in the size of the Company's portions between 2022 and 2024" dooms her falsity theory based on pressure to comply with CI. Order at 17-18.

***Value And Guest Experience.*** Schalow's statements that "our guests continue to appreciate the value we offer them" on May 16, 2024, ¶ 55, and that the Company "aim[s] to provide a great guest experience every time" on July 4, 2024, ¶ 60, are not actionable for three reasons. First, Schalow's statements regarding "value" and "guest experience" were true—as rising same-store sales and reinforcement of portion-size standards clearly showed. Ex. 4 at 2; Ex. 6 at 1. Second, these statements were, at most, inactionable puffery incapable of misleading investors. *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1063 (9th Cir. 2014). Third, the statements were opinions, and Plaintiff has not pleaded that (1) Schalow did not believe them, (2) they contained embedded statements of untrue fact, or (3) that a reasonable investor would have understood them to convey facts about the speaker's basis for the opinion. *Wochos*, 985 F.3d at 1189.

2.    The Social Media Risk Disclosure Was Not Misleading

The 2023 10-K filed on February 8, 2024, disclosed that the Company's "inability or failure to recognize, respond to and effectively manage the immediacy of social media could have a material adverse impact on our business ...." ¶ 53. Plaintiff asserts Chipotle's 1Q24 10-Q, filed on April 25, 2024, "incorporated that

risk disclosure by reference," ¶ 53, and was rendered false by social media criticism during or before April 2024, ¶ 54(a)-(b), and "customer complaints" during or before March 2024, ¶ 54(c). The Court previously rejected Plaintiff's challenge to the same risk disclosure because "'thousands of customers took to social media' to complain about the Company's portion sizes" *before* the challenged statements. Order at 20. That holding still applies. Plaintiff seemingly points to Smigel's YouTube video in March 2024 and stoptheskimp.com in April 2024 as developments that made the risk disclosure misleading. But those social media comments—also alleged in the prior complaint—had already gained "public notoriety," so no reasonable investor would be misled by a disclosure addressing that subject. *HRSA-ILA Funds v. adidas AG*, 2025 WL 3471703, at *2 (9th Cir. Dec. 3, 2025). If, as Plaintiff apparently suggests, social media criticism became more prominent in March and April 2024, that only underscores that "the Company's social media risk disclosure would [not] 'mislead a reasonable investor.'" Order at 20 (quoting *Sneed*, 147 F.4th at 1131).

In any event, Chipotle "affirmatively acknowledge[d]" *existing* criticism. *Wochos*, 985 F.3d at 1196; *Sundaram v. Freshworks Inc.*, 2023 WL 6390622, at *6 (N.D. Cal. Sept. 28, 2023) (similar). In language that Plaintiff elides, Chipotle said that social media platforms "have dramatically increased the speed and scale of dissemination and accessibility of information, including negative comments"; it also said "[i]t is impossible for us to fully predict or control social media backlash." Ex. 2 at 10. Given these past-tense acknowledgments, no "reasonable investor could have been misled by" the 1Q24 10-Q's "generalized observations" about social media. *Plumbers & Steamfitters Loc. 60 Pension Tr. v. Meta Platforms, Inc.*, 2024 WL 4251896, at *20 (N.D. Cal. Sept. 17, 2024), *aff'd sub nom.*, *Menora Mivtachim Ins. Ltd. v. Meta Platforms, Inc.*, 2026 WL 508834 (9th Cir. Feb. 24, 2026).

Plaintiff's allegation that Chipotle "internally acknowledged" that portion-size complaints "had already negatively impacted consumer sentiment" likewise fails. ¶ 54(c). The only "customer complaints" relevant to whether the 1Q24 10-Q

was misleading are *social media* complaints. Plaintiff does not allege that social media complaints appeared in an "internal Company database," ¶ 112; but if they did, they would, by definition, already be public. Plaintiff's only support for this theory is CS-2, but CS-2 left Chipotle in March 2024—before the social media criticism Plaintiff cites. And none of the allegations attributed to CS-2 suggests that Hartung had contemporaneous knowledge of social media complaints in April 2024. *Handal v. Innovative Indus. Props., Inc.*, 157 F.4th 279, 299 & n.15 (3d Cir. 2025).

