ROBBINS GELLER RUDMAN
  & DOWD LLP
TOR GRONBORG (179109)
TRIG R. SMITH (237399)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
torg@rgrdlaw.com
trigs@rgrdlaw.com

Lead Counsel for Lead Plaintiff

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| MICHAEL STRADFORD, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> CHIPOTLE MEXICAN GRILL, INC., et al., <br><br> Defendants. | Case No. 8:24-cv-02459-SPG-JDE <br><br> <u>CLASS ACTION</u> <br><br> OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES LAWS <br><br> DATE: May 20, 2026 <br> TIME: 1:30 p.m. <br> CTRM: 5C <br> JUDGE: Hon. Sherilyn Peace Garnett |

4923-4180-5976.v1

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................ 1

II.   STATEMENT OF FACTS ......................................................................... 3

    A.   Defendant Niccol's 2018 Hire as CEO Brought a Marked Change to the Company's Culture of "Generous Portions" ................ 3

    B.   Chipotle's Enforcement of the "Critical Inventory" Metric Manifested Itself in Customer Complaints of Skimping ..................... 4

    C.   Public Accusations of Chipotle Skimping on Customer Orders .......... 4

    D.   Defendants' False and Misleading Class Period Statements ............... 6

    E.   Chipotle's Stock Dropped After Publication of the June 27, 2024 Wells Fargo Report, and While Other Unique Fraud-Related News Entered the Market ....................................................... 6

III.  LEGAL STANDARD ................................................................................ 7

IV.   THE COMPLAINT ADEQUATELY ALLEGES MISLEADING STATEMENTS ......................................................................................... 7

    A.   Defendants' Abject Denials of Skimping Were Misleading When Made .......................................................................................... 8

    B.   The Company's April 2024 Risk Disclosure Was Misleading When Made .......................................................................................... 12

V.    THE COMPLAINT RAISES A STRONG INFERENCE OF SCIENTER ............................................................................................... 13

    A.   The Complaint Raises a Strong Inference that Defendants Had Direct Knowledge of Chipotle's Internal Investigation Into the Veracity of Public Accusations of Skimping .................................... 14

    B.   Defendants' Repeated Abject Denials of Customer Skimping Raises a Strong Inference of Deception ............................................. 16

    C.   The Temporal Proximity of Defendants' Disclosure of Skimping to Their Repeated Denials Bolsters a Strong Inference of Deception ......................................................................... 17

    D.   When Viewed Holistically, the Facts Alleged in the Complaint Raise a Strong Inference of Scienter .............................................. 18

VI.   THE COMPLAINT ADEQUATELY ALLEGES SCHEME LIABILITY ............................................................................................... 19

VII.  THE COMPLAINT ADEQUATELY ALLEGES LOSS CAUSATION ............................................................................................ 19

- i -

4923-4180-5976.v1

**Page**

VIII. THE COMPLAINT ADEQUATELY ALLEGES CONTROL
PERSON LIABILITY ...................................................................................... 25

IX. CONCLUSION ................................................................................................. 25

4923-4180-5976.v1

**TABLE OF AUTHORITIES**

**Page**

**CASES**

*Alger Dynamic Opportunities Fund v. Acadia Pharms. Inc.*,
756 F. Supp. 3d 852 (S.D. Cal. 2024) ...............................................................15

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .............................................................................................7

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008)...........................................................................9, 17

*Blake v. Canoo Inc.*,
807 F. Supp. 3d 1061 (C.D. Cal. 2025)........................................................11, 16

*Citiline Holdings, Inc. v. iStar Fin. Inc.*,
701 F. Supp. 2d 506 (S.D.N.Y. 2010)................................................................21

*Cooper v. Pickett*,
137 F.3d 616 (9th Cir. 1997).............................................................................17

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) .......................................................................................2, 20

*Fecht v. Price Co.*,
70 F.3d 1078 (9th Cir. 1995)...............................................................................9

*Glazer*, 63
F.4th at 780.......................................................................................................12

*In re Alphabet, Inc. Sec. Litig.*,
1 F.4th 687 (9th Cir. 2021)..................................................................................9

*In re Amgen Inc. Sec. Litig.*,
2014 WL 12585809 (C.D. Cal. Aug. 4, 2014).....................................................13

*In re Aqua Metals, Inc. Sec. Litig.*,
2019 WL 3817849 (N.D. Cal. Aug. 14, 2019)....................................................19

*In re Atossa Genetics Inc. Sec. Litig.*,
868 F.3d 784 (9th Cir. 2017)...............................................................................9

4923-4180-5976.v1

**Page**

*In re Bofl Holding, Inc. Sec. Litig.*,
977 F.3d 781 (9th Cir. 2020) ................................................................20

*In re DiDi Glob., Inc. Sec. Litig.*,
2025 WL 2345696 (S.D.N.Y. Aug. 13, 2025) .......................................19

*In re Gilead Scis. Sec. Litig.*,
536 F.3d 1049 (9th Cir. 2008) ..............................................................20

*In re Lendingclub Sec. Litig.*,
282 F. Supp. 3d 1171 (N.D. Cal. 2017) ................................................20

*In re Nektar Therapeutics Sec. Litig.*,
34 F.4th 828 (9th Cir. 2022)..................................................................21

*In re Questcor Sec. Litig.*,
2013 WL 5486762 (C.D. Cal. Oct. 1, 2013) ........................................... 7

*In re VeriFone Holdings, Inc. Sec. Litig.*,
704 F.3d 694 (9th Cir. 2012)................................................................... 7

*Institutional Invs. Grp. v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009) ...........................................................16, 17

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018).......................................................1, 9, 21

*Kui Zhu v. Taronis Techs. Inc.*,
2020 WL 1703680 (D. Ariz. Apr. 8, 2020)...........................................22

*Lloyd v. CVB Fin. Corp.*,
811 F.3d 1200 (9th Cir. 2016).........................................19, 20, 22, 25

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011) ................................................................................. 8

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
540 F.3d 1049 (9th Cir. 2008)..............................................................23

- iv -

**Page**

*Mineworkers' Pension Scheme v. First Solar Inc.*,
881 F.3d 750 (9th Cir. 2018) ............................................................... 20

*Omnicare, Inc. v. Laborers Dist. Council*
*Constr. Indus. Pension Fund*,
575 U.S. 175 (2015) ............................................................................. 9

*Ramos v. Comerica Inc.*,
2024 WL 2104398 (C.D. Cal. Apr. 12, 2024) ..................................... 24

*Reese v. Malone*,
747 F.3d 557 (9th Cir. 2014),
*overruled on other grounds by*
*City of Dearborn Heights Act 345*
*Police & Fire Ret. Sys. v. Align Tech., Inc.*,
856 F.3d 605 (9th Cir. 2017) .............................................................. 18

*S. Ferry LP, No. 2 v. Killinger*,
542 F.3d 776 (9th Cir. 2008) ........................................................ 13, 15

*Sanchez v. Decision Diagnostics Corp.*,
2022 WL 18142518 (C.D. Cal. Dec. 5, 2022) ................................... 20

