LATHAM & WATKINS LLP
Michele D. Johnson (CA Bar No. 198298)
 michele.johnson@lw.com
Ryan A. Walsh (CA Bar No. 294506)
 ryan.walsh@lw.com
650 Town Center Drive, 20th Floor
Costa Mesa, California 92626-1925
Telephone: +1.714.540.1235
Facsimile: +1.714.755.8290

Andrew B. Clubok (*pro hac vice*)
 andrew.clubok@lw.com
Susan E. Engel (*pro hac vice*)
 susan.engel@lw.com
Matthew J. Peters (*pro hac vice*)
 matthew.peters@lw.com
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004-1304
Telephone: +1.202.637.2200
Facsimile: +1.202.637.2201

*Attorneys for Defendants Chipotle Mexican Grill, Inc., Brian Niccol, John R. Hartung, and Laurie Schalow*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| MICHAEL STRADFORD, Individually and on Behalf of All Others Similarly Situated,<br><br>                    Plaintiff,<br><br>        v.<br><br>CHIPOTLE MEXICAN GRILL, INC., BRIAN NICCOL, JOHN R. HARTUNG, and LAURIE SCHALOW,<br><br>                    Defendants. | Case No. 8:24-cv-02459-SPG-JDE<br><br>CLASS ACTION<br><br>**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**<br><br>Judge: Hon. Sherilyn Peace Garnett<br>Date: May 20, 2026<br>Time: 1:30 p.m.<br>Place: Courtroom 5C |

# **TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ................................................................................................. 1

II. ARGUMENT ..................................................................................................... 2

    A. Plaintiff Fails To Plead Falsity With Particularity ............................. 2

        1. The Portion-Size Statements Were Not Misleading ................. 2

        2. The Social Media Risk Disclosure Was Not Misleading ........................................................................... 7

        3. Niccol Is Not The Speaker For the 1Q24 10-Q ........................ 8

        4. The Safe Harbor Shields Forward-Looking Statements ............................................................................ 8

    B. Plaintiff Fails To Plead A Strong Inference Of Scienter .................... 8

    C. Plaintiff Fails To Plead Loss Causation With Particularity .............. 12

    D. Plaintiff Fails To Plead Scheme Liability ........................................ 15

    E. Plaintiff Fails To Plead A Section 20(a) Claim ............................... 15

III. CONCLUSION ............................................................................................... 15

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Abbate v. Wells Fargo Bank, N.A.*,
2011 WL 9698215 (C.D. Cal. 2011) .................................................................................15

*Arredondo v. Univ. of La Verne*,
618 F. Supp. 3d 937 (C.D. Cal. 2022) ............................................................................7, 8

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ...........................................................................................12

*Blake v. Canoo Inc.*,
807 F. Supp. 3d 1061 (C.D. Cal. 2025) .............................................................................7

*Borteanu v. Nikola Corp.*,
2023 WL 1472852 (D. Ariz. Feb. 2, 2023) ......................................................................15

*Cooper v. Pickett*,
137 F.3d 616 (9th Cir. 1997) ...........................................................................................12

*HRSA-ILA Funds v. adidas AG*,
2025 WL 3471703 (9th Cir. Dec. 3, 2025) ........................................................................7

*In re Allied Nevada Gold Corp.*,
2016 WL 4191017 (D. Nev. Aug. 8, 2016) .......................................................................12

*In re Galena Biopharma, Inc. Sec. Litig.*,
117 F. Supp. 3d 1145 (D. Or. 2015) .................................................................................15

*In re Herbalife, Ltd.*,
2015 WL 7566616 (C.D. Cal. Nov. 23, 2015) ..................................................................10

*In re Lululemon Sec. Litig.*,
14 F. Supp. 3d 553 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d
Cir. 2015) ............................................................................................................................4

*In re Palo Alto Networks, Inc. Sec. Litig.*,
2025 WL 1093247 (N.D. Cal. Apr. 11, 2025) ....................................................................5

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

*In re Solarcity Corp. Sec. Litig.*,
274 F. Supp. 3d 972 (N.D. Cal. 2017)................................................................9

*Institutional Investors Group v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009) ...............................................................11, 12

*Janus Cap. Grp., Inc. v. First Deriv. Traders*,
564 U.S. 135 (2011) ...........................................................................8

*Joyce v. Amazon.com, Inc.*,
2025 WL 835054 (W.D. Wash. Mar. 17, 2025)....................................12

*Lloyd v. CVB Fin. Corp.*,
811 F.3d 1200 (9th Cir. 2016) ...........................................................13, 14

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
540 F.3d 1049 (9th Cir. 2008)............................................................13, 14

*Ng v. Berkeley Lights, Inc.*,
2024 WL 695699 (N.D. Cal. Feb. 20, 2024).......................................14

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
759 F.3d 1051 (9th Cir. 2014)............................................................11

*Prodanova v. H.C. Wainwright & Co.*,
993 F.3d 1097 (9th Cir. 2021) ...........................................................10

