**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

MICHAEL STRADFORD, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

v.

CHIPOTLE MEXICAN GRILL, INC., BRIAN NICCOL; JOHN R. HARTUNG; and LAURIE SCHALOW,

Defendants.

Case No. 8:24-cv-02459-SPG-JDE

**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS [ECF NO. 72]**

Before the Court is the Motion to Dismiss, (ECF No. 72 ("Motion")), filed by Defendants Chipotle Mexican Grill, Inc., Brian Niccol, John R. Hartung, and Laurie Schalow ("Defendants"). The Court has read and considered the parties' submissions and concluded that the Motion is suitable for decision without oral argument. *See* Fed. R. Civ. P. 78(b); C.D. Cal. L.R. 7-15. Having considered the parties' submissions, the relevant law, and the record in this case, the Court GRANTS the Motion and DISMISSES Lead Plaintiff Lisa Tsai's ("Plaintiff") Second Amended Complaint with prejudice. *See* (ECF No. 70 ("SAC")).

# I. BACKGROUND

According to the SAC, Defendant Chipotle Mexican Grill (the "Company" or "Chipotle") made a series of false or materially misleading statements between April 25, 2024, and October 29, 2024 (the "Class Period"). Plaintiff claims that the Company misled investors by denying that it had reduced the size of its portions because it failed to also disclose that it was investigating criticism from customers online. *See* (SAC ¶ 61). Plaintiff also claims that the Company misled investors through a disclosure warning about the risk of negative publicity on social media because the Company failed to disclose that, at the time, it was already experiencing negative publicity on social media. *See* (*id.* ¶ 19).

## A. The Company

Chipotle is a "fast-casual" restaurant chain with over 3,700 locations. *See* (*id.* ¶¶ 15, 30). Plaintiff alleges that, beginning in Spring 2022, management aimed to increase profits by shrinking the size of Chipotle's portions. *See* (*id.* ¶ 36). The SAC alleges that the Company, Chief Executive Officer ("CEO") Brian Niccol, Chief Financial Officer ("CFO") John R. Hartung, and Chief Corporate Affairs and Food Safety Officer Laurie Schalow defrauded investors through a series of statements between April 2024 and July 2024. *See* (*id.* ¶¶ 7–13, 17–20).

## B. Niccol's Leadership

Steve Ells founded Chipotle in 1993. *See* (*id.* ¶¶ 15, 33). Under Ells's leadership, the Company "placed an emphasis on employee satisfaction and building a culture of family between restaurant workers and management." (*Id.* ¶ 33). The Company similarly taught employees "to focus on customer satisfaction." (*Id.* ¶ 34). One way that the Company sought to ensure customer satisfaction was "to be more generous with serving portions" if customers requested extra food. *See* (*id.*).

In 2018, the Company hired Niccol to replace Ells as CEO. *See* (*id.* ¶ 35). After the Company hired Niccol, Chipotle's "corporate culture changed significantly," and "there was more pressure . . . to generate profits by controlling costs." (*Id.* ¶¶ 35–36). During the 2020 coronavirus pandemic, the Company responded to "inflationary pressure" by raising

prices. (*Id.* ¶ 36). The Company raised prices by approximately 10% in 2021 and by an additional 5% in 2022. *See* (*id.*). The SAC alleges between late 2021 and 2022, "management" also discussed how the Company's portion sizes impacted its profits and decided that employees were providing too much food to customers. *See* (*id.*).

**C. The Critical Inventory Metric**

The SAC alleges that, through the Company's "Critical Inventory" metric, the Company shrunk customer portion sizes. *See* (*id.* ¶¶ 39–40, 111–23). Under Niccol's leadership, each store location was expected to "meet or exceed" an internal "Critical Inventory" metric. (*Id.* ¶ 39). This metric tracked food inventory levels "for high-cost items such as steak, chicken, sofritas, avocados, blocks of cheese, and queso blanco (melted white cheese)." (*Id.*). The Company required each store to enter their Critical Inventory levels into an internal system two times each day. *See* (*id.*). The system then generated reports to show the variance between "what employees were supposed to provide under Chipotle policy" and "the amount of inputs actually sold." (*Id.*). Management expected that, "in general," each store location would produce less than a 0.6% variance from Company policy. *See* (*id.*).

**D. Social Media Backlash**

Beginning in 2023, "[t]housands of customers took to social media" to complain about the Company's portions. (*Id.* ¶ 41). In October 2023, "a video on TikTok complaining of the Company's shrinking portion sizes" received "millions of views, hundreds of thousands of likes, and thousands of comments." (*Id.* ¶ 42). In December 2023, the New York Post "published an article about the growing criticism of the Company on social media." (*Id.* ¶ 43). In March 2024, a YouTube video compared the size of burrito and burrito bowl orders across three different store locations over a 30-day period, finding that burritos ordered online "were skimpier [than burritos ordered in stores] 70% of the time." (*Id.* ¶ 44). "The public backlash peaked in May 2024," when a "TikTok influencer" previously associated with Chipotle posted a "viral" video "criticiz[ing] the Company's shrinking portions." (*Id.* ¶ 45). As discussed below, the Company publicly denied that it

had shrunk portion sizes. However, according to a former General Manager, the Company internally "responded by holding 'town hall' style meetings where Chipotle senior management told restaurant managers and employees to increase portion sizes." (*Id.* ¶ 46).

**E. The Confidential Sources**

The Complaint relies on statements from four confidential sources (together, the "Confidential Sources") to show that the Company's use of the Critical Inventory metric led to smaller portions. *See* (*id.* ¶¶ 108–24). According to Confidential Source 1, a former Regional Training Manager for employees and managers at more than 100 stores, "upper management began to apply constant and intense pressure down to the regional and restaurant levels to cut costs" after Niccol joined the Company. (*Id.* ¶¶ 108, 110). Confidential Source 1 also reported that, from 2023 to early 2024, the Company increasingly pressured employees "to meet or beat the [Critical Inventory] variance figures." (*Id.* ¶ 111). Confidential Source 1 claimed that the Critical Inventory variance target was "unrealistic" and, in response to pressure from management, employees "skimped" on customer portion sizes "all the time," with "skimping becoming more and more prevalent from 2022 to 2023 and again from 2023 to 2024." (*Id.*).