### 3. Niccol Is Not The Speaker For The 1Q24 10-Q

Niccol signed the 2023 10-K. Plaintiff no longer directly challenges any statement in that filing; rather, she challenges the 1Q24 10-Q to the extent it incorporates the 2023 10-K's social media risk disclosure. Plaintiff claims that Niccol is also "primarily liable" for the April 25, 2024 10-Q because he "approved" it "for filing." ¶ 53. That argument fails. Plaintiff pleads no facts suggesting Niccol exercised "ultimate control" over the 1Q24 10-Q that Hartung—not Niccol—signed months after the 2023 10-K. *Hampton v. Aqua Metals, Inc.*, 2020 WL 6710096, at *17 (N.D. Cal. Nov. 16, 2020) (holding that company's co-founder did not make statements in public filing he neither signed nor was alleged to have exercised control over); *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 426-27 (7th Cir. 2015) (holding that CEO does not make unsigned or unattributed statements unless CEO "*actually exercised* control over [statement's] content").

### 4. The Safe Harbor Shields Forward-Looking Statements

Even if a statement is false or misleading, the PSLRA safe harbor protects statements that are forward-looking and not made with actual knowledge of falsity. 15 U.S.C. § 78u-5(c); *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1039 n.18 (9th Cir. 2002) (actual knowledge is a "stricter standard" than scienter). Two of the challenged statements are subject to the safe harbor.

*First*, Plaintiff's challenge to the social media risk disclosure falls within the safe harbor because she challenges the forward-looking portion of that disclosure.

Plaintiff alleges that the Company portrayed the risk of social media complaints as a mere possibility that "could have a material adverse impact on [Chipotle's] business." ¶ 53. But saying that something "could harm [a company's] business" is forward-looking. *Wochos*, 985 F.3d at 1191, 1195-96. Plaintiff admits that only Hartung signed the 1Q24 10-Q, yet fails to plead that Hartung (or Niccol) spoke with actual knowledge of falsity. *Infra* at 17-22. Moreover, "explicitly warn[ing] investors about" a risk "undercut[s] [the] theory" that Defendants "conceal[ed]" this risk. *Strezsak v. Ardelyx Inc.*, 2024 WL 1160900, at *10 (N.D. Cal. Mar. 18, 2024).

*Second*, Schalow's July 4, 2024 statement that Chipotle "aim[s] to provide a great guest experience every time" is a forward-looking statement about the company's goals. *See Wochos*, 985 F.3d at 1192. Plaintiff does not remotely suggest that Schalow knew that this statement was false or misleading when she made it.

## B.    There Is Still No Strong Inference Of Scienter

To plead scienter, Plaintiff must allege with particularity that Defendants "intentionally misled investors, or acted with deliberate recklessness" towards a danger of doing so. *In re NVIDIA Corp.*, 768 F.3d at 1056-57. "[P]lausibly alleg[ing] knowledge" of undisclosed facts is not enough. *Id.* at 1056. An "inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. This Court rejected Plaintiff's scienter allegations, concluding that the portion-size statements were not "'patently false'" as required to plead a core-operations inference; no allegations showed that Defendants "had access to data" that contradicted their statements; none of the confidential sources' accounts suggested that any Individual Defendant "acted with scienter"; and Niccol's and Hartung's stock sales were "not suspicious." Order at 22-29. Instead, "the most plausible inference … is that Defendants honestly believed the Company had not changed the size of its portions." Order at 29. Plaintiff's practically identical scienter allegations provide no basis to reach a different conclusion.

***Stock Sales.*** Plaintiff still does not plead any motive to defraud. Plaintiff does not allege that Schalow sold *any stock*. That Schalow made four of the seven challenged statements—statements essentially identical to Niccol's—yet "sold nothing at all," "suggest[s] that there was no insider information from which to benefit." *Metzler Inv. GMBH v. Corinthian Colls.*, 540 F.3d 1049, 1067 (9th Cir. 2008); *In re Solarcity Sec. Litig.*, 274 F. Supp. 3d 972, 1011 (N.D. Cal. 2017) (same).