*Schueneman v. Arena Pharms., Inc.*,
840 F.3d 698 (9th Cir. 2016) ........................................................... 9, 14

*SEC v. Cap. Gains Rsch. Bureau, Inc.*,
375 U.S. 180 (1963) ............................................................................. 2

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007) ....................................................................... 7, 13

*Wochos v. Tesla, Inc.*,
985 F.3d 1180 (9th Cir. 2021) ............................................................ 24

*Zamani v. Carnes*,
491 F.3d 990 (9th Cir. 2007) .............................................................. 10

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009) .............................................................. 18

- v -

4923-4180-5976.v1

**Page**

**STATUTES, RULES, AND REGULATIONS**

15 U.S.C.
  §78j(b) ...................................................................................................................... 2, 25
  §78t(a) ............................................................................................................................ 25
  §78u-4(b)(1) ..................................................................................................................... 7

Federal Rules of Civil Procedure
  Rule 9(b) ...................................................................................................................... 7, 20
  Rule 12(b)(6) ................................................................................................................ 7, 20
  Rule 15(a) ....................................................................................................................... 25

17 C.F.R.
  §240.10b-5 ........................................................................................................................ 5

4923-4180-5976.v1

Lead Plaintiff Lisa Tai ("Plaintiff") respectfully submits this opposition to Defendants' Notice of Motion and Motion to Dismiss the Second Amended Complaint (ECF 72) ("Mtn.").[1]

## I.   INTRODUCTION

During the April 25 through October 29, 2024 Class Period, Defendants denied public accusations that Chipotle restaurants were skimping on customers' orders.[2] In May 2024, for example, Niccol denied the accusations and called them "***crazy to me***" at the same time Chipotle was conducting an undisclosed investigation into their veracity. Defendants cannot dispute that Schalow was responsible for heading up that investigation, which commenced in late 2023. Yet, Schalow flatly denied the accusations too. To deliberately secret the fact that Chipotle was actively investigating those allegations, at the same time abjectly denying their merit, is securities fraud. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008-09 (9th Cir. 2018) (a statement is misleading if it "omits material information").

Between June 27, 2024 and July 23, 2024, while information from market participants leaked into the market about Chipotle skimping on its customers, and after Defendants' July 24, 2024 concession of the same, the Company' stock price dropped from over $65.00 per share, to under $50.00.

Within three weeks of making their final denial, however, Defendants disclosed on July 24, 2024 that skimpy portions were a problem in at least 10% of the Company's 3,500 restaurants. Niccol further disclosed that the Company had been internally investigating the accusations, stating they "caused [Chipotle] to reexamine

---

[1]   Defendants are Chipotle Mexican Grill, Inc. ("Chipotle" or the "Company"), Brian Niccol ("Niccol"), John R. Hartung ("Hartung"), and Laurie Schalow ("Schalow") (the "Individual Defendants," and collectively with Chipotle, "Defendants").

[2]   Emphasis is added and citations are omitted unless otherwise stated.

- 1 -

its portion execution across its entire system" **after** "we got the feedback on portion sizes."

The fundamental purpose of the federal securities laws is "to substitute a philosophy of full disclosure for the philosophy of caveat emptor and thus to achieve a high standard of business ethics in the securities industry." *SEC v. Cap. Gains Rsch. Bureau, Inc.*, 375 U.S. 180, 186 (1963). When, as here, corporate officers fail to provide full and accurate disclosure and violate §10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), a plaintiff must plead: (1) a material misrepresentation or omission (falsity); (2) made with scienter; (3) in connection with the purchase or sale of a security; (4) relied upon by plaintiffs; (5) a loss causally connected to the alleged fraud; and (6) economic loss or damages. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005).

Defendants do not dispute whether the Second Amended Complaint for Violations of the Federal Securities Laws (ECF 70) ("Complaint") adequately pleads the security purchases, reliance, materiality, and damages elements of the §10(b) claim. Defendants, however, seek dismissal of the case by arguing the Complaint fails to adequately plead: (a) falsity; (b) scienter; and (c) loss causation. *See* Mtn. With regard to Defendants' falsity arguments, the Court should reject them. Defendants do not, because they cannot, dispute that at the same time they uttered their abject denials of skimping, they failed to disclose that Chipotle was actively investigating the veracity of those very accusations. The Complaint sufficiently alleges the denials to be misleading. *See* §IV.A., *infra*.

The Court should also reject Defendants' scienter arguments. Again, Defendants do not, because they cannot, dispute that the Complaint adequately alleges that Schalow had direct knowledge of the ongoing investigation at the time she made her abject denials. Given that Schalow directly reported to Niccol, Chipotle had been facing allegations of "skimping" customers for months, and Niccol later admitted that the Company's investigation began as soon as the Company received feedback on

- 2 -

4923-4180-5976.v1

portions from the public, it defies logic to suggest Niccol was somehow unaware of the investigation when he made his denials.  This is particularly true given the accusations of skimping cut against, as Niccol stated, the Company's "core brand equity" of providing generous portions to all customers.  The Complaint's allegations collectively raise a strong inference to Defendants' intent to deceive.  *See* §V., *infra.*

The Complaint adequately alleges scheme liability with regard to Defendants' acts of cheating customers.  *See* §VI., *infra*.  Lastly, the Complaint sufficiently alleges the "leakage theory" of loss causation.  *See* §VII., *infra.*

## II.    STATEMENT OF FACTS

Chipotle owns and operates Chipotle Mexican Grill restaurants, which feature a menu of burritos, burrito bowls, quesadillas, tacos, and salads.  ¶15.[3]  The Company's first store was opened in 1993 in Denver, Colorado.  *Id.*  By December 31, 2024, the Company operated over 3,700 restaurants in the United States and internationally.  *Id.*  As stated by Niccol on July 24, 2024: "Generous portions [are] a core brand equity of Chipotle.  It always has been, and it always will be."  *Id.*

### A.    Defendant Niccol's 2018 Hire as CEO Brought a Marked Change to the Company's Culture of "Generous Portions"

Under Chipotle's Denver, Colorado-based founder's leadership (Steve Ells), the Company placed an emphasis on employee satisfaction and building a culture of family between restaurant workers and management.  ¶33.  The Company also trained its employees to focus on customer satisfaction and to be more generous with serving portions even if it meant less profitability.  ¶¶33-34.  Upon Niccol's onboarding as CEO in February 2018, the culture of encouraging employees to serve generous portions changed.  ¶¶35-40.

---

[3]    All "¶_" and "¶¶_" references are to the Complaint.