*Reese v. Malone*,
747 F.3d 557 (9th Cir. 2014) .............................................................11

*Rok v. Identiv, Inc.*,
2017 WL 35496 (N.D. Cal. Jan. 4, 2017), *aff'd sub nom.*
*Cunningham v. Identiv, Inc.*, 716 F. App'x 663 (9th Cir. 2018).................13, 14

*Sneed v. Talphera, Inc.*,
147 F.4th 1123 (9th Cir. 2025)..........................................................3, 4, 5, 11

*Weston Fam. P'ship LLLP v. Twitter, Inc.*,
29 F.4th 611 (9th Cir. 2022)..............................................................7

*Wochos v. Tesla*,
985 F.3d 1180 (9th Cir. 2021) ...........................................................15

*Xiaojiao Lu v. Align Tech., Inc.*,
417 F. Supp. 3d 1266 (N.D. Cal. 2019) ............................................3, 4

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009) ................................................................................. 6

LATHAM&WATKINSLLP
ATTORNEYS AT LAW

DEFS.' REPLY ISO MOTION TO DISMISS
SECOND AM. COMPL.
Case No. 8:24-cv-02459-SPG-JDE

## I.    INTRODUCTION

Plaintiff's latest argument that Chipotle and the Individual Defendants defrauded investors about the amount of chicken in their burrito bowls relies on warped interpretations of the challenged statements and untenable inferences about what any Defendant knew and when. This Court rejected similar arguments before, and this case remains nothing more than an attempt to turn social media criticism into securities fraud. The SAC should be dismissed, this time with prejudice.

*First*, Plaintiff's misleading-omission theory is baseless. Plaintiff contends that Defendants' statements denying changes to Chipotle's portion sizes were rendered misleading by failing to disclose an "internal investigation" into portion-size complaints. That alleged omission does not render any challenged statement misleading. Those statements addressed whether Chipotle changed its portion-size *standards*—not whether its 3,500+ restaurants always served perfectly consistent portions or whether Chipotle had investigated customer complaints. Plaintiff concedes that *Chipotle's* portion-size standards did not change and does not allege an investigation into those standards. Opp. 19. As Niccol explained in July 2024, Chipotle investigated whether restaurants were *complying with* Chipotle's portion-size standards. But Plaintiff does not plead any particularized facts about that investigation that render any challenged statement misleading when made: not its timing, not who was involved, nor when any Defendant learned of its finding that 10% of restaurants needed retraining.

*Second*, Plaintiff's scienter theory is implausible. She does not plead what each Defendant knew and when with respect to the investigation—facts that are necessary for any viable scienter theory under Ninth Circuit precedent. The only plausible inference is innocent: when Defendants learned of social media criticism, they disclosed that portion-size standards had not changed, looked into compliance with those standards, and addressed the inconsistencies uncovered. That reflects responsible business practices, not an intent to defraud or deliberate recklessness.

*Third*, Plaintiff's loss causation theory is equally deficient. She attempts to recover for weeks of price drops using a Wells Fargo analyst report that merely confirmed what months of viral social media criticism had already made public. But she cannot do so based on a disclosure that did not correct any prior challenged statement. And the other stock drops that Plaintiff cites were not prompted by a new or corrective disclosure, nor were they significant enough to plead loss causation.

*Fourth*, Plaintiff's scheme-liability argument is paper-thin, is not specific to any Defendant's conduct, and impermissibly relies on non-public-facing actions.

## II.    ARGUMENT

### A.    Plaintiff Fails To Plead Falsity With Particularity

#### 1.    The Portion-Size Statements Were Not Misleading

Plaintiff primarily asserts that Defendants' statements that Chipotle's portion sizes had not changed were misleading because they omitted that the Company was "conducting an internal investigation." Opp. 8. This investigation theory is based on materially identical allegations to the ones this Court deemed insufficient. Order at 18. Plaintiff does not rehabilitate her investigation allegations, nor does she meaningfully defend her remaining falsity arguments, which are also meritless.

***Investigation.*** According to Plaintiff, Defendants misled investors by (1) "abjectly denying" that "Chipotle restaurants were skimping on customers' orders" while (2) "actively investigating" whether restaurants were doing so. Opp. 1, 8. Both steps of this theory fail. First, the challenged statements addressed whether Chipotle's portion-size standards had changed, not whether all 3,500+ restaurants were consistently complying with those standards. Indeed, Defendants acknowledged possible variation. Plaintiff offers no reason why Niccol or Schalow acted improperly in denying accusations that Chipotle's portion-size standards changed. Second, Plaintiff pleads no particularized facts about the alleged investigation that would render any challenged statement misleading. Defendants denied changes to Chipotle's portion-size standards, and Plaintiff does not plead an

investigation into changed standards. Instead, she asserts that Chipotle investigated inconsistent compliance with those standards. This apples-to-oranges comparison does not contradict any challenged statement. Nor could it render any statement misleading, because Plaintiff fails to allege when the investigation began, who was involved in it, when it yielded results, or when any Defendant learned those results—basic facts necessary to plead falsity under the PSLRA and Rule 9(b).