Confidential Source 2 previously worked as the Company's Manager of Customer Incidents. *See* (*id.* ¶ 112). Confidential Source 2 reported directly to Schalow, "regularly providing her and her team excel spreadsheets of customer complaints, updates on customer complaints at her request, and helping her respond to various PR and customer-relations situations." (*Id.*). According to Confidential Source 2, "the Company experienced an uptick in complaints about portion sizes in 2021 and 2022" but "the Company's executives did not seem to care about them until late 2023." (*Id.* ¶ 114). "In late 2023, Schalow and her team began focusing on the issues concerning portion size, acknowledging the growing number of complaints." (*Id.*). At some point before March 2024, when Confidential Source 2 left the Company, "Schalow's team reached out . . . for help in addressing the portion size debacle." (*Id.* ¶ 114). Plaintiff frames this as an

"internal investigation" into online criticism of the Company's portions. *See, e.g.*, (*id.* ¶ 103).

Confidential Source 3, a former General Manager for the Company, "corroborated [Confidential Source 1's] description" of the Critical Inventory metric and "recalled General Managers . . . feeling significant pressure around maintaining compliance" with the Company's Critical Inventory standards. (*Id.* ¶¶ 115–17). According to Confidential Source 3, "General Managers . . . were reprimanded and screamed at if variance went above the allowed 0.6%." (*Id.* ¶ 118). Confidential Source 3 claims that he/she and other General Managers in his/her area were told by Field Leaders or Vice Presidents that "portion sizes were to blame" "if they had high [Critical Inventory] variance." (*Id.*). "[W]hen stores were not meeting [Critical Inventory] goals, General Managers were implicitly instructed to skimp on portions by Field Leaders and VPs." (*Id.*).

Confidential Source 4, a former Assistant General Manager, echoes Confidential Source 3's account. *See* (*id.* ¶¶ 120–21). According to Confidential Source 4, from 2022 to 2023, the Company increased pressure to meet Critical Inventory targets. *See* (*id.* ¶ 122). In one instance, Confidential Source 4 "discussed the pressure these metrics imposed with a Field Leader," who "acknowledged that the goals were 'crazy'" but "said they were coming from above [Confidential Source 4's] level." (*Id.*). Confidential Source 4 claims that employees decreased customer portion sizes in response to this pressure. *See* (*id.* ¶ 123). According to Confidential Source 4, employees who did not "comply" with the Company's Critical Inventory metrics were fired. *See* (*id.* ¶ 121).

Confidential Sources 3 and 4 claim that, amidst social media backlash in May 2024, the Company changed its approach to portioning food. *See* (*id.* ¶¶ 119, 124). The Company allegedly "held town hall meetings to discuss correcting portion sizes." (*Id.* ¶ 119). According to Confidential Source 3, after the town hall meetings, the Critical Inventory variance in his/her geographic region "balloon[ed] to 1%-3%." (*Id.*). Confidential Source 4 "was told by employees at the Company's headquarters to re-train employees regarding portions." (*Id.* ¶ 124).

**F. Challenged Statements**

Plaintiff challenges a total of seven statements by Defendants as false or materially misleading. *See* (*id.* ¶¶ 53, 55–60). Six statements address claims that the Company reduced the size of its portions. *See* (*id.* ¶¶ 55–60). One statement addresses the Company's potential reputational risk from social media. *See* (*id.* ¶ 53).

On April 25, 2024, the Company filed a Form 10-Q for the first quarter of 2024 with the Securities and Exchange Commission ("SEC"). *See* (*id.* ¶ 53). The Company's Form 10-Q incorporated the Company's risk factors for the Company's fiscal year 2023. *See* (*id.* ¶ 18). One risk factor warned investors that the Company's "inability or failure to recognize, respond to and effectively manage the immediacy of social media could have a material adverse impact on [the] business." (*Id.*). The Company further cautioned that customers' "[u]se of social media . . . could lead to litigation or result in negative publicity that could damage our reputation." (*Id.* ¶ 53). Plaintiff alleges that the Company's social media risk disclosure was false and/or materially misleading because it only warned of a potential risk from negative publicity on social media and, as of April 25, 2024, the Company had already concluded that social media criticism of the Company's portion sizes had negatively impacted the Company's business. *See* (*id.* ¶ 19).

On May 16, 2024, Schalow told Restaurant Business Online, "[w]e have not changed our portion sizes, and our guests continue to appreciate the value we offer them." (*Id.* ¶ 55). On May 29, 2024, Niccol appeared on the CNBC program "Mad Money" with Jim Cramer and denied that the Company had reduced the size of its portions. (*Id.* ¶ 56). The same day, on May 29, 2024, Schalow told ABC News and the Washington Post that "[t]here have been no changes in our portion sizes." (*Id.* ¶ 57). The next day, on May 30, 2024, Niccol told Fortune Magazine, "portions have not gotten smaller." (*Id.* ¶ 58). On June 28, 2024, Schalow denied that the Company had changed the size of its portions. (*Id.* ¶ 59). Finally, on July 4, 2024, Schalow told Fox Business, "[t]here have been no changes in our portion sizes." (*Id.* ¶ 60).

Plaintiff alleges that Niccol and Schalow's statements denying a reduction in the size of the Company's portions were misleading because (a) beginning in 2022, Chipotle leadership pressured store managers to meet the Company's Critical Inventory targets; (b) Chipotle leadership suggested to store managers that they could reduce portion sizes to meet their Critical Inventory targets; and (c) at the time Niccol and Schalow denied that the Company had reduced the size of its portions, the Company had begun investigating social media criticism of the Company's portion sizes. *See* (*id.* ¶ 61).