Schalow's lack of sales aside, Plaintiff does nothing to address the Court's conclusions that the quantity of Niccol and Hartung's stock sales was not "necessarily suspicious," and that the timing of the sales "does not support an inference of scienter." Order at 27-28. Niccol's alleged stock sales on April 26, 2024, occurred over a month *before* his two challenged statements on May 29 and 30, 2024. As this Court recognized, Niccol's sale of stock "[a]bout three weeks before . . . *anyone* from the Company denied Chipotle had reduced the size of its portions," Order at 28 (emphasis added); ¶¶ 56, 58, "provide[d] no motive for defrauding investors," *In re Target Corp. Sec. Litig.*, 955 F.3d 738, 743 (8th Cir. 2020). Plaintiff tries to work around this problem by saying Niccol also *made* the risk factor disclosure in the 1Q24 10-Q. But as noted, that's wrong. *Supra* at 16. These facts—and Niccol's trading history—confirm that his sale was innocuous. Order at 27.[3]

Similarly, Hartung's June 13, 2024 sale of just 3.6% of his holdings was not at all suspicious. Order at 27. Hartung sold 3,000 shares on the same day he exercised stock appreciation rights to acquire 3,000 shares, so he "maintained roughly the same economic exposure to the Company's stock price before and after his sale." Order at 28-29; Ex. 28 at 1 (Hartung sold 539 of 3,000 total shares to satisfy his payment obligations upon the exercise of stock appreciation rights). Moreover, his sale could

---

[3] Though this Court previously declined to "notice the truth of the stock sales" not specifically alleged by Plaintiff, Order at 14, Niccol's April 2024 sale was also in line with his prior trading history. Ex. 29 at 3 (Niccol reported selling 5,634 shares—19% of his holdings—in February 2023); *Id.* at 1-2 (Niccol reported selling 4,465 shares—16.5% of his holdings—between November 2021 and February 2022).

not have been an attempt to profit from the social media risk disclosure. By June 13, 2024, that risk had materialized, ¶ 45, and was reflected in the stock price. *See Sundaram v. Freshworks Inc.*, 2025 WL 1083168, at *4 (N.D. Cal. Apr. 10, 2025).

Plaintiff's only "new" stock-sale allegations assert that Niccol's April 26, 2024 sale and Hartung's June 13, 2024 sale were "highly suspicious, if not flat-out illegal," because they knew of an "ongoing and undisclosed internal investigation" that had already found a negative "impact[] [on] the Company's reputation." ¶¶ 105, 107. As this Court held, Plaintiff did not plead that "'an internal investigation' 'validated'" portion-size "criticism, much less that Niccol was aware of the results of such an investigation." Order at 28. Plaintiff likewise fails to plead that Niccol (or Hartung) knew secrets about the effect of customer complaints on Chipotle's reputation when he sold. Plaintiff relies on CS-2's interactions with "Schalow's team." ¶¶ 105, 107 (citing ¶¶ 72, 77, 112, 114). But CS-2's lack of interactions with Niccol or Hartung and Schalow's lack of sales severely undercut any argument that Niccol or Hartung traded based on non-public information about customer complaints. Tellingly, Plaintiff does not even attempt to allege that Niccol or Hartung traded on inside information. *In re Silver Lake Grp., LLC Sec. Litig.*, 108 F.4th 1178, 1191-93 (9th Cir. 2024). Plaintiff's conclusory assertion about Defendants' knowledge does not turn their innocuous sales into suspicious ones, and her failure to plead what any Defendant knew and when they knew it undercuts her entire argument that any Defendant spoke with deliberate recklessness.

***Confidential Sources.*** This Court already held that Plaintiff's confidential-source allegations were "not sufficient to show scienter." Order at 24. Nothing has changed. Plaintiff has not added a single new confidential-source allegation, so there is no reason for this Court to depart from its prior conclusion.

As the Court found, none of the confidential-source allegations shows that any Individual Defendant was "involved" in an "'internal investigation'" or "had reason to believe the Company had reduced the size of its portions." Order at 18, 26. The

only confidential source who interacted with an Individual Defendant is CS-2, but his allegations do not help Plaintiff. According to CS-2, Schalow and her team began "focusing on the issues concerning portion size" and "acknowledging the growing number of complaints" in "late 2023." ¶ 114. In March 2024, "Schalow's team reached out to CS-2's team for help in addressing the portion size debacle." *Id*. But, as the Court concluded, "the most compelling inference from these allegations is that Schalow was focused on responding to the reputational impact of customer complaints." Order at 26. Responding to customer complaints—which every "large company" gets, *id.* at 17—does not suggest Schalow intended to defraud investors or was deliberately reckless when she spoke well after CS-2 left the Company.