- 3 -

**B.**    **Chipotle's Enforcement of the Critical Inventory Metric
Manifested Itself in Customer Complaints of Skimping**

Under Niccol's leadership, each Chipotle restaurant was expected to meet or exceed a Company metric known as Critical Inventory (or "CI"). CI tracked store inventory for high-cost inputs such as steak, chicken, sofritas, avocados, and cheese products. ¶¶36, 39. Twice each day, Chipotle restaurant employees were required to count their CI and enter it into a computer program known as the E-Restaurant System (or "ERS"). ¶39. The ERS system provided restaurant employees and Chipotle management a variance of the amount of menu items sold, versus what was dictated by the CI policy. *Id.* Chipotle management expected all restaurants, in general, to produce less than a 0.6% variance in terms of actual food on hand versus the CI policy metric. *Id.*

According to several former Chipotle corporate managers, numerous Chipotle restaurants could not hit the CI target without skimping. ¶¶40, 110-111, 117-118. Further, as a result of Defendants' aggressive enforcement of the CI metric, restaurant employees regularly skimped out of fear of losing their jobs. ¶¶121-123. A former Manager of Customer Incidents confirmed that skimping was an issue at the Company beginning in late 2021 and only worsened during 2024. ¶¶113-114.

**C.**    **Public Accusations of Chipotle Skimping on Customer
Orders**

On October 30, 2023, content creator Ryan Lynch posted a video on TikTok complaining of the Company's shrinking portion sizes. ¶42. That video received millions of views, hundreds of thousands of likes, and thousands of comments from customers echoing that Chipotle's burrito bowls were shrinking in size. *Id.*

On December 19, 2023, the *New York Post* published an article about the growing criticism of the Company, headlined "Chipotle called out by fans over 'shrinking' portion sizes." ¶43. The article quoted a Northwestern University professor who noted, "'[w]hen something touches a nerve like this, brands really do

- 4 -

4923-4180-5976.v1

need to respond'" and "'I don't think anyone is expecting Chipotle to change overnight, but if I were Chipotle, I would acknowledge [the matter] . . . and look into it. There may be procedural reasons they cannot do it, but authenticity would go a long way here.'" *Id.* To quell investors' concern, Chipotle ***denied*** the allegations on December 19, 2023. *Id.*

By April 2024, complaints about skimping orders and inconsistent portioning were growing in frequency. ¶44. A website known as "stoptheskimp.com" had been accumulating ratings of Chipotle Mexican Grill restaurants relating to the amount the Company had allegedly skimped on customer orders. *Id.* In March 2024, Zackary Smigal alleged that on-line orders placed at restaurants located in Pennsylvania and Ohio were skimpier 70% of the time. *Id.* In late April 2024, while Chipotle was secretly investigating the veracity of the public accusations, Niccol sold over $20 million of Chipotle common stock outside of his Rule 10b5-1 insider trading plan. ¶¶8, 104-105, 114.

On May 3, 2024, TikTok influencer Keith Lee, who had promoted Chipotle through a brand partnership with the Company, posted a video alleging shrinking portions. ¶45. The video received tens of millions of views, millions of likes, and sparked multiple news articles amplifying his allegations. *Id.* Privately, and in direct response to the public backlash, in May 2024 the Company responded by instructing restaurant managers to retrain employees on appropriate portion sizes. ¶¶46, 124. In mid-June 2024, Hartung sold $8 million of his personal holdings of Chipotle stock prior to Schalow twice again denying the public accusations. ¶¶106-107.

On June 27, 2024, Wells Fargo analysts covering Chipotle published a report on serving weight findings after ordering 75 similar burrito bowls at 8 New York City locations. ¶50. This was the first time a securities analyst tested the public allegations. *Id.* Wells Fargo reported that portion sizes varied significantly, with the largest bowl being roughly double the size of the smallest. *Id.* Prior to June 27, 2024, Niccol had characterized the public allegations of skimping as "crazy to me." ¶56.

- 5 -

4923-4180-5976.v1

After Wells Fargo (a sophisticated market participant) issued its report in late June 2024, however, Defendants did not characterize its contents as "crazy," but nonetheless denied the continued allegations of skimping.

In response to the Wells Fargo report, *BroBible* accused Defendants of "[c]ompletely [l]ying" about Chipotle's purported consistent portion sizes. ¶64. On July 12, 2024, *Bloomberg* reported that heightened public accusations had sent Chipotle's stock into its "worst tailspin" in nearly a year. ¶66. On July 15, 2024, TD Securities reported that Chipotle investor survey data had dropped in June 2024 and linked that decrease to the portion scandal. ¶67. On July 29, 2024, *YouGov.com* reported that Chipotle customer satisfaction scores had significantly degraded between March and mid-July 2024. ¶69.

**D.    Defendants' False and Misleading Class Period Statements**

On April 25, 2024, Defendants caused Chipotle to issue its 1Q 2025 Form 10-Q with misleading risk warnings about the Company's ability to respond to social media accusations that might damage the Company's reputation. ¶53. Between May 16 and July 4, 2024, Niccol and Schalow issued a series of abject denials of public accusations of skimping, two of which were on the heels of Wells Fargo's June 27, 2024 report. ¶¶55-60.

**E.    Chipotle's Stock Dropped After Publication of the June 27, 2024 Wells Fargo Report, and While Other Unique Fraud-Related News Entered the Market**

Between June 27, 2024 and July 23, 2024, as new information related to Defendants' deception leaked into the market, the Company's stock price dropped from $65.86 to $52.55 per share, or over 20% (representing a multi-billion dollar loss in market capitalization). ¶¶62-70.

After the market close on July 24, 2024, Defendants announced that 10% or more of its restaurants had been skimping customers, and the Company's forward cost of sales would increase 40 to 60 basis points in order to fix the problem. ¶¶71-73.

- 6 -

4923-4180-5976.v1

Over the next two days, the Company's stock price dropped by 3.8%. ¶74. On October 29, 2024, Chipotle disclosed that its cost of sales had actually increased by 90 basis points, and a potential 2% to 3% menu price increase would likely be necessary to fully address the skimping scandal. ¶¶80-81. The next day, the Company's stock price dropped by 7.9%. ¶82.

## III. LEGAL STANDARD

In assessing a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a court must "consider the complaint in its entirety," "accept all factual allegations . . . as true," and construe those allegations in the light most favorable to the plaintiff. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322-23 (2007). A complaint "does not need detailed factual allegations," but need only allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).

Along with Rule 12(b)(6)'s requirements, a complaint alleging securities fraud must satisfy the requirements of Rule 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012).

## IV. THE COMPLAINT ADEQUATELY ALLEGES MISLEADING STATEMENTS

To adequately plead falsity, the pleading must "'specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading.'" *Id.* (alteration in original) (quoting 15 U.S.C. §78u-4(b)(1)). In short, a complaint must identify "who" made the allegedly misleading statements, "what" statements were misleading, "where" and "when" the statements were made, and "how" the statements were misleading. *See In re Questcor Sec. Litig.*, 2013 WL 5486762, at *8 (C.D. Cal. Oct. 1, 2013).

Defendants do not credibly dispute that the Complaint adequately alleges the "who," "what," "when," and "where" of their alleged misstatements. Defendants

- 7 -

4923-4180-5976.v1

contend the Complaint does not adequately allege "how" those statements misled investors. Mtn. at 8-16. Defendants are incorrect.