*First*, rather than denying portion-size variability across restaurants, the challenged statements conveyed that the Company's "portion sizes" had "not changed." ¶ 55; ¶¶ 56-60. As this Court recognized, none of these statements was misleading because Plaintiff failed to plead the Company "systematically reduced portion sizes." Order at 16-18; Mot. 11-12. Indeed, Plaintiff *admits* Defendants never "ordered the company to change its portion size standards." Opp. 19. Because she cannot demonstrate that portion-size standards changed, she reframes the challenged statements as representations that *all* "customers' orders" at *all* 3,500+ "Chipotle restaurants" *complied* with those standards. Opp. 1. But Plaintiff cannot state a claim by "ignor[ing] the actual content" of Defendants' statements. *Xiaojiao Lu v. Align Tech., Inc.*, 417 F. Supp. 3d 1266, 1275 (N.D. Cal. 2019).

The "context surrounding the statement[s]" makes clear that they addressed Company-wide portion-size standards, not consistency in complying with those standards. *Sneed v. Talphera, Inc.*, 147 F.4th 1123, 1131 (9th Cir. 2025) (citation omitted). Criticism of Chipotle's portion sizes went viral against a backdrop of consumer suspicion of "shrinkflation," a trend of companies intentionally "shrinking their product sizes and charging the same or more." Ex. 11 at 4. Just as "[s]ome Oreo fans" claimed "the cookies no longer have as much cream in the middle," Ex. 24 at 3, some Chipotle customers "insist[ed] the portions have shrunk while prices have been hiked higher," Ex. 8 at 1. As Plaintiff's own source puts it, criticism "c[a]me[] from diners who say [Chipotle's] *serving sizes* have shrunk." Opp. 11 (emphasis added) (quoting Ex. 13 at 1). In other words, customers complained they were paying

the same amount (or more) for three ounces of steak that they used to pay for four. *See* Ex. 6 at 2 (describing "employee guidebook showing standard sizes"). In response to these accusations, Defendants denied changes to the *Company's* portion sizes—the standard was still four ounces.

Defendants did not "abjectly den[y]" portion-size *inconsistency*, as Plaintiff suggests. Opp. 11. She identifies no "questions directed to Defendants" about inconsistency. Opp. 11. And she cannot manufacture a denial of inconsistency through "selective quoting." *Align*, 417 F. Supp. 3d at 1276. Plaintiff repeatedly contends that "Niccol had characterized the public allegations of skimping as 'crazy to me.'" Opp. 5; Opp. 1, 15, 17. That is a blatant mischaracterization. In response to a question about customers "filming" Chipotle "worker[s]" to gain "leverage," Niccol said "the whole thing is kind of crazy to me." Ex. 7 at 3:25-4:9. Plaintiff's reliance on this out-of-context quotation underscores that her argument is baseless.

Plaintiff cannot reconcile her characterization of the challenged statements as "abject denials" of portion-size inconsistency, Opp. 2, 6, 8, with the context of those same statements *acknowledging* the possibility of portion inconsistency. Mot. 11-12. For example, Schalow's recognition that Chipotle may not have "deliver[ed] on our value" and her request that "guests … reach out so we can make it right," Ex. 6 at 1; Ex. 5 at 3, shows the challenged statements "[were] not guarantees" of perfect portion sizes "at all times." *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 578 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015). Moreover, the same articles containing the challenged statements noted that "scoops of meat, beans and rice" can be "subjective" and "vary by restaurant, or even by server," Ex. 4 at 3, and that Chipotle's "human element" can lead to variability, Ex. 6 at 2. Indeed, even Plaintiff's *BroBible* article, Opp. 11, concedes that "something like a Chipotle-style restaurant is never going to be an exact science," Ex. 10 at 4. No "reasonable investor" would view the challenged statements—read alongside their caveats and "in the context of" Chipotle's made-to-order model—as unqualified denials of

portion-size inconsistency. *Sneed*, 147 F.4th at 1131-32. And courts "look at falsity" through the reasonable investor's perspective, *id.*—which is not, as Plaintiff contends, a question of materiality, *see* Opp. 9-10 & n.4.

*Second*, in attempting to plead the "facts" about Chipotle's investigation that render the challenged statements misleading, Plaintiff relies heavily on Niccol's July 24, 2024 statement that 10% of restaurants were "outliers that needed to be retrained." Ex. 17 at 16. From this, Plaintiff argues that Schalow and Niccol must have known about an investigation into compliance with portion-size standards and its findings when they made the challenged statements weeks or months earlier. Opp. 10-11. Plaintiff's argument is sheer speculation and does not come close to satisfying Rule 9(b)'s or the PSLRA's requirements for pleading a misleading statement.