Plaintiff relies on statements that Niccol made during the Company's earnings call for the second quarter of 2024 to support the claim that the Company misled investors by failing to disclose an internal investigation. *See* (*id.* ¶¶ 24, 61). In relevant part, Niccol told investors that, in response to criticism on social media, the Company had "leaned in and reemphasized generous portions across all of our restaurants" and was "committed to making this investment to reinforce that Chipotle stands for a generous amount of delicious, fresh food at fair prices for every customer visit." (*Id.* ¶ 24). Niccol also said that the Company "wanted to make sure we're executing consistently across the system." (*Id.*). Niccol told investors that the Company was focused on ensuring "correct and generous portions" at "outlier restaurants" and expected this "investment" would contribute to an increase in the Company's sales costs. *See* (*id.*).

**G. Investor Losses**

Plaintiff alleges Defendants' fraud was gradually revealed to the market through a series of news articles and analyst reports published between June 27, 2024, and July 24, 2024. *See* (*id.* ¶¶ 62–74, 80–81). In large part, Plaintiff relies on a June 27, 2024, analyst report published by Wells Fargo and a series of articles published in response to that report. *See* (*id.* ¶¶ 62–65). The Wells Fargo report analyzed portion variation between 75 burrito bowls ordered at eight New York City store locations. *See* (*id.* ¶ 62). The report stated that, "[a]t the median in-store orders and digital orders were very similar" but "consistency varied widely" between locations. (*Id.*). Based on Wells Fargo's sample, "some locations serv[ed] bowls that weigh[ed] ~33% more than other locations (on equivalent orders),"

with "the heaviest digital/in-store bowls weighing 87%/47% more vs the lightest." (*Id.*). The Company's stock price saw a 5.4% day-over-day decline from $65.86 per share on June 26, 2024, to $62.41 per share on June 27, 2024. *See* (*id.* ¶ 63). Over the next month, the Company's stock price saw a further decline from $62.41 per share on June 27, 2024, to $52.55 per share on July 23, 2024. *See* (*id.* ¶ 70).

Plaintiff alleges that the Company made two corrective disclosures, which revealed the fraud to the market. First, Plaintiff relies on Niccol's statements during the Company's earnings call for the second quarter of 2024. *See* (*id.* ¶ 24). As noted, during the earnings call, Niccol told investors that the Company had "reemphasized generous portions across all of our restaurants," "wanted to make sure [it was] executing consistently across the system," and expected its cost of sales to increase due in part to its "investment . . . to ensure correct and generous portions." (*Id.*). Second, Plaintiff relies on the Company's financial disclosures for the third quarter of 2024. *See* (*id.* ¶ 27). In its third quarter earnings press release, the Company announced that its cost of sales had increased by 90 basis points and partially attributed that increase to the Company's focus on "ensuring consistent and generous portions." (*Id.* ¶ 27). Then, during the Company's earnings call for the quarter, the Company's then-CFO, Adam Rymer, attributed part of the increase in the Company's cost of sales and decrease in profit margins to "the investment that we made in portion." (*Id.* ¶ 81). Rymer also told investors that the Company may need to increase prices by 2% to 3% to offset the Company's increased cost of sales. *See* (*id.*).

## II. PROCEDURAL BACKGROUND

Plaintiff Michael Stradford filed this lawsuit in November 2024. In February 2025, the Court appointed Lisa Tsai as Lead Plaintiff. *See* (ECF No. 41); *see also* 15 U.S.C. § 78u-4(a)(3)(B)(i) (courts must appoint as lead plaintiff the member of the purported class most capable of adequately representing the interests of class members). Tsai filed a First Amended Complaint on April 29, 2025. *See* (ECF No. 49 ("FAC")). Defendants moved to dismiss, (ECF No. 55), and the Court dismissed the FAC on December 18, 2025, (ECF No. 67 ("*Stradford I*")). The Court held that the FAC had not adequately alleged that

Defendants made false or materially misleading statements by warning investors about reputational risk from social media or denying that the Company had reduced the size of its portions. *See* (*Stradford I* at 19–20). The Court also held that the FAC had not adequately alleged that Defendants warned about reputational risk from social media or denied that the Company had reduced the size of its portions with the intent to deceive investors or with deliberate indifference to the risk of misleading investors. *See* (*id.* at 20–29).

Plaintiff filed the SAC on January 20, 2026. The SAC asserts two claims: (1) a claim alleging violations of § 10(b) of the Exchange Act and SEC Rule 10b-5, promulgated thereunder; and (2) a claim alleging a violation of § 20(a) of the Exchange Act for control person liability. *See* (SAC ¶¶ 132–45). Defendants filed the instant Motion to Dismiss on March 3, 2026. On the same day, Defendants also filed a Request for Judicial Notice. *See* (ECF No. 73 ("RJN")). Plaintiff filed an opposition brief on March 31, 2026, *see* (ECF No. 72 ("Opposition")), and Defendants filed a reply brief on April 28, 2026, *see* (ECF No. 78 ("Reply")).

## III. LEGAL STANDARD

To state a claim for securities fraud, plaintiffs must satisfy three requirements. *Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681, 690–91 (9th Cir. 2011). First, consistent with Rule 8(a)(2), a plaintiff must provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), alleging "enough facts to state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In ruling on such a motion, the court must "accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). However, the court is "not required to accept as true allegations that contradict exhibits attached to the Complaint," allegations that contradict "matters properly subject to judicial notice, or allegations that are merely

conclusory, unwarranted deductions of fact, or unreasonable inferences." *Seven Arts Filmed Ent., Ltd. v. Content Media Corp. PLC*, 733 F.3d 1251, 1254 (9th Cir. 2013) (internal quotation marks omitted).