Plaintiff's vague allegations regarding access to data do not change the analysis. Plaintiff alleges that CS-2's team provided Schalow's "team" with "excel spreadsheets of customer complaints." ¶ 112. As this Court recognized, these generic allegations lacking any particularized facts about the contents of those spreadsheets did "not show Schalow had access to information that cast doubt on her statements" denying changes to the Company's portion sizes. Order at 22-23. Without "specific reference to the[ir] contents," *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 414 (9th Cir. 2020), Plaintiff cannot demonstrate that these "customer complaints" related to portion sizes—as opposed to, for example, food safety.

The remaining confidential sources fare no better. CS-1, CS-3, and CS-4 lack "the required personal knowledge of [Defendants'] decision-making to show scienter." Order at 25 (citation omitted). And CS-1's and CS-2's statements regarding "routine corporate objectives" like cutting costs cannot be used to impute knowledge of a skimping campaign to Niccol and Schalow. *Id.* (citation omitted).

***Core Operations.*** Plaintiff cannot rely on the core-operations doctrine to support an inference of scienter. The Court already correctly held that Plaintiff failed to allege that "any Defendant was exposed to factual information to suggest that the Company had reduced the size of its portions." Order at 22-23. Plaintiff's core-

operations allegations have not changed in any relevant way. She now focuses on the alleged portion-size "investigation" instead of the CI metric, but still has not offered any particularized allegations regarding Defendants' exposure to any data that would permit them "to infer changes in meal portions." *Id.* at 23. A core-operations inference applies when a statement's "falsity is patently obvious." *Sneed*, 147 F.4th at 1134 (citation omitted). That is not the case here. Portion-size consistency across over 3,500 restaurants is not "a fact of such prominence that it would be 'absurd' to suggest" Defendants did not know about it. *Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1112 (9th Cir. 2021).

***Repeated Statements.*** For repeated denials to demonstrate scienter, Plaintiff must allege that Defendants "had access to specific information" contradicting their statements when made or, to infer deliberate recklessness, that their comments addressed portion sizes "with 'a high degree of specificity.'" *Joyce v. Amazon.com, Inc.*, 2025 WL 835054, at *13-14 (W.D. Wash. Mar. 17, 2025). As the Court recognized, Order at 23-24, Plaintiff fails to plead that Niccol or Schalow had access to information about portion sizes—or knew of any investigation, let alone its results—when they made the challenged statements. *Supra* at 20; ¶¶ 14, 105.

Regardless, the challenged statements did not address portion-size inconsistency—the issue about which Plaintiff claims investors were misled—with "a high degree of specificity." *Joyce*, 2025 WL 835054, at *13-14. During the July 24, 2024 earnings call, Niccol said about 10% of restaurants "needed to be retrained" on the Company's portion-size to "ensur[e]" they "consistently ma[de] bowls and burritos correctly." Ex. 17 at 4, 16. Context makes clear, however, that the challenged statements made weeks or months earlier never denied inconsistency. *Supra* at 11-12. Rather, Niccol and Schalow stated that the Company had not "changed" or "shrunk" its portion sizes. ¶¶ 55, 59. That belief was buttressed by the Company's strong sales performance and many "defender[s] of [its] brand." Ex. 4 at 2-3. At the same time, Defendants told customers to "reach out" if the Company "did

not deliver on [its] value," so that the Company "c[ould] make it right." Ex. 6 at 1; Ex. 5 at 3. Neither Niccol nor Schalow was deliberately reckless about whether investors would be misled about portion-size consistency across 3,500 restaurants.

*Holistic Analysis.* A "holistic" analysis confirms the absence of scienter. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 992 (9th Cir. 2009). Plaintiff's theory boils down to an assertion that Defendants publicly denied portion-size changes while simultaneously knowing of an "undisclosed" investigation that would prove the opposite. But the far more compelling inference is that Defendants made the challenged statements based on the only knowledge they had: that the Company had not changed its portion-size standards. Plaintiff's allegations reflect a public company taking appropriate steps to respond to criticism. That is good corporate management—not securities fraud.

### C.      Plaintiff Still Fails To Plead Loss Causation With Particularity

As it did before, this Court can dismiss without reaching loss causation. Order at 15. But loss causation still provides an independent basis for dismissal. Plaintiff attempts to plead corrective disclosures on June 27, 2024 (the Wells Fargo Report), July 24, 2024 (the 2Q24 Earnings Call), and October 29, 2024 (the 3Q24 Earnings Call). None of these alleged corrective disclosures is (1) new, (2) corrective, and (3) correlated with any meaningful loss. *See Apollo*, 774 F.3d at 603.