## A. Defendants' Abject Denials of Skimping Were Misleading When Made

Between May 16 and July 4, 2024, Niccol and Schalow made the following denials of public allegations of skimping, in direct response to inquiries by the press:

- May 16 [Schalow]: "'We have not changed our portion sizes, and our guests continue to appreciate the value we offer them.'" ¶55.

- May 29 [Niccol]: "No.  No.  We never have." ¶56.

- May 29 [Schalow]: "'There have been no changes to our portion sizes . . . .'" ¶57.

- May 30 [Niccol]: "'[P]ortions have not gotten smaller.'" ¶58.

- June 28 [Schalow]: "[T]he company has not changed its portion sizes." ¶59.

- July 4 [Schalow]: "'There have been no changes in our portion sizes, and we aim to provide a great guest experience every time.'" ¶60.

When Niccol and Schalow chose to deny the accusations, they failed to disclose that Chipotle was at the time conducting an internal investigation into their veracity. ¶¶112, 114 (CS-2 stated that he was directly involved in that investigation by no later than March 2024 and that Schalow headed the effort), ¶¶71-72, 76-77 (Niccol disclosing that Chipotle commenced the internal investigation as soon as they got feedback on the portion sizes).

Companies control what to disclose to market participants, by controlling what they say. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011).  Here, Niccol and Schalow could have refused to answer questions regarding the accusations.  Or, they could have simply said they were investigating them and would inform investors of the findings.  They did not, but curtly and repeatedly denied them.  ¶¶55-60.  "'[O]nce defendants [choose] to tout' positive information to the market, 'they

- 8 -

4923-4180-5976.v1

[are] bound to do so in a manner that wouldn't mislead investors,' including disclosing adverse information that cuts against the positive information." *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016). When allegations concern an omission or misstatement, the plaintiff must also allege materiality. To do so, the allegations must raise a reasonable expectation "'that discovery will reveal evidence satisfying the materiality requirement, and to allow the court to draw the reasonable inference that the defendant is liable.'" *Khoja*, 899 F.3d at 1009 (quoting *In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 794 (9th Cir. 2017)). At the motion to dismiss stage, however, "resolving materiality as a matter of law is generally appropriate 'only if . . . the materiality of the [omitted information] is so obvious that reasonable minds could not differ.'" *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 700 (9th Cir. 2021) (quoting *Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995)).

The material information that would have been conveyed to investors had Defendants disclosed Chipotle's internal investigation is critical: It would have also clarified whether Niccol and Schalow had any basis to make the denials in the first instance. Even if Defendants' denials could be characterized as opinions – which they are not – they are still adequately alleged as materially misleading because the denials omitted a material fact – *i.e.*, the Company was then internally investigating the veracity of the public accusations themselves – which "conflict[s] with what a reasonable investor would take from the [abject denial] itself." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 188-89 (2015). *See also Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) (noting a "statement is misleading if it would give a reasonable investor the 'impression of a state of affairs that differs in a material way from the one that actually exists'").

Defendants' implicitly concede that Plaintiff's theory of falsity – that is, denying public allegations of skimping, while failing to disclose Chipotle's ongoing

- 9 -

4923-4180-5976.v1

internal investigation of the veracity of those charges – is valid, but attempt to distract the Court with series of straw man arguments.  Mtn. at 10-12.  Yet, the Complaint alleges the Company had experienced an uptick in complaints about portion sizes between 2021 and 2022, but according to a former Chipotle Manager of Customer Incidents, Chipotle did not begin investigating them seriously until late 2023.  ¶114.  The Manager of Customer Incidents worked closely with Schalow regarding customer complaints and assisted Schalow to respond to customer-relations issues.  *Id.*  No later than March 2024, moreover, Schalow's team reached out directly to the Manager of Customer incidents to help with the ongoing investigation into customers' accusations of skimping.  *Id.*; *but see* Mtn. at 11 (incorrectly claiming the Complaint offers no details about the investigation).   Here, Defendants completely disregard these allegations, which demonstrate what she is alleged to have known "at the time" she repeatedly denied the public accusations.  Mtn. at 10-11.[4]

With regard to Niccol, Defendants only argue that there are no allegations demonstrating when he "knew" about the investigation at the time he made his denials.[5]  Mtn. at 10.  But the argument is misplaced.  As Chipotle's Chief Corporate Affairs and Food Safety Officer, and a person authorized to speak publicly on behalf of the Company, Schalow reported directly to Niccol, Chipotle's CEO.  ¶12.  Further, Niccol acknowledged that Chipotle's investigation of skimping accusations began "when we got the feedback on the portion sizes."  ¶¶72, 76-79 (the press interpreted Niccol's statement as confirming that the investigation started as soon as "the topic blew up on social media").

Defendants cannot argue Niccol did not have access to Schalow, who headed up the investigation and reported directly to him.  Nor can Defendants rationally argue

---

[4]    Because Defendants' motion did not argue the undisclosed internal investigation was immaterial to investors, this Court need not consider it should Defendants raise it in reply.  *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007).

[5]    Defendants, however, do not dispute that the Complaint alleges that Schalow had direct knowledge of the undisclosed internal investigation.

- 10 -

that Niccol did not have access to Schalow's work-product detailing the status of that investigation. And, Niccol told investors that serving "generous portions" always had been a "core brand equity." ¶¶15, 24, 71. Here, these facts are sufficiently particular and suggest that Niccol always had access to the investigation's findings, and Schalow herself, who headed up the internal investigation. *See Blake v. Canoo Inc.*, 807 F. Supp. 3d 1061, 1085 (C.D. Cal. 2025) (noting that "repeated" statements regarding a specific topic, which defendants told investors were very important to the company's operations made it absurd to argue that they were without knowledge of the matter).

Defendants repeatedly attempt to muddy the Complaint's allegations by claiming the subject matter of the denials was whether Defendants had ordered or directed restaurants to skimp on customers. Mtn. at 1-2, 11-13. Wrong. The Complaint alleges Defendants' denials were in response to analysts and investors' questions directed to Defendants about whether the public allegations had merit. ¶¶55-60. Defendants' mischaracterization of the Complaint's allegations also conflicts with contemporaneous analyst and press interpretation of the relevant events. In concluding that "Chipotle is Completely Lying About Consistent Portion Sizes," *Bro Bible* noted "social media is abound with people complaining about the lack of food." ¶64. *Bloomberg* characterized the accusations as online criticism "from diners who say [Chipotle's] serving sizes have shrunk." ¶66. *CBS News* reported that "Niccol disclosed that skimpy portions have been a problem at about 10% of its roughly 3,500 locations." ¶76. *Forbes* reported that "Chipotle's CEO confirmed at least 10% of its locations were skimping . . . ." ¶77.