To demonstrate that Niccol or Schalow misleadingly omitted facts about an investigation of portion-size consistency, Plaintiff needed to plead particularized facts about that investigation. She did not. Plaintiff asserts that an investigation of customers' complaints about portion sizes started "[i]n late 2023" and that, "[p]rior to CS-2's departure in March 2024, Schalow's team reached out to CS-2's team for help in addressing" those complaints. ¶ 114. Plaintiff suggests (at 8, 11) that until March 2024, *i.e.*, the time of his departure, CS-2 was involved in the same "internal investigation" that Niccol described as "relook[ing]" at the Company's "execution across our entire system" during the July 24, 2024 earnings call. Ex. 17 at 4. But CS-2's "vague account[]" is not sufficient to link his work prior to March 2024 to the investigation that informed Niccol's July 24, 2024 statements. *In re Palo Alto Networks, Inc. Sec. Litig.*, 2025 WL 1093247, at *5 & n.2 (N.D. Cal. Apr. 11, 2025). Between CS-2's departure and Niccol's statements, Lee's TikTok went viral, customers started filming Chipotle employees, and Wells Fargo wrote a report about bowl weight "consistency." ¶¶ 45, 62, 64. None of Plaintiff's allegations suggests that the complaints in "an internal company database" or "address[ed]" by "Schalow's team" that CS-2 described, ¶¶ 112, 114, are the "portion concerns …

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

brought up in social media" that Niccol mentioned, Ex. 17 at 4. Nor does Plaintiff allege that CS-2 examined compliance with portion-size standards across restaurants, rather than looking at individual "customer complaints." ¶ 112.

At most, CS-2's allegations suggest that Schalow knew of individual customers' portion-size complaints before the challenged statements and that her team was "addressing" them. ¶ 114. But "'the mere existence of consumer complaints'" "is insufficient to establish falsity." Order at 17-18 (citation omitted). An investigation of customer complaints in late 2023 and early 2024 is not a substitute for particularized facts about an investigation of portion-size consistency.

Plaintiff's attempts to tie Niccol to a portion-size consistency investigation grasp at straws. On July 24, 2024, Niccol said the Company "relook[ed] at our execution across our entire system" and learned that "about 10%" of restaurants were "outliers that needed to be retrained" to follow the "right standards." Ex. 17 at 4, 16. These comments do not bridge the gap in Plaintiff's allegations. Niccol does not say when the investigation into compliance with portion-size standards began, who was involved in that investigation, when the investigation yielded findings about "outlier" restaurants, or when any Defendant learned those findings. Ex. 17 at 4, 16. According to Plaintiff, "Niccol always had access to the investigation's findings" and "Schalow herself." Opp. 10-11. But no matter what or whom Niccol could access, Plaintiff still pleads no particularized facts suggesting that any "findings" were made *before* any challenged statement. Mot. 10. Indeed, there is nothing to suggest that Niccol (or Schalow) learned the investigation's conclusion—that 10% of restaurants needed retraining—before the July 24, 2024 earnings call.

Because no particularized allegations tie Niccol or Schalow to the investigation, Plaintiff makes scienter arguments. Opp. 9, 11. But her "generalized claims about corporate knowledge" are not sufficient to show scienter, *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 998 (9th Cir. 2009), nor can Plaintiff assert that "defendants must have known" about portion-size issues when

they spoke "based on later facts or developments," *Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 621 (9th Cir. 2022). *Blake v. Canoo Inc.* is not to the contrary; there, the plaintiff alleged that individual defendants had scienter because they actually knew about the loss of "revenue-generating business partners" but lied about the business's "pipeline." 807 F. Supp. 3d 1061, 1083-84 (C.D. Cal. 2025).

***Critical Inventory.*** Plaintiff abandons her theory that the portion-size statements were false because "management" pressured lower-level employees to reduce portions to comply with CI metrics. ¶ 61(e). Instead, Plaintiff says her CI allegations "corroborate what was behind customer complaints about shrinking portions." Opp. 12. This reframing ignores the deficiencies this Court identified regarding "when the Company adopted the Critical Inventory metric" or whether Defendants ever changed it. Order at 17. Without those facts, Plaintiff cannot show that a metric for ensuring *correct* portions actually reduced them. Mot. 13-14.

***Value And Guest Experience.*** Plaintiff does not dispute that statements about Chipotle's "value," ¶ 55, and "customer experience," ¶ 60, were accurate, or, alternatively, puffery or opinion. That waives any contrary argument. *Arredondo v. Univ. of La Verne*, 618 F. Supp. 3d 937, 950 (C.D. Cal. 2022); Mot. 14.