Second, a plaintiff must satisfy the heightened pleading standard of Federal Rule of Civil Procedure 9(b), requiring that fraud claims "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To meet this standard, a plaintiff must identify "the time, place, and content of [the] alleged misrepresentation[s]," as well as the "circumstances indicating falseness" or "the manner in which the representations at issue were false and misleading." *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1547–48 (9th Cir. 1994) (internal quotation marks and alterations omitted); *see also Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010) ("Rule 9(b) requires a party to state with particularity the circumstances constituting fraud or mistake, including the who, what, when, where, and how of the misconduct charged." (internal quotation marks omitted)). Those allegations "must be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007). Although the circumstances of the alleged fraud must be alleged with specificity, knowledge "may be alleged generally." Fed. R. Civ. P. 9(b).

Finally, a plaintiff must satisfy the additional requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), which "require that a complaint plead with particularity both falsity and scienter." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009) (internal quotation marks omitted). Under the PSLRA, a complaint must (1) "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," and (2) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(1)–(2).

**IV. REQUEST FOR JUDICIAL NOTICE**

Generally, at the motion to dismiss stage, courts may not consider any material beyond the pleadings when assessing the sufficiency of a complaint under Federal Rule of Civil Procedure 12(b)(6). *See Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) ("[R]eview is limited to the complaint." (citation omitted)). If a court considers such extrinsic evidence, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). However, under the doctrines of incorporation-by-reference and judicial notice, courts may consider the contents of certain extrinsic documents "without converting the motion to dismiss into a motion for summary judgment." *Lee*, 250 F.3d at 688.

Defendants request that the Court take judicial notice of 29 exhibits. *See* (RJN at 2–5). Among other exhibits, Defendants request that the Court take judicial notice of (1) the Company's Form 10-K for fiscal year 2023; (2) the Company's Form 10-Q for the first quarter of fiscal year 2024; and (3) the transcript for the Company's earnings call for the second quarter of fiscal year 2024. *See* (*id.* at 2, 4); *see also* (ECF No. 72-4, Ex. 2 ("FY23 10-K"); ECF No. 72-5, Ex. 3 ("1Q24 10-Q"); ECF No. 72-19, Ex. 17 ("2Q24 Earnings Transcript")). The Company's securities filings are properly subject to judicial notice. *See Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008). The 2Q24 Earnings Transcript is incorporated by reference into the SAC, as Plaintiff refers extensively to Niccol's statements on the Company's earnings call and relies on those statements to allege falsity. *See, e.g.*, (SAC ¶¶ 61(d), 71, 75–78, 91, 103); *see also Alghazwi v. Beauty Health Co.*, 801 F. Supp. 3d 982, 999 (C.D. Cal. 2025). Therefore, the Request for Judicial Notice is GRANTED as to the Company's FY23 10-K, 1Q24 10-Q, and 2Q24 Earnings Transcript. It is unnecessary for the Court to take judicial notice of the other requested documents to resolve this Motion. Therefore, the Request for Judicial Notice is otherwise DENIED as moot.

## V. DISCUSSION

Plaintiff alleges securities fraud on two theories. First, Plaintiff alleges that Defendants committed securities fraud by making false or misleading statements about the risk of reputational harm from social media and denying that the Company had reduced the size of its portions. *See* (Opp. at 15–20); *see also* 17 C.F.R. § 240.10b-5(b) (liability for misstatements under Rule 10b-5). Second, Plaintiff argues that Defendants committed a scheme to defraud because certain "mid-level" managers implicitly or indirectly instructed employees to reduce the size of customer portions. *See* (*id.* at 26); *see also* 17 C.F.R. § 240.10b-5(a), (c) (liability for scheme to defraud or acts which would operate as a fraud or deceit under Rule 10b-5). As discussed below, neither theory states a claim.

### A. False or Misleading Statements

Under Rule 10b-5(b), a defendant who makes any untrue statement of a material fact or omits to state a material fact necessary to make the statements made not misleading commits securities fraud. *See* 17 C.F.R. § 240.10b-5(b). To state a claim, a plaintiff must allege "(1) a material misrepresentation or omission ('falsity'), (2) made with scienter, (3) in connection with the purchase or sale of a security, (4) reliance on the misrepresentation or omission, (5) economic loss, and (6) loss causation." *In re Genius Brands Int'l, Inc. Sec. Litig.*, 97 F.4th 1171, 1180 (9th Cir. 2024). Plaintiff claims that Defendants committed securities fraud based on (1) the Company's social media risk disclosure for the first quarter of 2024; and (2) certain statements denying that the Company had changed the size of its portions. As discussed below, neither theory plausibly alleges that any Defendant made a false or materially misleading statement.

#### 1. <u>Social Media Risk Disclosure</u>

The Company filed its Form 10-K for fiscal year 2023 on February 7, 2024. *See* (FY23 10-K at 73). In its filing, the Company warned investors: "Our inability or failure to recognize, respond to and effectively manage the immediacy of social media could have a material adverse impact on our business." (*Id.* at 12). The Company explained that "[u]se of social media by our employees, guests and associates could lead to litigation or result in

negative publicity that could damage our reputation." (*Id.*). The Company filed its Form 10-Q for the first quarter of 2024 on April 25, 2024. *See* (1Q24 10-Q at 34). The Company's quarterly filing stated that "[t]here have been no material changes from the risk factors previously disclosed in our Annual Report on Form 10-K for the year ended December 31, 2023." (*Id.* at 32).

Plaintiff argues that the risk disclosure in the Company's Form 10-Q was false or materially misleading because, at the time the Company filed its Form 10-Q, it "had already concluded that the increasing number of social media allegations of skimping had negatively impacted the Company's business through increased negative customer sentiment." (SAC ¶ 19). Defendants argue that the Company's social media risk disclosure was not false or materially misleading for two reasons. First, Defendants argue that other language in the social media risk disclosure "affirmatively acknowledged existing criticism" and, as a result, "no reasonable investor could have been misled by the [Company's] generalized observations about social media." (Motion at 23 (internal quotation marks and alterations omitted)). Second, Defendants argues that the social media risk disclosure would not mislead a reasonable investor because posts criticizing the Company's portion sizes had already gained "public notoriety" by April 2024. *See* (*id.*).