*Wells Fargo Report.* Plaintiff alleges that the Wells Fargo Report on June 27, 2024 partially revealed the "truth" by concluding that consistency "varied widely." ¶ 62. The Report, however, did not reveal "new information to the market that was not yet reflected in the company's stock price." *Espy v. J2 Glob., Inc.*, 99 F.4th 527, 541 (9th Cir. 2024) (citation omitted). Plaintiff herself alleges that criticism regarding portion sizes had already "peaked" in May 2024 with the Keith Lee video. ¶ 45. And by April 2024, YouTuber Zackary Smigel had already analyzed burrito weights and concluded there was variation. ¶¶ 44, 54. Because "publicly available" complaints about portion sizes were well known to the market before June 27, 2024,

the Wells Fargo Report was not "new" information. *Espy*, 99 F.4th at 542.

Moreover, the Report is not "corrective" because it does not "trac[e] back" to the "very facts about which the defendant[s] [allegedly] lied"—namely, that Chipotle's portion sizes had not changed. *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 838 (9th Cir. 2022) (citation omitted). The Report does not address whether portion sizes changed over time—only that they were inconsistent across locations. But inconsistency alone does not "speak to" Plaintiff's theory of falsity—*i.e.*, a change in the size of the Company's portions between 2022 and 2024. Order at 18; *In re Genius Brands Int'l, Inc. Sec. Litig.*, 97 F.4th 1171, 1184 (9th Cir. 2024).

In any event, Chipotle's "share price" did not "f[a]ll significantly" after the Report was released. *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 392 (9th Cir. 2010) (citation omitted). On June 27, Chipotle's stock price fell 5.2%. ¶ 61. This is far from the double-digit declines typically required to plead loss causation. *See Metzler*, 540 F.3d at 1064 (concluding "modest" 10% drop was not sufficient); *Ramos v. Comerica Inc.*, 2024 WL 2104398, at *4 (C.D. Cal. Apr. 12, 2024) (two-day drop of 7.4% not sufficient). Nor is it inconsistent with past movement: the previous week, Chipotle stock dropped 6.2%. Ex. 27 at 4 (June 18-20, 2024).

Plaintiff attempts to mask the June 27 drop's insignificance by claiming that, between June 27 and July 23, 2024, Chipotle's stock fell by 20.2% "as a direct result" of the report. ¶¶ 68, 79. But a "leakage" claim requires a later "bombshell disclosure" fully confirming the leaked piecemeal truths. *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016). Press coverage that merely "reiterat[ed] and re-emphasiz[ed]" prior public information does not suffice. *Rok v. Identiv, Inc.*, 2017 WL 35496, at *18 (N.D. Cal. Jan. 4, 2017), *aff'd sub nom. Cunningham v. Identiv, Inc.*, 716 F. App'x 663 (9th Cir. 2018). Here, no "bombshell" ever dropped. The Wells Fargo Report echoed prior weight-comparison "studies." *See* ¶¶ 50, 62; Ex. 9 at 4. The follow-on articles added nothing: *Bloomberg* recapped social media "hubbub" and noted the recent stock split "added to … volatility," ¶ 66; Ex. 13, while

*BroBible* rehashed the Report, ¶ 64; Ex. 10. "A reasonable investor reading these [articles] would likely have taken their contents with a healthy grain of salt." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 797 (9th Cir. 2020).

***2Q24 Earnings Call.*** The July 24, 2024 earnings call was not corrective. Niccol's statement that the Company had "relook[ed] at our execution across [the] entire system" and was addressing portion consistency issues at 10% of "outlier" restaurants did not reveal that any previous statements were false. ¶¶ 24, 79, 90; *see also* ¶ 72. Plaintiff cites several post-earnings call articles suggesting that Niccol's comments showed that "Chipotle customers were right" because "some restaurants were skimping." ¶ 76; Ex. 20. But nothing said during the earnings call conflicts with prior statements that the Company had not "changed" or "shrunk" portions, as a leakage theory requires. *Supra* at 23. And while two articles refer to Defendants' May 2024 statements, Ex. 23 at 1; Ex. 21 at 2, neither shows that those statements were false or misleading. Those statements were about changes in *the Company's* portion sizes, not consistency across 3,500-plus restaurants. Without a "'bombshell disclosure'" that runs "directly contrary" to the challenged statements, *Rok*, 2017 WL 35496, at *19, Plaintiff cannot recover for the prior four weeks' decline.