Defendants next fault Plaintiff for again relying on CI allegations to prove up falsity. Mtn. at 13-14. But the flaw in that argument is Defendants' mischaracterization of the Complaint's allegations. Defendants argue that the pleading does not establish that strict enforcement of the CI metric was an "'instruct[ion]'" to skimp. *Id.* at 13. Again, that is not what Plaintiff alleges. The Complaint alleges that Defendants abjectly denied public allegations that restaurants

- 11 -

4923-4180-5976.v1

were skimping when responding to inquiries from the press and analysts about whether the accusations had merit.  And, the CI metric allegations are there to demonstrate and corroborate what was behind customer complaints about shrinking portions.  ¶111 (restaurants skimped "all the time" to meet the CI metric), ¶118 (employees encouraged to skimp on orders to meet the CI metric), ¶¶121, 123 (Chipotle employees feared losing their jobs due to Chipotle's pressure to satisfy the CI metric, but skimped customer orders due to Chipotle senior management's "unrealistic expectations" with regard to the metric), ¶119 (after Keith Lee's May 3, 2024 viral TikTok post, Chipotle ordered stores to correct their portions sizes, resulting in a ballooning of non-compliant CI metrics).

**B.     The Company's April 2024 Risk Disclosure Was Misleading When Made**

Defendants assert that the April 25, 2024 risk disclosure in the Company's Form 10-Q is not actionable because: (a) negative social media comments had already gained "'public notoriety'"; and (b) Niccol cannot be liable because he did not sign the Form 10-Q.  Mtn. at 15-16.  As an initial matter, the risk warned of in the disclosure is the potential "material adverse impact" on Chipotle's business, due to a failure "to recognize, respond to and effectively manage the immediacy of social media." ¶53.  The risk disclosure does not directly address accusations of skimping. And, Schalow first denied the allegations in late 2023, and Niccol and Schalow continued to issue abject denials in May, June and July 2024.  ¶¶55-60.  In short, there was no reason to update the risk disclosure in light of Defendants' denials.

Risk disclosures can be misleading to investors when they speak to unrealized risks and do not alert investors that the risk may have already materialized. *Glazer*, 63 F.4th at 780.  For instance, by no later than March 31, 2024, Chipotle internally acknowledged the rising level of risk to the Company as a result increasing public allegations, but they did nothing to update the risk disclosure on April 25, 2024. ¶114 (noting the same logic applies with regard to the PSLRA's Safe Harbor, cautionary

- 12 -

4923-4180-5976.v1

language is not "meaningful" if it only discusses a mere possibility the risk may have materialized).

Defendants suggest that Niccol cannot be liable for the 1Q 2024 risk disclosure because he did not sign that document. Mtn. at 16. That argument should be rejected. Niccol did sign the 2023 Form 10-K, which included the same risk disclosure, verbatim. ¶53. The Company incorporated that disclosure (which Niccol had already signed off on) into the 1Q 2024 Form 10-Q. *Id.* Further, the Company's code of ethics required Niccol to provide "accurate and complete information to the public." ¶8. Accordingly, Defendants' suggestion that Niccol, as CEO and Chairman of the Board, did not control the contents of Chipotle's 1Q 2024 Form 10-Q rings hollow. ¶14.

## V. THE COMPLAINT RAISES A STRONG INFERENCE OF SCIENTER

A pleading raises a strong inference of scienter where it "'state[s] with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind'" – *i.e.*, that the defendants' conduct was "'knowing' or 'intentional'" or otherwise rose to the level of "'deliberate recklessness.'" *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 782 (9th Cir. 2008). An inference of scienter is "strong" when it is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. When considering scienter allegations, courts should "assess all the allegations holistically" rather than "scrutiniz[ing] each allegation in isolation." *Id.* at 326. The inference of scienter "need not be irrefutable . . . or even the 'most plausible of competing inferences.'" *Id.* at 324. With respect to equally plausible inferences, a "'tie goes to the Plaintiff.'" *In re Amgen Inc. Sec. Litig.*, 2014 WL 12585809, at *8 (C.D. Cal. Aug. 4, 2014).

- 13 -

4923-4180-5976.v1

A.    **The Complaint Raises a Strong Inference that Defendants Had Direct Knowledge of Chipotle's Internal Investigation Into the Veracity of Public Accusations of Skimping**

The Complaint alleges that in late 2023, Schalow was responsible for commencing an internal investigation into public accusations of the Company skimping on customer orders. ¶114. The initiation of the investigation appears to have coincided with accusations by Ryan Lynch (a TikTok influencer) of the Company's shrinking portions and a *New York Post* article summarizing criticism of the same. ¶¶41-43. In a December 19, 2023 *New York Post* article, Schalow first denied the veracity of the skimping allegations, stating "'[w]e have not changed our portion sizes . . . .'" ¶43. The investigation carried on past March 2024, with Niccol confirming the investigation commenced as soon as the accusations began to blow up on social media. ¶¶72, 77, 114. As part of that investigation, Schalow recruited Chipotle's Manager of Customer Incidents to assist in it by no later than March 2024, and the Manager of Customer Incidents recalled communications to Company restaurants – overseen by Schalow – to address the alleged portion size problems. ¶114. After Keith Lee ( a social media influencer paid by Chipotle) and Wells Fargo (a securities analyst who had long covered the Company for investors) called the Company out again for alleged skimping (¶¶45, 50) in May and June 2024, respectively, Schalow issued several outright denials of skimping. ¶18 (May 16, 2024: "'We have not changed our portion sizes . . . .'"), ¶57 (May 29, 2024: "'There have been no changes to our portion sizes . . . .'"), ¶59 (June 28, 2024: Schalow said "the company has not changed its portion sizes."), ¶60 (July 4, 2024: "'There have been no changes in our portion sizes . . . .'").

Here, Schalow chose to speak about, and respond to, the topic of public accusations of skimping. Accordingly, she and Chipotle were under a legal duty to speak in a manner that that wouldn't mislead investors, "including disclosing adverse information that cuts against the positive information." *Schueneman*, 840 F.3d at 706-09. On May 16, May 29, June 28, and July 4, 2024, when Schalaw made her abject

- 14 -

4923-4180-5976.v1

denials, she had knowledge of and deliberately withheld the ongoing investigation into the veracity of the accusations. ¶114. Certainly, the fact that the Company was investigating the charges would have allowed investors to measure the credibility of Defendants' denials.

Because the Complaint adequately alleges a strong inference of Schalow's intent to deceive, it also raises a strong inference of Chipotle's intent to deceive with respect to all of Schalow and Niccol's abject denials of skimping on customers. ¶¶12, 14 (*respondeat superior* allegations); *see Alger Dynamic Opportunities Fund v. Acadia Pharms. Inc.*, 756 F. Supp. 3d 852, 870 n.2 (S.D. Cal. 2024) (recognizing the corporate entity as being secondarily liable under the doctrine of *respondeat superior*). Schalow's direct knowledge of, and participation in, the investigation is imputed to Chipotle. And, CEO Niccol's denials were also made on behalf of his principle, Chipotle. ¶¶7-9, 14. Accordingly, at a minimum, the Court should deny Defendants' motion to dismiss with respect to Schalow and Chipotle.