### 2.   The Social Media Risk Disclosure Was Not Misleading

When Hartung signed the 1Q24 10-Q incorporating the Social Media Risk Disclosure on April 25, 2024, "[t]housands of customers" had complained on social media about Chipotle's portion sizes, and Ryan Lynch's October 30, 2023 TikTok complaining about portion sizes had "received millions of views." Order at 20 (alteration in original); Mot. 14-16. Defendants' "failure" to disclose this already-public information could not have misled a reasonable investor. *See HRSA-ILA Funds v. adidas AG*, 2025 WL 3471703, at *2 (9th Cir. Dec. 3, 2025). Plaintiff asserts that the risk disclosure did not "alert investors that the risk may have already materialized" even though "no later than March 31, 2024," Chipotle faced a "rising level of risk" due to "increasing public allegations." Opp. 12. But she does not

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

DEFS.' REPLY ISO MOTION TO DISMISS
SECOND AM. COMPL.
Case No. 8:24-cv-02459-SPG-JDE

explain how this statement concealed the reputational effect of *public* criticism.

### 3. Niccol Is Not The Speaker For the 1Q24 10-Q

Plaintiff also insists that Niccol can be liable for the 1Q24 10-Q's risk disclosure. That risk disclosure was not misleading, but regardless, Plaintiff does not plead that Niccol can be liable for the 1Q24 10-Q he did not sign. Plaintiff contends Niccol made the 1Q24 10-Q's risk disclosure because he signed the 2023 10-K "which included the same risk disclosure." Opp. 13. That is irrelevant. Plaintiff does not challenge the 2023 10-K's risk disclosure as false. Niccol's responsibility for the 2023 10-K cannot extend to the 1Q24 10-Q simply because the latter filing referred to Niccol's earlier risk disclosure. Nor do bare assertions about a "code of ethics" or Niccol's corporate titles render him the *maker* of the 1Q24 10-Q. Opp. 13; Mot. 16; *Janus Cap. Grp., Inc. v. First Deriv. Traders*, 564 U.S. 135, 142-43 (2011).

### 4. The Safe Harbor Shields Forward-Looking Statements

The risk disclosure was not misleading, but, in any event, the safe harbor would preclude liability. Neither Hartung nor Niccol knew the risk disclosure was false. Opp. 12; Mot. 16-17. The safe harbor also applies to Schalow's July 4, 2024 statement. Mot. 17. Plaintiff's only reference to Defendants' safe harbor argument appears in a parenthetical about the Social Media Risk Disclosure, and it is unresponsive. That concedes the argument. *Arredondo*, 618 F. Supp. 3d at 950.

### B. Plaintiff Fails To Plead A Strong Inference Of Scienter

Plaintiff's unchanged scienter allegations neither fix the deficiencies catalogued in this Court's Order nor overcome Rule 9(b)'s and the PSLRA's demanding standards. Plaintiff tries to stretch allegations about Schalow's role in responding to individual customer complaints into an inference that Schalow intended to defraud investors and that Niccol and Hartung shared the same nefarious intent. Plaintiff's scienter theory fails because it lacks basic facts about what each Defendant knew and when that are required to plead scienter. The only plausible inference is that when Defendants learned of social media criticism, they disclosed

that portion-size standards had not changed, looked into compliance with those standards, and addressed the inconsistencies uncovered. That is responsible management. None of Plaintiff's allegations supports a strong inference of scienter.

***Stock Sales.*** Plaintiff's passing references to stock sales tacitly concede that they provide no basis for inferring scienter. Schalow is central to Plaintiff's investigation theory, so the fact she "sold nothing at all," Mot. 18, guts any assertion that she "inten[ded] to deceive," Opp. 15. Plaintiff briefly mentions Niccol's $20 million and Hartung's $8 million stock sales, Opp. 18, but does not attempt to refute the Court's previous conclusion that "[n]either quantity is necessarily suspicious." Order at 27. Nor does she explain how the timing of Niccol's sale—"about three weeks before … anyone from the Company denied Chipotle had reduced the size of its portions"—was suspicious, especially taking into account his prior trading history. Order at 28-29. And her assertions about what Niccol "knew of" or had "access to," Opp. 18, are "merely speculative," *In re Solarcity Corp. Sec. Litig.*, 274 F. Supp. 3d 972, 1011 (N.D. Cal. 2017) (citation omitted).

***Confidential Sources.*** Plaintiff provides no reason for the Court to revisit its prior holding that Plaintiff's confidential source allegations were not "sufficient to show scienter." Order at 24. Plaintiff focuses on CS-2's allegations that Schalow knew of an "internal investigation into public accusations of … skimping" when she made challenged statements in May through July 2024. Opp. 14. But for support, the SAC relies on the same, unchanged allegations from the prior complaint: that Schalow "acknowledg[ed] the growing number of complaints" in late 2023 and her "team reached out to CS-2's team for help in addressing the portion size debacle" at some point before CS-2 left the Company in March 2024. ¶ 114. That Schalow was aware of and acted to address customer complaints does not suggest she intended to deceive investors when she spoke about the Company's unchanged portion sizes. To the contrary, Schalow's statements acknowledged customers' concerns and expressed a desire to "make it right." Ex. 6 at 1. As this Court observed, "the most

compelling inference from [CS-2's] allegations is that Schalow was focused on responding to the reputational impact of customer complaints"—not that she "had reason to believe the Company had reduced the size of its portions." Order at 26.