In response, Plaintiff argues that "[r]isk disclosures can be misleading to investors when they speak to unrealized risks and do not alert investors that the risk may have already materialized." (Opp. at 19). Plaintiff argues that, at the time of the Company's filing, the Company had "internally acknowledged the rising level of risk" from criticism on social media. (*Id.*). In support, Plaintiff relies on an allegation that the Company was initially slow to respond to criticism about its portions but, in late 2023, began to "acknowledge the growing number of complaints" and "investigate portion size concerns." (SAC ¶ 114).

The Court agrees that Plaintiff has not alleged facts to plausibly suggest that the Company's risk disclosure was false. To show falsity, a plaintiff must "demonstrate that a particular statement, when read in light of all the information then available to the market . . . conveyed a false or misleading impression." *In re Oracle Corp. Sec. Litig.*, 627 F.3d

376, 390 (9th Cir. 2010). Thus, a statement is only materially misleading "if there is a high likelihood that the statement would significantly alter the 'total mix' of information" available to investors. *HRSA-ILA Funds v. adidas AG*, No. 24-6655, 2025 WL 3471703, at *2 (9th Cir. Dec. 3, 2025) (internal quotation marks and alterations omitted); *see also Sneed v. Talphera, Inc.*, 147 F.4th 1123, 1131 (9th Cir. 2025) ("[C]ourts sometimes look at falsity through the lens of a 'total mix' of information that forms part of the materiality analysis.").

As alleged, the Company experienced sustained social media criticism by April 2024. Thousands of customers complained about the Company's portion sizes on social media in 2023. *See* (SAC ¶ 41). In October 2023, a content creator posted a TikTok video that "received millions of views, hundreds of thousands of likes, and thousands of comments from customers." (*Id.* ¶ 42). In December 2023, "the New York Post published an article about the growing criticism of the Company on social media." (*Id.* ¶ 43). This criticism was public and well documented. Therefore, this case is distinguishable from cases in which courts have found risk disclosures to be materially misleading. *See, e.g.*, *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 948 (9th Cir. 2023) (disclosure stating that failures to prevent security breaches "could" result in the loss or misuse of data was false or materially misleading because company was aware of large scale data breach); *see also adidas*, 2025 WL 3471703, at *2 (the risk disclosure in *Facebook* was misleading because the company "concealed" a historical data breach). Plaintiff has not plausibly alleged that a reasonable investor would be misled by the Company's first quarter 2024 risk disclosure.

2. <u>Changes to Portion Size</u>

Plaintiff also alleges that Niccol and Schalow's statements denying that the Company had reduced the size of its portions were false or materially misleading. *See* (SAC ¶ 18). Plaintiff argues that, at the time Niccol and Schalow made these denials, the Company had secretly launched an internal investigation to determine whether social media criticism of the Company's portion sizes was accurate. *See* (SAC ¶ 61); *see also* (Opp. at 8–9, 15–18). In support, Plaintiff relies on (1) confidential witness statements

from the Company's former Manager of Customer Incidents; and (2) Niccol's statements during the Company's second quarter earnings call for fiscal year 2024. *See* (*id.*).

According to the SAC, as part of his or her normal job responsibilities, Confidential Source 2 "led a team of ten specialists that focused on customer complaints," regularly provided Schalow and her team with "excel spreadsheets of customer complaints" and "updates on customer complaints," and helped the Company "respond to various PR and customer-relations situations." (SAC ¶ 112). Confidential Source 2 claims that the Company "experienced an uptick in complaints about portion sizes in 2021 and 2022" but "the Company's executives did not seem to care about them until late 2023." (*Id.* ¶ 114). "In late 2023, Schalow and her team began focusing on the issues concerning portion size" and "privately worked to investigate portion size concerns." (*Id.*).

Confidential Source 2 left the Company in March 2024. *See* (*id.*). Between May 2024 and July 2024, Niccol and Schalow repeatedly denied that the Company had "changed its portion sizes." *See, e.g.*, (*id.* ¶¶ 55–60). On July 24, 2024, during the Company's second quarter earnings call, Niccol addressed the social media posts criticizing the Company's portions. *See* (*id.* ¶ 24). Niccol began by saying that there was never "a directive to provide less to our customers." (*Id.*). However, he acknowledged that customer feedback had caused the Company to "relook at our execution" to "make sure we're executing consistently." (*Id.*). Niccol said that the Company would "invest" to make sure certain "outlier restaurants" served customers with "correct and generous portions." (*Id.*). Later in the call, an analyst asked Niccol about the Company's "message" to consumers. (2Q24 Earnings Transcript at 17). In response, Niccol said that the Company "looked across the system" when it "got the feedback on the portion sizes" and found that approximately 10% of restaurants were "outliers that needed to be retrained." (*Id.*).

Defendants presents two arguments for why these allegations do not show that Niccol and Schalow's statements denying a reduction in portion sizes were false or materially misleading. First, Defendants argue that Plaintiff has not pleaded fraud with

particularity because the SAC fails to allege sufficient information about the Company's "investigation" into customer feedback. *See* (Motion at 18); *see also* (Reply at 10–12). Second, Defendants argue that their denials were not misleading because the Company denied that it had changed the size of customer portions, not that its orders were consistent across restaurants. *See* (Motion at 19); *see also* (Reply at 8).