Nor was there anything corrective about the warning that efforts to ensure portion consistency would likely raise costs by 0.4% to 0.6%. The 2023 10-K warned "social media backlash" could harm business "regardless of the information's accuracy." Ex. 2 at 10. Chipotle's responses to portion complaints were consistent with that disclosure and Defendants' statements that portion sizes had not changed.

The resulting two-day drop of 3.8% was also well below the double-digit threshold for significance, *Metzler*, 540 F.3d at 1064, and well within the stock's typical price fluctuations. Ex. 27 at 4 (July 22-24, 2024). Moreover, by July 30, 2024, Chipotle's stock climbed to $52.57—1.5% *higher* than the July 24 closing price. *Id.* at 3. This "quick and sustained price recovery after the modest [July 24 to 26] drop refutes [any] inference" of loss causation. *Wochos*, 985 F.3d at 1198.

*3Q24 Earnings Call.* Plaintiff points to a 7.9% drop after the October 29, 2024 earnings call that confirmed the cost increases Chipotle forecasted, and that should have already been incorporated into the stock's price. Ex. 27 at 9. In any event, this single-digit drop was insignificant and ephemeral. The stock price rebounded, consistently traded above $58 per share for several weeks, and reached $66.16 in mid-December 2024, surpassing its June 27, 2024 "peak." Ex. 27 at 2-3. This recovery defeats any inference of a "material drop." *Wochos*, 985 F.3d at 1198.

### D.    Any Scheme Liability Claim Fails

Plaintiff's addition of the words "scheme" or "course of conduct" to her statement-based challenge does not "sufficiently allege[] distinct conduct" as required to state an independent scheme-liability claim. *Oaktree Principal Fund V, LP v. Warburg Pincus, LLC*, 2016 WL 6782768, at *14-15 (C.D. Cal. Aug. 9, 2016). Plaintiff alleges no deception implicating any Defendant aside from challenged statements. *See* ¶¶ 53-61. Thus, Plaintiff's "alleged scheme consists entirely of (and fails for the same reasons as)" the statement-based claim. *Kang v. PayPal Holdings, Inc.*, 620 F. Supp. 3d 884, 901-02 (N.D. Cal. 2022). Regardless, Plaintiff's failure to plead scienter or loss causation is also fatal to any scheme liability claim.

### E.    Plaintiff's Section 20(a) Claim Fails

Because Plaintiff fails to plead a primary violation of Section 10(b), her Section 20(a) claims fail. *Zucco*, 552 F.3d at 990. Regardless, Plaintiff has not shown that any Defendant controlled another's statements. Boilerplate allegations of "direct and supervisory involvement in the Company's day-to-day operations" are insufficient, ¶ 144, especially as to Schalow and Hartung, who did not plausibly have "ultimate authority" over Niccol's statements. *Murphy v. Precision Castparts Corp.*, 2020 WL 4040827, at *24 (D. Or. July 17, 2020).

### V.    CONCLUSION

For the foregoing reasons, Defendants respectfully seek dismissal of Plaintiff's Second Amended Complaint with prejudice.

Dated: March 3, 2026

Respectfully submitted,

LATHAM & WATKINS LLP

By   */s/ Michele D. Johnson*
Michele D. Johnson (CA Bar No. 198298)
 michele.johnson@lw.com
Ryan A. Walsh (CA Bar No. 294506)
 ryan.walsh@lw.com
650 Town Center Drive, 20th Floor
Costa Mesa, California 92626-1925
Telephone: +1.714.540.1235
Facsimile: +1.714.755.8290

Andrew B. Clubok (*pro hac vice*)
 andrew.clubok@lw.com
Susan E. Engel (*pro hac vice*)
 susan.engel@lw.com
Matthew J. Peters (*pro hac vice*)
 matthew.peters@lw.com
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004-1304
Telephone: +1.202.637.3309
Facsimile: +1.202.637.2201

*Attorneys for Defendants Chipotle Mexican Grill, Inc., Brian Niccol, John R. Hartung, and Laurie Schalow*

**L.R. 11-6.2 Certificate of Compliance**

The undersigned, counsel of record for Defendants Chipotle Mexican Grill, Inc., Brian Niccol, John R. Hartung, and Laurie Schalow, certifies that this brief contains twenty-five (25) pages, which complies with the page limit set by the Court's Standing Order for Newly Assigned Civil Cases, dated January 10, 2025.

Dated: March 3, 2026

By  */s/ Michele D. Johnson*
Michele D. Johnson