With regard to Niccol's intent to deceive investors for his denials (¶¶56, 58), application of the core operations doctrine is appropriate. *See S. Ferry*, 542 F.3d at 785-86 (a court may credit the core operations doctrine where "allegations that, when read together, raise an inference of scienter that is 'cogent and compelling, thus strong in light of other explanations'"). Niccol's direct report, Schalow (Chief Corporate Affairs and Food Safety Officer) (¶12), was responsible for initiating and overseeing the investigation into accusations of skimping. ¶114. That investigation commenced in late 2023, and continued by Niccol's admission up to the disclosure of its findings in late July 2024. ¶¶72, 77. Niccol implied that he had a sound basis to deny the allegations in May 2024 when he characterized them as "***crazy to me***." ¶56. In addition, the Complaint details growing and accelerating public allegations of skimping on customers between October 2023 and July 2024, which was a prominent news and social media phenomena targeting Chipotle's business. ¶¶41-51. Thus, it would be "absurd" to suggest that Niccol was not aware of the existence of the

- 15 -

4923-4180-5976.v1

internal investigation into skimping when he issued his abject denials. *See Blake*, 807 F. Supp. 3d at 1083-85; *see also* §V.B.-C., *infra*.

Defendants next contended that skimping at 10% or more of the Company restaurants is not a fact of such importance that Defendants must have been aware of it. Mtn. at 21. But, one cannot deny skimping if there was no inquiry into whether it, in fact, was occurring. Further, the argument misses the point. The question is whether the internal investigation into the veracity of wide-spread allegations of skimping, that commenced in late 2023, was so important that Niccol and Hartung would have been aware of it.

### B. Defendants' Repeated Abject Denials of Customer Skimping Raises a Strong Inference of Deception

Where a defendant issues repeated denials in response to pointed and direct questions from market participants, it can raise a strong inference of scienter. *See Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 270 (3d Cir. 2009).

In *Avaya*, the Third Circuit panel concluded that even though a CFO may not have been aware of the true state of affairs in the company regarding unusual discounting of prices, his repeated denials to analysts and investors raised a strong inference of reckless conduct. *Id.* (holding the pleading raised a strong inference of recklessness "[g]iven the specificity and repetition of the analysts' questions, McGuire's position as Chief Financial Officer, and the alleged state of Avaya's business at the time the questions were asked, there is a strong inference that McGuire's behavior reached this threshold of recklessness"). Here, Niccol's direct report, Schalow, headed up the undisclosed internal investigation into the veracity of public accusations of skimping. ¶¶112, 114. Further, market participants' repeated questioning of Niccol and Schalow about whether the accusations of skimping had merit, and their abject denials, was critical to investors because, as proudly claimed by Niccol, "***generous portions***" was and always had been a "***core brand equity***" of Chipotle. ¶71; *Avaya*, 564 F.3d at 271 (noting "operating margin[s]" were central to

- 16 -

the "'Avaya story'"). Defendants do not dispute, because they cannot, that the Complaint alleges an internal investigation into the veracity of the public accusations of skimping. And, Niccol clearly had access to his direct report, Schalow, and Chipotle's work product related to that investigation. Accordingly, when uttering his denials of skimping, Niccol was reckless (whether he knew about the investigation or not) because the allegations of skimping cut against the long-standing Chipotle story of "core brand equity."

The panel in *Avaya* also noted that the "temporal proximity" of the denials to the disclosure of corrective information only "strengthen[ed] the inference of scienter." 564 F.3d at 271. As discussed below, the same holds true here.

**C.     The Temporal Proximity of Defendants' Disclosure of Skimping to Their Repeated Denials Bolsters a Strong Inference of Deception**

While the temporal proximity of a defendant's misleading statements to a corrective disclosure does not itself raise a strong inference, it certainly can "'bolster'" the inference. *Berson*, 527 F.3d at 988 n.5. Here, the Company's internal investigation into the veracity of the public accusations of skimping were headed by Niccol's lieutenant, Schalow, it commenced in late 2023 and its results were disclosed by Niccol on July 24, 2024. ¶¶71-72, 114. Within 9-weeks of Niccol's denials, including his characterization of the charges as "crazy to me," he disclosed that 10% or more of the Company's 3,500 restaurants were skimping on customers' orders. ¶71. This is circumstantial evidence of Niccol's intent to deceive because the temporal proximity of the denials to the corrective disclosure in July 2024 "mounts" with the Complaint's allegations that the Company was then conducting an internal investigation into veracity of the public accusations. *See Cooper v. Pickett*, 137 F.3d 616, 626 (9th Cir. 1997).

- 17 -

4923-4180-5976.v1

**D.     When Viewed Holistically, the Facts Alleged in the Complaint Raise a Strong Inference of Scienter**

When conducting its scienter inquiry, the Court must first determine whether any of the allegations, standing alone, raise a strong inference of scienter.  If no individual allegation is sufficient, it must then determine whether a holistic review of the pleading's allegations combine to create a strong inference. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 992 (9th Cir. 2009).

As demonstrated above, the Complaint alleges that Schalow had direct knowledge of the internal investigation into the veracity of the public allegations of skimping, at the time she abjectly and repeatedly denied them.  Further, Niccol and Schalow made repeated denials while that internal investigation proceeded.  Given that Schalow reported directly to Niccol and shared executive suite positions at the Company, it would be absurd to conclude that neither Niccol and Hartung had no knowledge of the internal investigation headed up by Schalow. *See Reese v. Malone*, 747 F.3d 557, 572 (9th Cir. 2014) (an assertion that defendants were unaware of alleged issues can be directly contradicted by the fact that they made specific statements that were inconsistent with information they had access to), *overruled on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 619 (9th Cir. 2017).  Here, Niccol had direct access to Schalow and the status of Chipotle's internal investigation at the time they denied Chipotle was skimping customers.  Niccol sold $20 million of his personal holdings of Chipotle stock (outside his 10b5-1 trading plan) in April 2024 (¶7), when he either knew of the internal investigation of public accusations of skimping or had access to its results through Schalow.  And, Hartung sold $8 million of his personal holding Chipotle stock one month before Chipotle acknowledged skimping on customers. ¶10.

Defendants' purported exculpatory explanation is striking: The "far more compelling inference" is that their abject denials were based on "the only knowledge

- 18 -

4923-4180-5976.v1

they had: that the Company had not changed its portion-size standards." Mtn. at 22. The Court should reject this argument. The Complaint does not allege that Niccol, Schalow, or Hartung ordered the Company to change its portion-size standards. Rather, the Complaint alleges that when Niccol and Schalow denied public allegations that Chipotle restaurants were skimping on customers, they failed to disclose that the Company was then investigating the veracity of the charges.

## VI. THE COMPLAINT ADEQUATELY ALLEGES SCHEME LIABILITY

Defendants' sole argument against Plaintiff's scheme allegations fails (Mtn. at 25), as the Complaint here alleges the "scheme went beyond the making of any alleged misrepresentations and statements." *In re Aqua Metals, Inc. Sec. Litig.*, 2019 WL 3817849, at *9 (N.D. Cal. Aug. 14, 2019). Plaintiff's allegations of Defendants' "course of conduct that artificially inflated the price of Chipotle's stock" (¶17), separate from the misstatements, comprise multiple paragraphs. ¶¶111-112, 117. Those allegations detail internal conduct – including implicit or indirect instructions from mid-level corporate management to skimp – which artificially reduced (unbeknownst to investors) the Company's costs. *Id.* These actions are thus "'distinct from the alleged misrepresentations and omissions'" alleged throughout the remainder of the Complaint. *In re DiDi Glob., Inc. Sec. Litig.*, 2025 WL 2345696, at *2 (S.D.N.Y. Aug. 13, 2025).