What is missing from CS-2's account is significant: there are "no detailed or specific allegations about" an investigation into portion-size standards, nor portion-size consistency across restaurants; there is nothing about the investigation's conclusions; and perhaps most fatally, CS-2 has not a word to say about Schalow's or any Defendant's "exposure to the *results*" of such an investigation (or when that happened). *In re Herbalife, Ltd.*, 2015 WL 7566616, at *3 (C.D. Cal. Nov. 23, 2015) (emphasis added). Without "allegation[s] of specific information conveyed to management and related to the fraud," Plaintiff cannot plead with particularity that Schalow intentionally misled investors or was deliberately reckless as to whether they would be misled about portion-size variation across restaurants. *Prodanova v. H.C. Wainwright & Co.*, 993 F.3d 1097, 1109 (9th Cir. 2021) (citation omitted).

***Core Operations.*** Plaintiff does not plead a single fact suggesting that Niccol (or Hartung) participated in or learned information about any investigation before making a challenged statement. Plaintiff thus falls back on a "core operations" theory. Opp. 15-16. But the "burden of proof" for pleading that theory is "high." *Prodanova*, 993 F.3d at 1111. Plaintiff "must provide either specific admissions" by Defendants that they were "involved in the details of [Chipotle's] operations" or "witness statements" that they were "specifically involved" in the internal investigation. *Id.* Plaintiff comes nowhere close. Neither Niccol (nor Hartung) ever admitted any "involvement with the minutiae of the [investigation]." *Id.* at 1112.

Plaintiff says that "because of [his] position[] in the company and [his] supervisory authority over [Schalow]," *id.*, Niccol must have been aware of the investigation, Opp. 15-16, 18. "This conclusory allegation, without more, is insufficient." *Prodanova*, 993 F.3d at 1112. Asserting that Niccol had "access to" Schalow and the Company's "work product," Opp. 17, is an allegation of "[m]ere

access to reports" that does not "establish a strong inference of scienter."[1] *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1063 (9th Cir. 2014).

Plaintiff says Niccol must have known of an investigation when he spoke, because "one cannot deny skimping if there was no inquiry into" it. Opp. 16. This claim that "it would be 'absurd' to suggest that [Niccol] was without knowledge" of the investigation's results falls flat. *Intuitive Surgical, Inc.*, 759 F.3d at 1063; *see* Order at 22. Niccol described the Company's portion-size standards, which Plaintiff *admits* had not changed. Opp. 19. In arguing about what Niccol and Hartung must have known, Plaintiff conflates CS-2's investigation of customer complaints with an investigation of restaurants' compliance with portion-size standards. Opp. 16. Even if inconsistency could render any challenged statement misleading, it would not have been "patently obvious" to Defendants. *Sneed*, 147 F.4th at 1134. And Plaintiff never alleges that Defendants knew the investigation's findings before preparing for the July 24, 2024 earnings call.

***Repeated Statements.*** Plaintiff argues that Defendants' "abject" denials of skimping support scienter. Opp. 16-17. But Plaintiff's sole authority, *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242 (3d Cir. 2009), is inapposite. There, a CFO's "unhedged denials" of discounting in response to "focused" questions about the company's pricing policies supported a scienter inference, because the company in fact "engaged in massive discounting on an unusually large scale." *Id.* at 270.

Here, unlike in *Avaya*, no "pointed and direct questions," Opp. 16, or "specific … inquiries" were posed, 564 F.3d at 270. None of Schalow's statements was in response to any question at all, and the only question Niccol answered during his appearance on *Mad Money*, Ex. 7 at 4:14-15 ("you've not shrunk the portions?"), bore no resemblance to the specific inquiries in *Avaya*. Moreover, none of the

---

[1] Unlike *Reese v. Malone*, 747 F.3d 557, 572 (9th Cir. 2014), where a defendant "specifically" "addressed corrosion rate data" that contradicted his statements, no Defendant referred to data about inconsistency before July 24, 2024.

challenged statements denied variation or inconsistency with "certitude." *Avaya*, 564 F.3d at 270. Plaintiff does not plead that Niccol or Schalow "had access to specific information" contradicting their statements or "spoke to investors with a great deal of specificity," so repetition alone does not support scienter. *Joyce v. Amazon.com, Inc.*, 2025 WL 835054, at *14 (W.D. Wash. Mar. 17, 2025); Order at 23-24.