In the Opposition, Plaintiff argues that Niccol and Schalow's repeated denials were materially misleading because, at the same time that the Company denied it had reduced its portions, the Company was "internally investigating the veracity of the public accusations themselves." (Opp. at 16). Plaintiff argues that the SAC sufficiently alleges the existence of an internal investigation based on allegations attributed to Confidential Source 2. *See* (*id.* at 17). Plaintiff further argues that the allegations attributed to Confidential Source 2 are sufficient to show that, at the time Schalow and Niccol denied reducing the size of the Company's portions, both Defendants knew that the Company was investigating complaints that the Company was "skimping" on portions. *See* (*id.*). Plaintiff also claims that Niccol and Schalow's failure to disclose the internal investigation, while denying that the Company had reduced the size of its portions, was a material omission because Niccol and Schalow denied reducing the size of customer portions in response to "analysts and investors' questions . . . about whether the public allegations had merit." (*Id.* at 18). In support, Plaintiff relies on news coverage of Niccol and Schalow's denials, including an article from "Bro Bible" titled "Chipotle is Completely Lying About Consistent Portion Sizes." (*Id.*).

The Court agrees that Plaintiff has not plausibly alleged facts to show that the Company was "internally investigating the veracity" of public allegations that the Company reduced the size of customer portions at the same time that Niccol and Schalow denied that the Company had done so. In support, Plaintiff primarily relies on allegations attributed to Confidential Source 2. *See* (*id.* at 16–17).[1] However, the allegations attributed

[1] Plaintiff also claims that, on the Company's second quarter earnings call, Niccol "disclos[ed] that Chipotle commenced the internal investigation as soon as they got

to Confidential Source 2 do not show that the Company had launched an internal investigation into whether it had reduced the size of its portions.

Confidential Source 2's description of the Company's response to social media criticism largely tracks his or her standard job duties. On a day-to-day basis, Confidential Source 2 "led a team" of employees "focused on customer complaints" and helped the Company respond to "various PR and customer-relations situations." (SAC ¶ 112). At some point in late 2023 or early 2024, Schalow's team contacted Confidential Source 2's team "for help in addressing the portion size debacle." (*Id.* ¶ 114). Plaintiff does not explain how this outreach differed in scope from Confidential Source 2's normal work responding to "customer-relations situations." *See* (*id.* ¶¶ 112, 114). Plaintiff also alleges that, in reaching out to Confidential Source 2, Schalow's team "privately worked to investigate portion size concerns." (*Id.* ¶ 114). However, Plaintiff does not allege any information about who was involved in this purported "investigation" or what the Company did to "investigate portion size concerns." (*Id.*). Therefore, Plaintiff has not alleged facts with sufficient particularity to show that Niccol and Schalow failed to disclose an internal investigation into the size of the Company's portions at the same time that they denied the Company had reduced the size of its portions.

Further, even if Plaintiff alleged sufficient facts to show that the Company was "investigating" complaints into the size of its portions, Plaintiff has not shown that Niccol and Schalow's failure to disclose the "investigation" was an actionable omission. The securities laws "do not impose a duty to disclose all material information." *Sneed*, 147

---

feedback on the portion sizes." (*Id.* at 15). In support, Plaintiff cites to Niccol's statement during the Company's second quarter earnings call that "part of the reason why we went and looked across the system was when we got the feedback on the portion sizes . . . we wanted to make sure we're executing consistently across the system." (SAC ¶ 72). However, contrary to Plaintiff's framing, this statement does not address an investigation into the "veracity" of social media criticism about the Company's portions and Niccol did not say when the Company "looked across the system" to "make sure [it was] executing consistently." *See* (*id.*). At most, Niccol said that someone at the Company, at some point in time, looked at variation between restaurant locations in response to customer feedback.

F.4th at 1131. "Disclosure is required only when necessary to make statements made, in the light of the circumstances under which they were made, not misleading." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1009 (9th Cir. 2018) (internal quotation marks and ellipses omitted). "An omission of information can mislead by affirmatively giving a reasonable investor an impression of a state of affairs that differs in a material way from the one that actually exists." *Sneed*, 147 F.4th at 1131 (internal quotation marks omitted).

From October 2023 through July 2024, the Company faced repeated accusations that it had reduced the size of its portions. *See* (SAC ¶¶ 41–52). In response, Niccol and Schalow repeatedly denied changing the Company's portions. *See, e.g.*, (*id.* ¶¶ 55–60). For example, on May 29, 2024, CNBC-host Jim Cramer asked Niccol, "You haven't shrunk – you've not shrunk the portions?" (*Id.* ¶ 56). Niccol confirmed, "No. No. We never have." (*Id.*). On the same day, Schalow told ABC News and the Washington Post, "There have been no changes in our portion sizes." (*Id.* ¶ 57). During this period, some customers and analysts also noted inconsistencies in the Company's portions. For example, in March 2024, a YouTube video claimed, based on orders from three different store locations in Pennsylvania and Ohio over a 30-day period, that portions for online orders were consistently smaller than portions for in person orders. *See* (*id.* ¶ 44). Similarly, on June 27, 2024, Wells Fargo reported that its analysts had ordered 75 similar burrito bowls from the Company across eight New York City store locations and found that portion sizes varied significantly. *See* (*id.* ¶ 50). However, Plaintiff has not alleged that Niccol and Schalow were ever asked whether the Company's portions varied across store locations, let alone that they denied inconsistencies between locations.

In the challenged statements, Niccol and Schalow only addressed accusations that the Company changed the size of its portions. *See* (SAC ¶¶ 41–52). However, the SAC does not plausibly allege that the Company reduced the size of its portions between 2021 and 2024.[2] In denying that the Company reduced the size of its portions, Niccol and

---

[2] It is not clear whether Plaintiff seeks to show falsity based on a reduction in the size of the Company's portions. The SAC alleges that, between 2022 and the beginning of the

Schalow did not "affirmatively create an impression" that the Company had perfect consistency across stores. *See Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1061 (9th Cir. 2014) ("Rule 10b-5 prohibits only misleading and untrue statements, not statements that are incomplete." (internal quotation marks omitted)). A reasonable investor also would not interpret Niccol and Schalow's "abject denial" that the Company reduced the sizes of its portions to imply the Company was taking no action in response to social media criticism. *See* (Opp. at 15). Because Plaintiff has not plausibly alleged Defendants made a false or materially misleading statement, the Motion is GRANTED insofar as Plaintiff seeks to recover under Rule 10b-5(b).