## VII. THE COMPLAINT ADEQUATELY ALLEGES LOSS CAUSATION

Defendants largely re-hash the same loss causation arguments they leveled at the prior pleading (ECF 55 at 20-25), but infuse a number of misleading factual claims, inappropriate characterization of the Complaint's allegations, and misstate the law. For instance, Defendants cite to *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016), for the proposition that a "'leakage'" theory of loss causation "*requires*" a "later 'bombshell disclosure'" fully confirming the leaked piecemeal

- 19 -

4923-4180-5976.v1

truths. Mtn. at 23. Any fair reading of *Lloyd*, however, reveals that the Ninth Circuit panel never held that.

In any event, the Complaint adequately alleges the "leakage theory" of loss causation. Pleading loss causation requires "no more than the familiar test for proximate cause," which simply requires a linkage between the alleged fraud and plaintiffs' loss. *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018). Pleading loss causation is "not meant to impose a great burden" (*Dura*, 544 U.S. at 347), and "even under Rule 9(b) the plaintiff's allegations will suffice so long as they give the defendant 'notice of plaintiffs' loss causation theory' and provide the court 'some assurance that the theory has a basis in fact.'" *In re Bofl Holding, Inc. Sec. Litig.*, 977 F.3d 781, 794 (9th Cir. 2020). Thus, loss causation is ordinarily "'not to be decided on a Rule 12(b)(6) motion to dismiss.'" *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008).

The Complaint alleges that most of the artificial inflation in Chipotle's stock caused by Defendants' Class Period misrepresentations dissipated between June 27 and July 26, 2024 – utilizing the leakage theory of loss causation and corrective disclosures. ¶¶62-83, 87-95; *see Sanchez v. Decision Diagnostics Corp.*, 2022 WL 18142518, at *14 (C.D. Cal. Dec. 5, 2022) (citing *In re Lendingclub Sec. Litig.*, 282 F. Supp. 3d 1171, 1181 (N.D. Cal. 2017)) (the "leakage theory" is characterized by "'interim manifestations'" of the truth prior to a corrective disclosure).

On June 27, 2024, Wells Fargo issued a report based on 75 orders of Chipotle "like-for-like" burrito bowls at various restaurants in New York City. ¶62. That report was issued in direct response to the public accusations of skimping. *Id.* Wells Fargo published the report on the heels of four unequivocal denials of skimping. ¶¶55-58. The press immediately commented on the report. ¶64 (*BroBible*, "Chipotle is Completely Lying About Consistent Portion Sizes"), ¶65 (*CNN*, "if portion sizes are not standardized it could hurt a chain's reputation . . . . [And m]any brands have been criticized for shrinking their product sizes . . . known as 'shrinkflation.'"). And,

- 20 -

4923-4180-5976.v1

Defendants' attempt to downplay the Wells Fargo report (Mtn. at 22-23) is not persuasive as they ignore one of its critical findings: "Bowl weight varied widely with the lightest bowl ~3 standard deviations below the median." ¶62. In reaction to the June 27, 2024 report – the findings of which contradicted Defendants' repeated denials – the Company's stock price dropped by 5.4%. ¶63.

Defendants contend that because various social media claims of skimping predated the June 27, 2024 Wells Fargo report, the report itself did not disclose any new information (despite the report findings that in New York, many of the Company's servings weighted multiple deviations below average (¶62)). Mtn. at 22-23.[6] Defendants' argument, moreover, ignores that as they continued to deny the public accusations from social media sources leading up to June 27, 2024, and the Company's stock maintained an upward price trajectory within the upper-$50 to upper-$60 price range during that time. ECF 72-29 at 4-5. It was not until a sophisticated market participant – Wells Fargo – reported its findings on June 27, 2024 that the market understood that the social media allegations might have merit. ¶¶62, 64-65. And, the lack of any discernable stock price reaction to the prior social media accusations, as opposed to the price drop following the June 27, 2024 Wells Fargo report, supports an inference that investors first credited Defendants' denials and, thus, did not begin to learn the truth of Chipotle's skimping problem until between June 27 and July 25, 2024 (where the stock price dropped from $65.88 per share to $50.82 in response to slow leakage of the truth) (ECF 72-29 at 4). *See Citiline Holdings, Inc. v. iStar Fin. Inc.*, 701 F. Supp. 2d 506, 515 (S.D.N.Y. 2010).

Defendants also ignore the Complaint's allegations of leakage of unique fraud-related news after Wells Fargo published its June 27, 2024 report. Mtn. at 24

___

[6] This is yet another example where Defendants' Motion disputes alleged facts by arguing from documents outside the Complaint. *See Khoja*, 899 F.3d at 1000-03 (noting that courts may not consider materials submitted under the judicial notice and incorporation for this purpose). Accordingly, Defendants' reliance on *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828 (9th Cir. 2022), and their factual spinning of the Complaint's allegations are misplaced. Mtn. at 23.

4923-4180-5976.v1

(suggesting no new fraud-related news was reported).  For example, on June 27, 2024, *BroBible* reported that Wells Fargo's findings demonstrated that Defendants were "completely lying."  ¶64.  On July 15, 2024, TD Securities reported for the first time that its internal Chipotle investor survey data had "slowed in June [2024]," which coincided with social media focus on portion variability.  ¶67.  On July 17, 2024, Wells Fargo issued a follow-up report identifying "rising concern" about the "portion size debate," and explicitly linked it to a 16% drop in the Company stock price since June 2024.  ¶68.  On July 19, 2024, *YouGov.com* reported for the first time that Chipotle "customer sentiment" measurement (or "Buzz" and "Value" scores) had significantly slipped into mid-July 2024, as customers expressed increasing dissatisfaction with the "value" they were receiving for their money.  ¶69.  As this fraud-related news hit the market, the Company's stock price continued to fall by 20.2%.  ¶70; *see Lloyd*, 811 F.3d at 1210 ("if the complaint alleges a subsequent corrective disclosure," it is a viable theory of loss causation to point to prior public disclosures of fraud-related news).