**Temporal Proximity.** Plaintiff argues that the temporal proximity of Defendants' statements to the corrective disclosure bolsters—but does not by itself support—a scienter inference. Opp. 17. There is no "temporal proximity" here: seven weeks elapsed between Niccol's May 30 statement and the July 24, 2024 earnings call when the alleged "truth" emerged. *See In re Allied Nevada Gold Corp.*, 2016 WL 4191017, at *12 (D. Nev. Aug. 8, 2016) ("five week[s]" insufficient).[2]

**Holistic Analysis.** Plaintiff's scienter theory is far less compelling than the innocent inference. Plaintiff acknowledges that what Defendants said was true: the Company had not changed its portion-size standards. That 90% of restaurants were adhering to these standards, but 10% were not, undercuts any suggestion that Defendants had conducted an internal investigation but concealed its findings to mislead investors, only to disclose those findings in July 2024. Rather, in light of Keith Lee's May 3, 2024 TikTok and two months of sustained social media criticism, the Company examined "execution across [the] entire system," found that 10% of restaurants were "outliers that needed to be retrained," and promptly disclosed that conclusion through Niccol's statements during the July 24, 2024 earnings call. The Company's effort to ensure that it was "executing consistently across the system" is sound management, not securities fraud. Ex. 17 at 16.

### C.    Plaintiff Fails To Plead Loss Causation With Particularity

Loss causation independently warrants dismissal. Plaintiff's "leakage" theory

---

[2] Plaintiff's cases are inapposite. *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 988 n.5 (9th Cir. 2008) (two-week gap); *Cooper v. Pickett*, 137 F.3d 616, 626 (9th Cir. 1997) (addressing falsity, not scienter).

LATHAM&WATKINSᴸᴸᴾ
ATTORNEYS AT LAW

DEFS.' REPLY ISO MOTION TO DISMISS
SECOND AM. COMPL.
Case No. 8:24-cv-02459-SPG-JDE

lacks a corrective disclosure confirming the leak, and the rest of her "corrective disclosures" revealed nothing new and were not followed by significant stock drops.

***Wells Fargo Report.*** Plaintiff's "leakage" theory attempts to capture a roughly 20% stock drop between the June 27, 2024 Wells Fargo Report and the July 24, 2024 earnings call disclosing that 10% of restaurants had portion-size issues and announcing a slight cost increase. *See* Opp. 20. This theory defies logic.

A "leakage" theory is just another way of alleging proximate cause: "the plaintiff must prove that when the relevant truth about the fraud began to leak out, it caused the price of [the] stock to depreciate." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016) (citation omitted). Plaintiff fails to establish proximate cause because the Wells Fargo Report did not reveal any "new information" that "relate[s] back" to the alleged fraud. *Rok v. Identiv, Inc.*, 2017 WL 35496, at *18-19 (N.D. Cal. Jan. 4, 2017), *aff'd sub nom. Cunningham v. Identiv, Inc.*, 716 F. App'x 663 (9th Cir. 2018). Plaintiff does not refute that allegations of portion-size inconsistency were widely alleged prior to June 27, 2024. Instead, Plaintiff argues the market did not "understand the social media allegations might have merit" until Wells Fargo, a "sophisticated market participant," addressed them. Opp. 21. But she does not explain why Wells Fargo's conclusion that "consistency varied widely" among eight restaurants, Ex. 9 at 1, would result in a stock drop when the previous "barrage of criticism" did not, Ex. 6 at 1. That is borne out by the 5.4% stock drop on June 27, 2024, which is too insignificant to support loss causation. *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064 (9th Cir. 2008).

If anything, Plaintiff's "sophisticated market participant" undermines her theory. Opp. 21. While the July 17, 2024 Wells Fargo Report attributed the recent stock slide to several factors—including the "factor rotation …, stock split & CFO transition noise, and … [the] portion size debate"—it also explained that "investors largely read the takeaway [from the June 27 report] as positive." Ex. 15 at 1; Mot. 6.

Plaintiff's sources reinforce this conclusion. TD Securities attributed the stock

drop to "social media focus on portion variability (aka Stop the Skimp)," Ex. 14 at 2—not any "relevant truth about the fraud" in the Wells Fargo Report, *Lloyd*, 811 F.3d at 1210. And *YouGov.com* described a "decline" in both "Buzz" and "Value" scores "for Chipotle since mid-April 2024," Ex. 16 at 1—before the Wells Fargo Report. A run of bad press and a stock drop do not establish loss causation.

*2Q24 Earnings Call.* Plaintiff claims the July 24, 2024 earnings call is the bookend of her leakage theory, and that its muted 3.8% stock-price impact is explained by prior dissipation of artificial inflation. Opp. 22. But Plaintiff must plead a disclosure of information "directly contrary" to Defendants' earlier representations that confirms the fraud. *Rok*, 2017 WL 35496, at *19. Niccol's statement that 10% of Chipotle restaurants "needed to be retrained" on the "right standards" is consistent with—and confirms the accuracy of—the challenged statements. Analysts viewed this disclosure not as an "admission of past concealment," *Ng v. Berkeley Lights, Inc.*, 2024 WL 695699, at *18 (N.D. Cal. Feb. 20, 2024), but as a "shrewd move" to address "consumer perception," Ex. 19 at 1. Plaintiff also points to news articles claiming Niccol "admit[ted]" to "skimping." Opp. 22; *see* Ex. 22; Ex. 21; Ex. 20. But in determining whether a statement was corrective, what matters are Niccol's words, not characterizations of them. Nothing Niccol said during the July 24, 2024 earnings call conflicted with his statements about Chipotle's portion-size standards.