**B. Scheme Liability**

Plaintiff also seeks to recover under a theory of scheme liability. *See* (Opp. at 26); *see also* (SAC ¶ 133). Under SEC Rule 10b-5(a) and (c), a defendant who uses a "device, scheme, or artifice to defraud" or engages in "any act, practice, or course of business which operates or would operate as a fraud or deceit" may be held liable for securities fraud. 17 C.F.R. § 240.10b-5(a), (c). Claims under Rule 10b-5(a) and (c) "cannot be premised on the alleged misrepresentations or omissions that form the basis of a Rule 10b-5(b) claim." *WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1057 (9th Cir. 2011), *abrogated on other grounds by Lorenzo v. Sec. & Exch. Comm'n*, 587 U.S. 71 (2019). To state a claim for scheme liability, a plaintiff must allege: "(1) the defendant

---

Class Period, "executives and upper management" attempted to cut costs by "closely monitoring and enforcing inventory targets" and "Chipotle leadership suggested to store managers that they could reduce portion sizes if they struggled to meet inventory targets." (SAC ¶¶ 61(e), (f)). However, in her Opposition, Plaintiff claims that Defendants "mischaracteriz[ed]" her argument for why the portion size statements were false in arguing that Plaintiff had not plausibly alleged that the Company instructed stores to reduce portions. *See* (Opp. at 18). Regardless, Plaintiff has not alleged sufficient facts to show that the Company systematically reduced the size of its portions across store locations, instead relying primarily on anecdotal information from low-level employees at a subset of store locations. *See, e.g.*, (SAC ¶¶ 108–14, 120–24); *see also* (*Stradford I* at 17 (rejecting similar allegations from the same Confidential Sources as insufficient to "show that the Company systematically reduced portion sizes")).

committed a deceptive or manipulative act in furtherance of the alleged scheme; (2) scienter; (3) a connection between the alleged deceptive or manipulative act and the purchase or sale of a security; (4) reliance upon the alleged deceptive or manipulative act; (5) economic loss; and (6) loss causation." *In re Aqua Metals, Inc. Sec. Litig.*, No. 17-CV-07142-HSG, 2019 WL 3817849, at *8 (N.D. Cal. Aug. 14, 2019).

Plaintiff claims that the SAC sufficiently alleges a "course of conduct that artificially inflated the price of Chipotle's stock," (SAC ¶ 17), separate from the challenged statements, based on allegations that stores received "implicit or indirect instructions from mid-level corporate management to skimp" on customer portions, *see* (Opp. at 26). In support, Plaintiff relies on three paragraphs of the SAC. *See* (Opp. at 26). According to Confidential Source 1, a Regional Training Manager for the Company, pressure to meet the Company's Critical Inventory metric led some employees to reduce customer portions. *See* (SAC ¶ 111). According to Confidential Source 2, the Company's Manager of Customer Incidents, the Company's culture was "more lax about portions" before Niccol became CEO. *See* (*id.* ¶ 113).[3] Confidential Source 3, who worked as a General Manager for a single store location, told Plaintiff that he recalled other General Managers feeling "significant pressure" to meet the Company's Critical Inventory metrics. *See* (*id.* ¶ 117).

These allegations are insufficient to allege scheme liability. First, scheme liability requires plaintiffs to show that "*the defendant* committed a deceptive or manipulative act." *Aqua Metals*, 2019 WL 3817849, at *8. However, Plaintiff has not identified what any Defendant did that was deceptive or manipulative. Instead, Plaintiff relies on "implicit" and "indirect" instructions from "mid-level" management. (Opp. at 26). Plaintiff does not identify any Defendant's alleged role in the "scheme." *See In re Galena Biopharma, Inc.*

---

[3] Plaintiff's Opposition cites to paragraph 112 of the SAC. *See* (Opp. at 26). However, paragraph 112 only addresses Confidential Source 2's job description and responsibilities, without addressing the Company's portion sizes. *See* (SAC ¶ 112). The Court therefore infers Plaintiff erred in citing to paragraph 112 and intended, instead, to cite to paragraph 113, which addresses a "shift in culture following Niccol being named CEO." *See* (*id.* ¶ 113).

*Sec. Litig.*, 117 F. Supp. 3d 1145, 1192 (D. Or. 2015) ("[E]ach defendant must be primarily liable under the securities laws and engage in his or her own deceptive conduct."). Second, scheme liability requires plaintiffs to show that, in committing a deceptive or manipulative act, a defendant acted with scienter. *See Aqua Metals*, 2019 WL 3817849, at *8. However, Plaintiff has not plausibly alleged that any Defendant was aware that "mid-level" management implicitly or indirectly instructed employees that they could reduce customer portions to meet the Critical Inventory metric. *See* (SAC ¶¶ 111, 113, 117).

Therefore, Plaintiff has not plausibly alleged a claim for scheme liability and the Motion is GRANTED insofar as Plaintiff seeks to recover under Rule 10b-5(a) or (c). Because Plaintiff has not plausibly alleged a primary violation of Section 10(b), the Motion is also GRANTED as to Plaintiff's claim for control person liability under Section 20(a). *See Zucco Partners*, 552 F.3d at 990 ("Section 20(a) claims may be dismissed summarily . . . if a plaintiff fails to adequately plead a primary violation of section 10(b).").

**C. Leave to Amend**

Plaintiff has requested leave to amend. Generally, "in dismissals for failure to state a claim, a district court should grant leave to amend." *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 247 (9th Cir. 1990). Nevertheless, a district court may, in its discretion, deny leave to amend when amendment would be futile. *See Zucco*, 552 F.3d at 1007. Amendment is considered futile where "allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Telesaurus VPC, LLC v. Power*, 623 F.3d 998, 1003 (9th Cir. 2010).