Defendants made two corrective disclosures.  On July 24, 2024, Niccol disclosed that Chipotle had a skimping problem at hundreds of its restaurants, that correcting it would impact the Company's forward cost of sales, and the Company investigated the allegations as soon as they heard about them.  ¶¶71-72, 75-79.  Niccol's statements led to a two-day drop of 3.8%.  ¶74.  *See Lloyd*, 811 F.3d at 1211 (upholding leakage theory and noting the "minimal effect" on the stock price following the corrective disclosure is not surprising given a steep stock price reduction due to prior leakage); *see also Kui Zhu v. Taronis Techs. Inc.*, 2020 WL 1703680, at *6 (D. Ariz. Apr. 8, 2020) (citing *Lloyd*, and explaining "[p]laintiffs theory of [prior] 'slow leak' revelation[s] is nuanced, but this Circuit has recognized that there are an infinite number of ways to allege loss causation").  While Defendants infuse improper factual arguments to downplay the magnitude of the July 2024 drop (Mtn. at 24), market participants did not.  Deutsche Bank, Morgan Stanley, Oppenheimer,

- 22 -

Guggenheim, Stephens, Evercore, and Wedbush Securities lowered their price targets for Chipotle stock (most by 5%) and linked the price downgrade to Chipotle's anticipated cost increase. ¶74.

Prior to market close on October 29, 2024, Chipotle disclosed that its cost structure increased by 90 basis points, in part, to further correct the scandal. ¶80. After the market close, Defendants announced that a 2% to 3% menu price increase would likely be needed to further fund a fix. ¶81. This news conveyed that Chipotle's skimping scandal would have a more adverse financial impact than previously disclosed on July 24, 2024 (*i.e.*, a 40 to 60 basis point increase in cost of sales). In arguing that nothing "'correct[ed]'" the alleged fraud on October 29, 2024, Defendants ignore these allegations too. Mtn. at 25. The next day, the Company's stock price dropped 7.9%. ¶82.

Lastly, Defendants argue: (1) the June 27 and October 30, 2024 drops were insignificant (or were below a double-digit "threshold"); and (2) stock price movements being within the stock's typical price fluctuations render loss causation implausible. Mtn. at 23-24. The Court should reject those arguments because the cases upon which Defendants rely are factually distinguishable and do not address the leakage theory of loss causation.

In *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, the Circuit panel found loss causation allegations wanting because the stock price immediately recovered, and sustained that recovery for months following a June disclosure. 540 F.3d 1049, 1065 (9th Cir. 2008). Here, after the Company's stock price dropped in response to the June 27, 2024 Wells Fargo report, Defendants continued to deny that Chipotle portion sizes were shrinking. ¶¶59-60. Further, between June 28 and July 24, 2024, the stock price did not recover, but dropped from $62.65 to $51.78 as additional unique fraud-relating information was disclosed by sources other than Defendants. ECF 72-29 at 4. Similar facts were not present in *Metzler*. And, *Metzler* does not hold that a double-digit drop is a minimum "threshold" to plead loss causation. *But see* Mtn. at 24.

- 23 -

4923-4180-5976.v1

With regard to Defendants' typical price movement argument (Mtn. at 23), *Ramos v. Comerica Inc.*, 2024 WL 2104398, at *4 (C.D. Cal. Apr. 12, 2024), is of no help either. In *Ramos*, the court stated that while the stock price recovered quickly after an alleged disclosure, "[t]his recovery was also sustained" for almost four months. *Id.* (citing *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1198 (9th Cir. 2021)). After Chipotle's stock slid from $65.86 to $49.83 per share between June 27 and July 26, 2024, it failed to recover to $65.86 for the remainder of the year. *See* ECF 72-29. *Wochos v. Tesla, Inc.* is distinguishable for the same reason. 985 F.3d at 1198 ("The quick and sustained price recovery . . . refutes the inference that the alleged concealment of this particular fact caused" the drop.).

Defendants again and again attempt to disconnect Defendants' denials that Chipotle's portions were allegedly shrinking from the Company's July 24, 2024 disclosure its internal investigation revealed that at least 10% of the Company's stores were skimping on customers. Mtn. at 23-25. For example, Defendants claim that the July 24, 2024 disclosures did not correct anything about smaller portions at Chipotle's restaurants. *Id.* at 24. But that argument collides with the content of July 24, 2024 disclosure as pleaded. Niccol said: "***We have also leaned in and reemphasized generous portions across all of our restaurants as it is a core brand equity of Chipotle***," and "we are committed to making this investment to reinforce that Chipotle stands for generous amount of delicious, fresh food." ¶24. One does not "reinforce" generous portions of food if the restaurants were overserving customers. And, Niccol explained why they were making the investment to fix the problem of skimping at hundreds of restaurants: "[P]art of the reason why we went and looked across the system was when we got the feedback on portion sizes." *Id.* Defendants fail to point this Court to any source of information suggesting that customers complained that Chipotle had served them too much food. That's because they cannot.

Defendants' after-the-fact mischaracterization of the corrective disclosures is also irrelevant. Mtn. at 23-25. What investors understood the disclosures to mean, ***at***

- 24 -

4923-4180-5976.v1

*the time they were made*, is relevant here because it provides the most plausible understanding of their meaning. *Lloyd*, 811 F.3d at 1210. After Wells Fargo reported on June 27, 2024 that "*[b]owl weigh varied widely with the lightest bowl ~3 standard deviations below the median*" weight, *Bro Bible* reported, "*Chipotle is Completely Lying About Consistent Portion Sizes*." ¶64. On July 25, 2024, following Chipotle's acknowledgment that at least 10% of its restaurants were skimping, *CBS News* reported that "*Niccol disclosed that skimpy portions have been a problem at about 10% of its 3,500 locations*." ¶76. *Forbes* reported "*Chipotle's CEO <u>confirmed</u> at least 10% of its locations were skimping . . . after the company previously denied the claim*." ¶77. *Today.com* reported "*Chipotle has <u>conceded</u> to customer complaints on social media, <u>admitting</u> that its portions sizes at some locations have been lacking*." ¶79. The Court should consider the Complaint's allegation of the contemporaneous reports of how market participants interpreted the alleged corrective information, not Defendants' belated counter-narrative. *Lloyd*, 811 F.3d at 1210.

## VIII. THE COMPLAINT ADEQUATELY ALLEGES CONTROL PERSON LIABILITY

Defendants do not dispute that the Complaint adequately alleges that the Individual Defendants were control persons pursuant to §20(a). Mtn. at 25. Because the Complaint adequately alleges primary violations of §10(b), the Court should uphold Plaintiff's §20(a) claim.

## IX. CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants' motion in its entirety. Should the Court grant Defendants' motion, however, Plaintiff asks the Court to allow for amendment. *See* Fed. R. Civ. P. 15(a).

DATED: March 31, 2026                           Respectfully submitted,

s/ Trig R. Smith
_____
TRIG R. SMITH

- 25 -

4923-4180-5976.v1

ROBBINS GELLER RUDMAN
  & DOWD LLP
TOR GRONBORG
TRIG R. SMITH
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
torg@rgrdlaw.com
trigs@rgrdlaw.com

Lead Counsel for Lead Plaintiff

4923-4180-5976.v1

## L.R. 11-6.2 CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for plaintiff Lisa Tai, certifies that this brief contains 25 pages, which complies with the page limit set by the Court's Standing Order for Newly Assigned Civil Cases, dated January 10, 2025.

DATED:  March 31, 2026

s/ Trig R. Smith
TRIG R. SMITH

4923-4180-5976.v1