*3Q24 Earnings Call.* The October 29, 2024 earnings call is likewise not corrective: it disclosed a cost-of-sales increase consistent with what Chipotle forecast in July. *Compare* Ex. 26 at 11 (October 2024 disclosure of 60 basis point increase due to "investment … in portion"), *with* Ex. 17 at 8 (July 2024 prediction of "40 to 60 basis point[]" increase); Mot. 6. In any case, the 7.9% single-day drop was insignificant. *See Metzler*, 540 F.3d at 1064. And the stock rapidly recovered. Contrary to Plaintiff's assertion that the stock "failed to recover to $65.86," it traded at $66.74 on December 12, 2024. Ex. 27 at 2-3. The swift recovery "refutes the inference that the alleged concealment" of portion inconsistency caused the decline.

*Wochos v. Tesla*, 985 F.3d 1180, 1198 (9th Cir. 2021).

### D.      Plaintiff Fails To Plead Scheme Liability

Plaintiff asserts that three paragraphs in the SAC plead a distinct scheme-liability claim based on "implicit or indirect instructions from mid-level corporate management to skimp[,] which artificially reduced (unbeknownst to investors) the Company's costs" and inflated the stock price. Opp. 19. These scant references to a scheme do not plead a distinct claim. Mot. 25. Even if they did, any scheme liability claim fails for several reasons. *First*, Plaintiff has not alleged with particularity when such a scheme began or that each Defendant knew of—let alone directed—it during the Class Period. Order at 25. Allegations about "mid-level … management" cannot be imputed to "*[D]efendant[s]*"—Niccol, Schalow, and Hartung. *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1192 (D. Or. 2015) (emphasis added). *Second*, Plaintiff has not alleged conduct that "had the principal purpose and effect of creating a false appearance of fact in furtherance of the scheme." *Borteanu v. Nikola Corp.*, 2023 WL 1472852, at *22 (D. Ariz. Feb. 2, 2023) (citation omitted). She pleads that "Company leadership focused closely on 'CI.'" ¶ 111; Opp. 19. But cost-management efforts reflect "a company acting in the regular course of business," *Borteanu*, 2023 WL 1472852, at *24-25, and when such conduct is "not disclosed to the investing public," it cannot create reliance, *Abbate v. Wells Fargo Bank, N.A.*, 2011 WL 9698215, at *2-4 (C.D. Cal. 2011). *Finally*, scheme liability requires scienter and loss causation, and Plaintiff cannot plead them. Mot. 25.

### E.      Plaintiff Fails To Plead A Section 20(a) Claim

Because Plaintiff's primary claim fails, so do her control claims. She suggests Defendants did not dispute control-person liability. Opp. 25. That is false: "Plaintiff has not shown that any Defendant controlled another's statements." Mot. 25.

### III.   CONCLUSION

The SAC should be dismissed with prejudice.

Dated: April 28, 2026

Respectfully submitted,

LATHAM & WATKINS LLP

By   */s/ Michele D. Johnson*
Michele D. Johnson (CA Bar No. 198298)
 *michele.johnson@lw.com*
Ryan A. Walsh (CA Bar No. 294506)
 *ryan.walsh@lw.com*
650 Town Center Drive, 20th Floor
Costa Mesa, California 92626-1925
Telephone: +1.714.540.1235
Facsimile: +1.714.755.8290

Andrew B. Clubok (*pro hac vice*)
 *andrew.clubok@lw.com*
Susan E. Engel (*pro hac vice*)
 *susan.engel@lw.com*
Matthew J. Peters (*pro hac vice*)
 *matthew.peters@lw.com*
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004-1304
Telephone: +1.202.637.3309
Facsimile: +1.202.637.2201

Peter Trombly (*pro hac vice*)
 *peter.trombly@lw.com*
1271 Avenue of the Americas
New York, NY 10020
Telephone: + 1.212.906.1200
Facsimile: + 1.212.751.4864

*Attorneys for Defendants Chipotle Mexican Grill, Inc., Brian Niccol, John R. Hartung, and Laurie Schalow*

## L.R. 11-6.2 Certificate of Compliance

The undersigned, counsel of record for Defendants Chipotle Mexican Grill, Inc., Brian Niccol, John R. Hartung, and Laurie Schalow, certifies that this brief contains fifteen (15) pages, which complies with the page limit set by the Court's Standing Order for Newly Assigned Civil Cases, dated January 10, 2025.

Dated:  April 28, 2026

By   */s/ Michele D. Johnson*
　　　Michele D. Johnson