In the FAC, Plaintiff relied on many of the same allegations as in the SAC. There, as here, Plaintiff challenged statements from Defendants denying that the Company had changed the size of its portions and statements concerning the risks that the Company faced from social media. *See* (FAC ¶ 15). In the FAC, Plaintiff claimed that statements denying that the Company had reduced the size of its portions were false or materially misleading because (1) the Company required restaurants to maintain an unrealistic Critical Inventory variance target; (2) certain employees reduced meal portion sizes to meet this target; (3)

the Company faced increasing customer complaints about its portions between 2022 and 2024; and (4) the Company ultimately responded by privately instructing stores to increase their portion sizes. *See, e.g.*, (*id.* ¶¶ 33–41, 98–114). Plaintiff argued that the Company's social media risk disclosures were false or materially misleading because, at the time the Company warned social media could result in negative publicity in its risk disclosure, the Company was "already facing significant negative publicity due to the social media campaigns launched in protest to the Company's shrinking portion sizes." (*Id.* ¶ 49).

The Court rejected both theories of falsity. *See* (*Stradford I* at 15–20). The Court explained that the FAC failed to plausibly allege that Niccol and Schalow made a false or misleading statement by denying that the Company had reduced the size of its portions. *See* (*id.* at 17). It explained that that the FAC claimed that these statements were false or materially misleading because the Company pressured stores to adhere to the Critical Inventory metric, which resulted in some stores reducing portions sizes, but the FAC's allegations as to the Critical Inventory metric did not comply with Rule 9(b). *See* (*id.*). The Court also rejected Plaintiff's argument that the portion size statements were false because the Company increased portions after an "internal investigation" into claims that the Company's "portion sizes were shrinking and inconsistent." (*Id.* at 18). The Court explained that the FAC failed to "identify when the Company carried out the 'internal investigation' into its portion sizes, who was involved, and what the results were; who in 'senior management' told employees to increase portion sizes and what they said; when 'Schalow's team' 'worked to address portion size concerns' and what this entailed; or what 'headquarters' said 'regarding portions.'" (*Id.* (citing FAC ¶¶ 41, 59(e), 104, 114)).

Separately, in assessing Plaintiff's challenge to the Company's social media risk disclosure, the Court held that Plaintiff had not shown that the risk disclosure changed the "total mix" of information available to investors. *See* (*id.* at 20). The Court noted that the FAC alleged that "[t]housands of customers took to social media" to complain about the Company's portions; a "TikTok [video] complaining of the Company's shrinking portion sizes" "received millions of views" on social media; and the New York Post "published an

article about the growing criticism of the Company on social media." (*Id.* (citing FAC ¶¶ 36–38)). Based on the public and widespread nature of the backlash on social media, as well as news coverage of the social media criticism, the Court held that "Plaintiff ha[d] failed to allege facts to show that, when considered in context, the Company's social media risk disclosure would mislead a reasonable investor." (*Id.* (internal alterations and quotation marks omitted)).

In the SAC, Plaintiff changed her theory of falsity for the portion size statements. She now alleges that the portion size statements are false or materially misleading because Defendants' statements denying a change to the size of the Company's portions triggered a duty to disclose the existence of an internal investigation into social media criticism. *See, e.g.*, (SAC ¶¶ 16, 20, 61(a)–(d)); *see also* (Opp. at 15–19). However, notwithstanding the Court's previous holding that the FAC failed to allege sufficient facts about the purported investigation to prove falsity, Plaintiff largely repeated the same allegations in the SAC, with minimal additions. *Compare* (FAC ¶¶ 102–04) *with* (SAC ¶¶ 112–14). In her Opposition, Plaintiff also fails to address how the SAC cured the deficiencies that the Court identified in her allegations as to the "internal investigation." *See* (Opp. at 15–19). Moreover, even if Plaintiff plausibly alleged the existence of an internal investigation into customer complaints, Plaintiff has not plausibly alleged that the Company's failure to disclose the existence of this investigation was materially misleading based on the Company's affirmative denial of a change to customer portions. Finally, the Court already rejected Plaintiff's theory for why the Company's social media risk disclosure was false or materially misleading, and Plaintiff has not addressed the deficiencies that the Court identified in dismissing the FAC. *See* (*Stradford I* at 19–20); *see also* (Opp. at 19–20).[4]

---

[4] Plaintiff's scheme liability claim also relies on the premise that, by enforcing compliance with the Critical Inventory targets, the Company systematically reduced customer portions. *See* (Opp. at 26). In dismissing the FAC, the Court previously held that Plaintiff had not plausibly alleged facts to support this theory. Among other deficiencies, the Court noted that Plaintiff had not plausibly alleged that Defendants were "aware employees were reducing the size of the Company's portions" in order to meet the Critical Inventory metric.

Because the SAC suffers from the same deficiencies identified in the FAC, the Court concludes that amendment would be futile. *See Zucco*, 552 F.3d at 1007 (failure to cure deficiencies identified in an order dismissing the complaint is "a strong indication that [plaintiffs] have no additional facts to plead"). The Court therefore denies leave to amend.

## VI. CONCLUSION

For the foregoing reasons, Court GRANTS the Motion and DISMISSES the SAC with prejudice.

**IT IS SO ORDERED.**

DATED: August 17, 2026

HON. SHERILYN PEACE GARNETT
UNITED STATES DISTRICT JUDGE

---

*See* (*Stradford I* at 22–23). In her Opposition, Plaintiff argues that "mid-level corporate management" implicitly or indirectly instructed employees to reduce customer portions but Plaintiff has not shown that Defendants were aware of these implicit and indirect instructions. *See* (Opp. at 26); *see also* (SAC ¶¶ 108, 111, 113 (allegations from Confidential Sources that some employees reduced portions because of pressure to meet the Critical Inventory target)).